AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**3/30/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ib___ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

3/30/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VAM___ ___ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No.   2:22-mj-01265-DUTY |
| David Joseph Bunevacz, | |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 28, 2018, in the county of Los Angeles in the Central District of California, the

defendant, David Joseph Bunevacz, violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/ S /
*Complainant's signature*

Geoffrey Elliott, Task Force Officer, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     3/30/2022

*Judge's signature*

City and state:   Los Angeles, California       Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander B. Schwab (x1259)

## **AFFIDAVIT**

I, Geoffrey Elliott, being duly sworn, declare and state as follows:

## I.   **INTRODUCTION**

1.      I am a detective with the Los Angeles Sheriff's Department, for which I have worked since October 1994. I am also a Task Force Officer with the Federal Bureau of Investigation, a position I have held since April 2020. I am currently assigned to the Fraud and Cyber Crimes Bureau and work with the Southern California High Tech Crimes Identity Theft Task Force, which is a multi-agency taskforce consisting of local, state, and federal law enforcement members. I investigate matters concerning embezzlements, bank fraud, wire fraud, identity theft, forgery, money laundering, and other illegal financial transactions. During my employment as a detective and TFO, I have participated in several investigations related to identity theft, embezzlement, organized criminal activity, bank fraud, wire fraud, and other financial crimes. I have participated in various aspects of criminal investigations, including bank records analysis, telephone records analysis, electronic surveillance, physical surveillance, execution of search warrants, arrests, and reviewing evidence from digital devices. I have also spoken to many law enforcement agents regarding their experience in investigating financial crimes, and interviewed defendants, confidential informants, and witnesses who had personal knowledge regarding the methods used to commit bank fraud, identity theft, and other financial crimes.

## II.   **PURPOSE OF AFFIDAVIT**

2.      This affidavit is made in support of a criminal complaint and arrest warrant for DAVID JOSEPH BUNEVACZ for wire fraud, in violation of 18 U.S.C. § 1343.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or

investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  STATEMENT OF PROBABLE CAUSE

**A.     Summary of Probable Cause**

4.      My investigation has revealed DAVID BUNEVACZ to be a peripatetic grifter who, for more than a decade, has scammed various investors through a variety of means, including misrepresenting his businesses, forging documents, misappropriating funds, laundering money through accounts in the names of shell companies, and omitting negative personal information, including a felony conviction relating to the sale of securities.

5.      In large part while on probation for committing state securities offenses, DAVID BUNEVACZ solicited funds from investors for his businesses, particularly CB Holding Group Corp. and CaesarBrutus LLC, which he claimed sold vape pens containing cannabis derivatives such as cannabidiol (also known as CBD) and tetrahydrocannabinol (also known as THC).[1] Though BUNEVACZ represented that the investments would be used to pay for necessary business expenses, he misappropriated the vast majority of the funds to pay for his own opulent lifestyle, including a luxurious house in Calabasas, Las Vegas trips, jewelry, designer handbags, a lavish birthday party for his daughter, and horses. Some funds he used to repay earlier investors in a manner consistent with a Ponzi scheme. To perpetrate the fraudulent scheme, BUNEVACZ concealed from investors his criminal conviction; used a falsified version of a settlement agreement to cover up his litigation history; forged bank statements, invoices, and purchase orders to make it falsely appear his companies were engaged in bona fide business activities; created shell companies with names intentionally similar to actual businesses; funneled the proceeds of his crimes through various bank accounts to make them more difficult to trace; and put the name of other individuals, including his stepdaughter, on corporate and financial records to further insulate his crimes from detection.

---

[1] From my review of publicly available information, I know that CBD oil is a cannabis derivative that many believe offers therapeutic benefits, including reduction in symptoms of pain or anxiety.

B.      **Background on Bunevacz**

6.       On the "About David Bunevacz" page of BUNEVACZ's personal blog, he

describes himself as "a former professional athelete [*sic*] turned businessman" who is "married

to a Philippine celebrity manager."[2] BUNEVACZ's blog also touts that, while a student at

UCLA, he "set the school record for javelin throw and was the team captain of the track team"

and "subsequently won the Philippine's [*sic*] first gold medal for decathlon event in the 1997

ASEAN games." BUNEVACZ's blog also links his athletic prowess with his business acumen:

"Using his business knowledge from an Ivy league college [*sic*] and self-discipline acquired

from relentless years as an athlete, David Bunevacz turned into a respected financial consultant,

entrepreneur and distributor of numerous health related products and solutions." Similar

statements concerning BUNEVACZ's athletic feats can be found on a Wikipedia entry for him.

7.       BUNEVACZ and members of his family maintain a public profile. Filipino media

company ABS-CBN has referred to BUNEVACZ and his wife as a "celebrity couple,"[3] and his

wife and daughter appeared on *Making a Model with Yolanda Hadid*, a reality television show.

8.       BUNEVACZ and his wife also have strong ties to the Philippines. As recounted

above, BUNEVACZ's blog celebrates his accolades competing for the Philippines in the

decathlon in the 1997 ASEAN games. According to information provided to me by a point of

contact with the Department of Homeland Security, BUNEVACZ has previously traveled under

a Philippines passport, suggesting that at least at some point he held citizenship in the Philippines

in addition to his U.S. citizenship. The agent's records also indicate that both BUNEVACZ's

wife and stepdaughter were born in the Philippines, and the latter is not yet a U.S. citizen.

BUNEVACZ and his wife previously lived in the Philippines while operating a "high-end beauty

---

[2] "About David Bunevacz," The Personal Blog of David Bunevacz, My Story: My Life, and My Rules, *available at* https://davidbunevacz.wordpress.com/about/ (last accessed Mar. 28, 2022).

[3] "Look: This Celebrity Daughter Is All Grown Up," *ABS-CBN News* (Sept. 16, 2017), *available at* https://news.abs-cbn.com/life/09/16/17/look-this-celebrity-daughter-is-all-grown-up.

clinic" called "Beverly Hills 6750 Cosmetic Surgery and Skin Institute."[4] Press reports allege

that BUNEVACZ and his wife left the Philippines for the United States "amidst allegations they

scammed their business partners of huge amounts of money" in connection with "an elite

cosmetic surgery clinic catering to Manila's high society."[5] According to the report, "[i]nsiders

at the clinic say the couple has an insatiable appetite for the good life, and suspicions from their

business partners grew after several high profile purchases were made known to the public,

including a new BMW X5," which BUNEVACZ gave his wife as an "anniversary gift." After

BUNEVACZ refused to return the allegedly misappropriated funds, his business partners took

"more drastic action" by physically assaulting BUNEVACZ.

       9.     According to Los Angeles Superior Court records that I have reviewed, on August

23, 2016, the Los Angeles County District Attorney's Office filed a nine-count Felony

Complaint against BUNEVACZ charging him with three counts of grand theft, in violation of

California Penal Code § 487(a); three counts of unlawful sale of securities, in violation of

California Corporations Code §§ 25110-25540(a); and three counts of fraudulent and prohibited

securities practices, in violation California Corporations Code §§ 25401-25540(b). On March 22,

2017, BUNEVACZ entered a plea of "no contest" to two counts of unlawful sale of securities

and was sentenced to 360 days of jail, three years of probation, and 300 hours of community

service. It was while he was on probation for his state securities offenses that he committed most

of the crimes alleged in this federal complaint.

       10.    Based on my investigation to date, I know from multiple witnesses that

BUNEVACZ regularly used the email address "Dave@HSKConsultants.com."  He also admitted

under oath during a February 25, 2020, judgment debtor examination that this was his email

address.

---

   [4] Jo-Ann Q. Maglipon, "PEP SCOOP: David Bunevacz and Jessica Rodriguez Booted Out of Beverly Hills 6750," *Philippine Entertainment Portal* (Dec. 13, 2007), *available at* https://www.pep.ph/lifestyle/14733/pep-scoop-david-bunevacz-and-jessica-rodriguez-booted-out-of-beverly-hills-6750.

   [5] Vincent Anthony Garcia, "Scamming Celeb Couple," *Gulf News* (Dec. 23, 2007), *available at* https://gulfnews.com/general/scamming-celeb-couple-1.219108.

C.     **BUNEVACZ Solicits Funds from Investors**

1.     <u>Victim 1</u>

11.     Based on my interview of Victim 1 and his attorney and review of documents and records they voluntarily provided, I know the following:

a.     Victim 1 formally ran a ticket-selling business and first met BUNEVACZ around the time of the 2008 Beijing Summer Olympics. BUNEVACZ explained to Victim 1 that, through a business he operated with his father, he had a large number of tickets to Olympic events. BUNEVACZ offered to sell these tickets to Victim 1 at a markup from their face value, which was low in comparison to their market value, which Victim 1 would then be able to sell at a premium himself, thereby pocketing the difference. Victim 1 successfully purchased a number of these tickets, which he physically received from BUNEVACZ in China and then resold to customers.

b.     In the leadup to the 2010 Vancouver Winter Olympics, BUNEVACZ again offered to sell Olympic tickets to Victim 1 for resale, claiming he could obtain approximately 17,000 such tickets. Given his prior successful dealings with BUNEVACZ, Victim 1 trusted BUNEVACZ's representations without further proof he had secured the promised tickets and eventually reached a formal agreement to purchase the tickets. Per the terms of the investment, Victim 1 generally agreed to pay BUNEVACZ two-thirds up front with the final third to be paid to BUNEVACZ upon delivery of the promised tickets. BUNEVACZ also informed Victim 1 that he would secure the Olympic tickets from suppliers through a combination of Victim 1's money, his own money, and loans, which Victim 1 would be responsible for repaying. BUNEVACZ claimed to have found a financing company based in Hong Kong, "Mocra Ltd.," which BUNEVACZ claimed to have used in the past, that was willing to provide such a loan.

c.     Eventually, as the Vancouver Olympics approached, Victim 1 grew concerned that he had yet to receive the tickets. BUNEVACZ responded that Mocra was holding the tickets as collateral in Hong Kong and refused to release the tickets until its loan had been

5

fully repaid. As Victim 1 later came to learn, Mocra was actually an entity controlled by BUNEVACZ, and BUNEVACZ spent the funds from Victim 1 on cars and gambling at casinos—a theme that would play out with funds provided by later victims of BUNEVACZ.

        d.     In total, Victim 1 paid BUNEVACZ, through the latter's company Pegazus Sports Marketing and Consultants, Inc., nearly $3 million.

        e.     According to Victim 1, BUNEVACZ failed to deliver to him a single ticket to the Vancouver Winter Olympics. The consequences of BUNEVACZ's failure to deliver the promised tickets were devastating for Victim 1: Victim 1 could not meet his business's obligations to purchasers. His business failed, he lost his savings and his house, and he was forced to declare bankruptcy.

        f.     Litigation in Los Angeles Superior Court between BUNEVACZ and Victim 1 eventually culminated in a "Settlement Agreement and Mutual General Release," which I have reviewed. Per the terms of the agreement, BUNEVACZ agreed to pay Victim 1 $325,000 to resolve the pending civil litigation. Based on my review of the signature page, it appears to me the agreement was signed by BUNEVACZ on August 23, 2014, and by Victim 1 on August 25, 2014. As explained below, BUNEVACZ would later use a counterfeit version of this settlement agreement in his efforts to convince another investor to provide him with funds.

        2.     <u>Victims 2A & 2B</u>

    12.     Based on my interview of Victim 2A[6] and his attorney and review of documents and records they voluntarily provided, I know the following:

        a.     Victim 2A is the President and CEO, as well as one of the founders, of Victim 2B, which is a publicly traded company based in Toronto, Ontario, in Canada. Victim 2A was introduced in roughly the Fall of 2018 to BUNEVACZ by a mutual business associate who was also investing with BUNEVACZ. The mutual business associate had invested in a business venture of BUNEVACZ's called "CB Holding Group Corp.," which was purportedly in the

---

[6] I understand that former counsel for Victim 2A made a referral to the FBI on February 2, 2020, but that a federal investigation was not opened at that time based on resource concerns.

business of supplying vape pens that could deliver cannabis derivatives, including cannabidiol (also known as CBD) and tetrahydrocannabinol (also known as THC).

b.     Victim 2A agreed to meet BUNEVACZ in Lexington, Kentucky, in approximately September or October of 2018 (BUNEVACZ informed Victim 2A he was in Lexington for his daughter's horse competition and to meet with a hemp-to-CBD provider). During the meeting, BUNEVACZ went over the CB Holding's business plan, past performance, and future opportunities. BUNEVACZ also promoted his prior business venture and showed purported audited financial statements showing business revenues of approximately $17 million. According to BUNEVACZ, he had made a profit of approximately $5-6 million upon exit from a prior cannabis startup company.  He also boasted of his relationship with Grenco Science, Inc., where his stepdaughter was purportedly an executive or senior employee. Incorporation records for CB Holding Group Corp. available through the Nevada Secretary of State's website list BUNEVACZ's stepdaughter as the sole officer for the company, holding the positions of president, secretary, treasurer, and director. A Nevada corporation by that name is also registered with the California Secretary of State and lists BUNEVACZ's prior address in Valencia, California, as the "Business Address."

i.     Based on my own research, I am aware that Grenco Science, Inc., is an established player in the cannabis space famous for the "G Pen," a well-known line of e-cigarette vaporizers marketed by rapper Snoop Dogg. Grenco Science, Inc., was incorporated in the State of California in March 2012 and listed an address in Los Angeles. I interviewed its CEO and founder, on January 27, 2022, who informed me that BUNEVACZ had provided Grenco Science a startup loan in 2012 for $200,000 or $300,000, which BUNEVACZ was repaid, with interest. Because BUNEVACZ provided this funding, the CEO gave BUNEVACZ's stepdaughter a job in 2012 or 2013. According to the CEO, she worked for Grenco Science for one or two years at the most, though without any involvement in management decisions. The CEO stated that he later learned that BUNEVACZ had himself borrowed the money he had loaned to Grenco Science by falsely representing he was a part owner of the company and had

certain proprietary manufacturing rights. The CEO also learned BUNEVACZ never repaid the money he had borrowed, as Grenco Science was named in a lawsuit attempting to recoup the borrowed funds.

        ii.      I separately found incorporation records for a "Grenco Science, Inc.," incorporated in the State of Nevada in July 2012 but whose status is listed as "permanently revoked." "David J. BUNEVACZ" is listed as this company's President, Secretary, Treasurer, and Director. Based on my training and experience, knowledge of this investigation, and interview of Grenco Science's CEO, I believe BUNEVACZ created this entity to create the appearance of a business relationship with the actual Grenco Science.

        c.      Victim 2A explained that, before investing, he performed some background research on BUNEVACZ using publicly available information. In doing so, he came across records of the lawsuit Victim 1 had brought against BUNEVACZ concerning the failed delivery of Olympic tickets. When asked about it, BUNEVACZ lied to Victim 2A, telling him that the lawsuit had been settled in his favor. On October 28, 2018, BUNEVACZ, using email account "Dave@HSKConsultants.com," sent Victim 2A a document that he claimed was the settlement agreement he had reached with Victim 1. According to this document, Victim 1 agreed to pay *BUNEVACZ* $325,000.

        i.      From my review of this settlement agreement and the actual settlement agreement reached between BUNEVACZ and Victim 1, it appears to me that the document BUNEVACZ sent Victim 2A is a forgery he created by modifying the real agreement, since it retains much of the original's formatting. Victim 1 and his attorney separately confirmed to me that, while the names on the agreement are theirs, the signatures on the agreement are forgeries. Victim 2A confirmed to me that, had he known this document was a forgery, he would not have invested with BUNEVACZ.

        d.      BUNEVACZ provided Victim 2A with copies of purported invoices reflecting the purchase of raw materials to be used to build vape pens and purchase orders indicating that CB Holding Group had secured sales agreements with reputable companies.

Victim 2A provided me copies of invoices from companies called "Greenfield Organix, Inc," "Claremont Capital Partners," and "Blue Ox Industrial Co., Ltd." and purchase orders from companies called "Saveur Vape" and "Sweeds," all of which BUNEVACZ had provided to Victim 2A.

      i.    I found an actual cannabis businesses called "Greenfield Organix" and "Claremont Capital Partners, LLC" in a search of business entities in the State of California. I contacted Greenfield Organix's CEO, who looped in corporate counsel for the business's parent company. The two of them stated they were not familiar with BUNEVACZ or CB Holding Group. I provided copies of the purported invoices, which corporate counsel informed me he had passed along to the accounting department. The accounting department had confirmed that the invoices were not in the company's system and appeared inauthentic. I also contacted the manager of Claremont Capital Partners, LLC, who similarly informed me that she was unfamiliar with BUNEVACZ or CB Holding Group and that the purported invoices from her company that BUNEVACZ had provided Victim 2A were forgeries.

      ii.    I also found evidence that similarly named entities—"Greenfield Organix, Inc." and "Claremont Capital Partners LLC"—had been incorporated in Nevada in 2018 with an individual's name listed on the incorporation documents. As discussed in further detail below, that individual ("Business Associate 1") subsequently confirmed to me that, at BUNEVACZ's direction, he had opened various businesses in his own name for BUNEVACZ's use.

      iii.    I therefore believe that BUNEVACZ created business entities with names similar to actual cannabis businesses in an effort to trade off the reputations of the real businesses and create a paper trail, particularly with respect to bank records, that gave the false appearance that funds from CB Holding were in connection with legitimate business activities.

      iv.    I also spoke to the owner of Blue Ox Industrial Co., Ltd., who informed me he had met BUNEVACZ through the latter's father and had, over the years, engaged in speculative business discussions with BUNEVACZ that never materialized into

anything concrete. He confirmed the purported invoices from his company that BUNEVACZ provided Victim 2A were forgeries. I found that a similarly named company—"Blue Ox Industrial, Inc."—was registered in the State of Wyoming in 2016 with Business Associate 1 listed as president.

            v.        I spoke to the CEO of SaveurVape Inc., a California business that markets itself as a premium e-liquid manufacturer for vape pens. The CEO stated that he was aware of BUNEVACZ through business associates and knew that BUNEVACZ was looking for investors. The CEO had no reason to doubt BUNEVACZ's bona fides at the time and noted that BUNEVACZ drove big, expensive cars, which gave the outward appearance that he was a successful businessman. The CEO confirmed, however, that SaveurVape had no business dealings with BUNEVACZ or any of his companies and that the purchase orders were fraudulent. As with the other companies, further research revealed the similarly-named "Saveur Vape LLC" had been registered in the State of Nevada in 2016 listing Business Associate 1 as Principal.

            vi.        Finally, one of the purchase orders listed "Sweeds/CBD."[7] I researched that name and discovered "Sweeds LLC," filed as a Limited liability company in the State of Florida in 2018. Public records indicated the registered agent was an individual with initials R.L., with a listed address in Miami the same as that used on the purchase order. I called R.L. at a number ending -7792—a slight deviation from the number on the purchase order, which ended -7299. R.L was very reticent during the phone call, asserting he had no knowledge of the company "Sweeds." R.L claimed he was a web designer and may have created a web page for Sweeds at some point. He then stated he was unable to answer any further questions and hung up. Further attempts to reach R.L. by phone call and text message have proved unsuccessful. I did, however, notice in bank records for "Claremont Capital Partners" (authorized signer: Business Associate 1), "Grenco Science" (authorized signer: BUNEVACZ), and "C and D Labs"

---

[7] Unlike the purchase order from Saveur Vape, which makes clear that payment is owed to CB Holding, the Sweeds purchase order lists Sweeds as the "vendor." I do not know whether this is an error in the generation of a fraudulent purchase order or intentional.

(authorized signer: Business Associate 1) that R.L. received payments totaling over $8,000 from those accounts.

        e.      In early 2019, Victim 2A made multiple trips to California to meet with BUNEVACZ. BUNEVACZ told Victim 2A during these meetings that he needed an additional $1 million to purchase CBD oil to fill vape pens to satisfy a pending purchase order and asked Victim 2A for a $1 million bridge loan to complete the order. BUNEVACZ's stepdaughter also reiterated to Victim 2A the need for the bridge loan. In March 2019, in response to these requests from BUNEVACZ, Victim 2A personally loaned $1 million to CB Holding.

        f.      Victim 2A provided me a copy of a PowerPoint presentation dated April 2019, which he had received by email from BUNEVACZ's stepdaughter on or about April 25, 2019. The presentation outlined investment opportunities with respect to "CB Holdings Group Corp."[8] The presentation characterized "CB Holding Group Corporation" as "an established California and Nevada Cannabis Products company involved in sale of cannabis THC and CBD vaporizers." The presentation also includes the following summary of CB Holdings Group Corp.'s business model:

> CB Holdings retains no physical assets or equipment used in manufacturing, all necessary inputs of production are outsourced. The I.P. resides with the flavor profile that the infuser in the United States has developed specifically for CB Holding Group (CB).
>
> CB Holding maintains a strategic relationship with their partner in China who receives and services all customer orders for disposable vaporizer. The vaporizer factory has been supplying the vape pens to the principals for more than ten years. CB Holding compensates the producer in increments, 50% of the cost is delivered at the order commencement and the remaining 50% delivered upon completion. This process takes about four weeks and the vape pens are air-freighted and shipped in.
>
> After placing the order for the pens, the raw pesticide-free oil is sourced from multiple vendors and paid for in full before pickup. The oil is then delivered to the lab that infuses the flavors into the oil with our proprietary custom process that renders the vape flavoring smooth and discrete. CB pays half the cost at delivery to the infuser and the remaining balance upon completion of the process.
>
> Once the pens arrive from China, the vape pens are filled with our custom-flavored infused THC oil. They are then packaged and ready to be picked up by

---

[8] The PowerPoint deck inconsistently includes and omits the *s*. The aforementioned corporate records and associated bank accounts list the name as "CB Holding Group Corp."

the distributor. The distributor/buyers pay by wire and cash prior to pickup. The whole process takes about 10 weeks.

The "Who We Are" section of the presentation listed biographies for BUNEVACZ and his stepdaughter.

13.     Victim 2A stated that he would not have invested with BUNEVACZ had he known that BUNEVACZ had a criminal history, nor would he have done so if he knew funds would be used to pay for personal expenses, such as gambling and the purchase of a horse.

       3.     <u>Victims 3, 4, and 5</u>

14.     Victims 3 and 4 are dentists and business associates in Southern California who both invested money with BUNEVACZ that was never repaid. I interviewed them separately. Victim 3 had met BUNEVACZ through his dental practice.

       a.     BUNEVACZ frequently bragged about his wealth and talked about buying horses, representing himself as a successful businessman and investor. Victim 3 eventually attended an e-cigarette roadshow and considered investing in an e-cigarette company. Victim 3 spoke with BUNEVACZ about it, and BUNEVACZ recommended against doing so, instead recommending that Victim 3 and Victim 4 invest in CB Holding. BUNEVACZ claimed that his holding company, CB Holding, owned a percentage in various CBD products and that he had storefronts in Hollywood. BUNEVACZ represented that CB Holding was cash rich, ready to go public, prepared to purchase a hemp farm and certified laboratory in Nevada, and already had several investors. These representations convinced Victim 3 to invest $800,000 with BUNEVACZ, and he entered a "senior secured promissory note" on January 31, 2019. The note was signed by BUNEVACZ's stepdaughter, with whom Victim 3 had not previously communicated. BUNEVACZ explained that, while he was the president of CB Holding, BUNEVACZ's stepdaughter was the CEO based on her prior experience in the vape pen industry. Victim 3 made the $800,000 investment through two separate $400,000 wire transfers[9]

_____

[9] The coding in the wire transfer records indicates that the wire transfer was conducted through Fed Wire, which, according to a senior special investigator with the reserve bank of New York, processes domestic wire transfers through either Texas or New Jersey.

made on February 5, 2019, to a Bank of America account in the name CB Holding Group. According to the signature cards for the account, it was opened at the Warner Center branch in Woodland Hills, California.

        b.      Victim 3 subsequently met BUNEVACZ's stepdaughter in person and communicated with her via telephone and text message. She stated that she and BUNEVACZ were in the process of selling horses and cannabis products to repay Victim 3. No repayment was ever made.

        c.      Victim 3's $800,000 investment represents the majority of his savings for the last decade. He stated that he would not have invested had he been aware that the funds would be used to fund BUNEVACZ's personal lifestyle or that BUNEVACZ had a prior criminal history or been the subject of criminal litigation.

       15.      Victim 4 was introduced to BUNEVACZ by Victim 3.

        a.      Victim 4's elderly father had been encountering health issues, and BUNEVACZ had provided Victim 4 with CBD oil products to help address them. BUNEVACZ bragged to Victim 4 that he owned a significant percentage of Papa & Barkley, which is an established Southern California cannabis business that provides products containing THC and CBD. BUNEVACZ also boasted that he owned a home in Calabasas and drove a Lamborghini and other luxury cars.

        b.      BUNEVACZ stated that he was raising money for his cannabis business, CB Holding, which he intended to take public and made Victim 4 believe that he was doing him a favor by allowing him to make an investment which could double or triple in a few years. BUNEVACZ explained that the investment funds would be used to buy labs and expand his business.

        c.      Per the terms of his agreement with BUNEVACZ, Victim 4 invested $400,000, structured as convertible debt, through a wire transfer made to an account in the name CB Holding Group on February 5, 2019. BUNEVACZ provided Victim 4 a "share certificate" for his investment that listed, instead of BUNEVACZ's name, that of his stepdaughter. When

Victim 4 asked the reason for this, BUNEVACZ claimed that he had conflicting businesses that required his stepdaughter's name to be listed. Victim 4 never met BUNEVACZ's stepdaughter and only directly communicated with BUNEVACZ about the $400,000 investment.

  d.  Victim 4 later retained an attorney and discovered that several lawsuits had been filed against BUNEVACZ. Victim 4 explained that, had he known of these lawsuits or the fact that BUNEVACZ had been convicted of a crime, he would not have invested with him. Victim 4 also made clear that he never authorized BUNEVACZ to use his investment for personal expenditures or to pay back previous investors.

  e.  Victim 4 was never repaid the funds he invested with BUNEVACZ. He explained that he had to take out a line of credit on his life insurance policy to make the investment, which represented a majority of his savings, and that the loss has delayed his retirement plans.

  16.  I also interviewed Victim 5, who was introduced to BUNEVACZ by Victim 4.

  a.  Before investing, Victim 5 spoke about eight times on the phone with BUNEVACZ, who told him that he already had cannabis products in the market, that CB Holding Group was about to go public, and that Victim 5's investment would be doubled within a year. Based on these representations, Victim 5 invested $300,000 by providing him a check written out to "DAVID BUNEVACZ" for $300,000, which BUNEVACZ deposited on February 12, 2019. Victim 5 stated that he had never communicated with BUNEVACZ's stepdaughter.

  b.  After Victim 5 invested $300,000, he heard nothing further for about six months. At that point, he asked BUNEVACZ for an update on the initial public offering of his cannabis company. BUNEVACZ told Victim 5 the company was about to go public and that "now" was the time to invest additional funds. Victim 5 declined to do so.

  c.  Victim 5 informed me that he would not have invested money with BUNEVACZ had he been aware of BUNEVACZ's criminal history or civil litigation history, nor would he have invested had he known BUNEVACZ was using investor money to fund his own lifestyle and pay back earlier investors.

d.      To date, Victim 5 has not been repaid any of his investment by BUNEVACZ. According to Victim 5, the investment represented a substantial portion of Victim 5's retirement savings. As a result, he has now had to live a more modest lifestyle, since he had been counting on his savings during retirement.

4.      <u>Victim 6</u>

17.      Based on my interview of Victim 6 and review of records he has provided me, I know the following:

a.      Victim 6 works in commercial real estate and met BUNEVACZ through his ex-father-in-law, who informed Victim 6 that BUNEVACZ was in the medical cannabis industry. Victim 6 recalled that BUNEVACZ drove high-end cars and appeared well put-together. BUNEVACZ told Victim 6 he was involved with Grenco Science, which Victim 6 knew as a reputable vape pen company.

b.      BUNEVACZ told Victim 6 he was starting a medical marijuana grow facility in Huntington Park and owned 21 percent of the facility. BUNEVACZ proposed a deal which allowed Victim 6 to buy ten percent of BUNEVACZ's ownership in the grow operation. Victim 6 actually met BUNEVACZ at the Huntington Park facility on several occasions to discuss the plans and to inspect the warehouse, which was large and needed a lot of work to make it into a grow facility. Victim 6 believed BUNEVACZ's claims, however, that he had the necessary backing and contacts to ensure it could be completed.

c.      According to Victim 6, BUNEVACZ told Victim 6 that he was using the investment money for construction and supplies necessary to get the grow facility operational. Victim 6 stated he would not have invested any money with BUNEVACZ if he had known BUNEVACZ would use the money on personal expenses. Victim 6 also informed me that he would not have invested if he had been aware of any prior criminal or civil litigation involving BUNEVACZ.

d.      Victim 6 provided me with an email sent by BUNEVACZ on February 7, 2017. In it, BUNEVACZ summarized some recent business expenses he had incurred in

connection with the Huntington Park facility and provided, as support for his assertions, invoices from Dolce Construction and bank statements for a Wells Fargo bank account ending -4209 that he held in his personal capacity. For example, he stated that he had "[p]aid Dolce Construction for all engineering and consultancy, and insurance etc 119,792 represented by wire on November 14" and "[p]aid dolce for purchase of materials etc 431,365.00 on December 28, 2016 represented by wire on statement."

        i.      The attached November and December 2016 statements for the account do, in fact, reflect outgoing wire transfers to "Dolce Construction, LLC" on those dates and for the sums represented. The bank statements, however, are fabrications. I have reviewed actual bank statements for BUNEVACZ's Wells Fargo account ending -4209 for those months, and the wire transfers BUNEVACZ cited are nowhere to be found.

        ii.     I also spoke with the owner of Dolce Construction and emailed him the invoices BUNEVACZ had emailed Victim 6. The owner reviewed them and informed me they were "100% fraudulent." While he had performed some work on the facility BUNEVACZ referenced, it was done on behalf of other individuals and for a far lower figure than what was listed on the invoices. The owner also said he did not know "Mary Bunevacz," whose name is listed on the purported invoices.

        e.     Based on BUNEVACZ's misrepresentations, Victim 6, along with his family and friends, pooled their money to invest a total of approximately $510,000 in BUNEVACZ's business, Caesar Brutus LLC, during February and March 2017. Though the name of BUNEVACZ's stepdaughter is listed on the corporate records for Caesar Brutus LLC, Victim 6 confirmed that he did not deal with her regarding the investment. According to Victim 6, he eventually threatened to sue BUNEVACZ, which caused BUNEVACZ to return some of the funds invested.

### D.    Analysis of BUNEVACZ's Bank Records

18.    Along with IRS-CI Special Agent Ryan Asato, I have personally reviewed records for roughly ten[10] bank accounts for which BUNEVACZ was an authorized signer, comprising accounts both in BUNEVACZ's name and in the name of the following business entities: CB Holding Group Corp., HSK Consultants LLC, Holy Smokes USA LLC, Marat Corday LLC, Grenco Science Inc., and Blue Ox Industrial Inc. Special Agent Asato and I also reviewed records for additional bank accounts for which BUNEVACZ was not listed as an authorized signer but where this investigation otherwise demonstrated that he exercised control over the funds in those accounts, either through his stepdaughter, BUNEVACZ's stepdaughter, or Business Associate 1, whom I interviewed. For purposes of this affidavit, the analysis includes four accounts for which BUNEVACZ's stepdaughter was the sole authorized signer in the names of CaesarBrutus California LLC, Brutus California Ventures Corporation, and CB Holding Group Corp, and roughly thirteen accounts for which Business Associate 1 was the sole authorized signer in the names of CaesarBrutus LLC, CaesurBrutus LLC,[11] Apex Shipping LLC, Claremont Capital Partners LLC, C & D Labs LLC, Greenfield Organix Inc, Saveur Vape LLC, CR Construction LLC, MJIC Inc, and Dolce Construction Corp. The accounts covered the time period of roughly January 2015 to December 2019.

19.    Reviewing account information for the 27 accounts listed above, Special Agent Asato has created several draft analyses regarding the sources of funds in the accounts, how money from the accounts was spent, and the layering of funds in some cases across various accounts. While his analysis is still at the draft stage and therefore subject to change before being formalized, that analysis reveals the following:

a.    Using a conservative estimate, BUNEVACZ raised investor funds of nearly $36 million, of which approximately $28.5 million was never paid back.

---

[10] I also reviewed additional accounts in BUNEVACZ's name or for which he was an authorized signer that are not the subject of the analysis summarized in this affidavit.

[11] Whether intentional or not, the financial records reflect accounts with the correct spelling—"CaesarBrutus"—and an incorrect spelling—"CaesurBrutus."

b.      There are multiple instances of transfers across accounts in the names of various business that have no apparent legitimate business purpose but are consistent with efforts to "layer" the funds as a form of money laundering.

c.      The expenditures from the accounts largely funded either BUNEVACZ's opulent lifestyle and that of his family or repayments to earlier investors, which I know to be a hallmark of a Ponzi scheme.

20.      The following sections outline this analysis in further detail.

1.      Specific Examples of Misappropriation of Funds and Money Laundering

21.      Working with Special Agent Asato, I have been able to trace how BUNEVACZ used funds received by many investors. In doing so, I have noticed multiple examples of "layering," a variety of money laundering in which an individual conducts multiple financial transactions using the proceeds of a crime to conceal the nature, location, source, ownership, or control of the funds involved. A flow chart summarizing some of this activity is attached to this affidavit as Exhibit 1.

22.      For example, the investment funds from Victims 3, 4, and 5 were all deposited into a Bank of America account in the name "CB Holding Group" for which BUNEVACZ's stepdaughter was the authorized signer (BUNEVACZ was added as an authorized signer in September 2019, according to the signature cards). As of February 4, 2019, the balance was only $100. The next day, $1.2 in funds from Victims 3 and 4 were deposited into the account, and on February 12, $300,000 from Victim 5 was deposited into the account. There was also a wire transfer of $49,950 into the account on February 22.

23.      A substantial portion of the funds was then transferred from the CB Holding account to other corporate accounts associated with BUNEVACZ. Before the end of February 2019, $140,000 had been transferred into a Wells Fargo account in the name "Caesar Brutus California LLC" for which BUNEVACZ's stepdaughter was the authorized signer; $315,000 was transferred to a Wells Fargo account in the name "Grenco Science, Inc." for which BUNEVACZ was the sole authorized signer, and which had a balance on February 5 of less than

$10,000. Before the end of the month, more than $100,000 was transferred from the Grenco Science account to an American Express credit card account.

      a.     I have reviewed records provided by American Express for this credit card account, which is in BUNEVACZ's name and a supplemental card to an account his wife holds with American Express. The records reflect charges expenses that appear personal in nature, rather than business-related. For example, the largest charges on the card are two January 2019 charges totaling more than $65,000 for the Montage Los Cabos hotel in the resort city of Cabo San Lucas. Other individual charges exceeding $10,000 include payments to Hermès, Louis Vuitton, and the Wynn Las Vegas Hotel.

24.     Some of the original $1.2 million in investor funds deposited into the CB Holding account was also misappropriated directly without further layering through other business accounts. For example, two payments totaling over $20,000 were made to Calabasas Audi and Audi Financial on February 19 and March 15. On March 1, 2019, an $18,000 payment was made to an individual that I later learned had been the owner of BUNEVACZ's residence, located at 25420 Prada De Oro in Calabasas.

      a.     From speaking with the owner's attorney, I know the $18,000 payment to be the monthly rent on BUNEVACZ's Calabasas home, which he rented from the owner. The attorney explained that the owner and his business partner purchased the house in July 2017 from Kylie Jenner and began renting it to BUNEVACZ in June 2018. The owner sold the house in the summer of 2020 but believed BUNEVACZ and his family remained tenants.

25.     Cash was also withdrawn from the account on two occasions that same month: $10,000 on February 6 and $9,000 on February 27. The following month, I noticed a similar pattern of cash withdrawals: $10,000 on March 12, $5,000 on March 18, $10,000 on March 20, $10,000 again on March 20, $10,000 on March 26, $10,000 again on March 26, $9,000 on March 28, and $2,500 on March 28. In my training and experience in investigating financial crimes, this behavior is consistent with "structuring" cash transactions to avoid a currency

transaction report from being filed, which is triggered for cash transactions exceeding $10,000.[12] Structuring is a hallmark of individuals attempting to hide their wealth from investigators and government officials and is also a federal crime under the Bank Secrecy Act.

26.     Finally, in reviewing the use of funds from Victims 3, 4, and 5, I noticed payments to a previous investor. In February 2019, a total of $170,000 was transferred, either through wire or check, to an individual who had previously provided funds exceeding $5.2 million to a Wells Fargo account in the name "CaesarBrutus LLC." The sole signer on that account was Business Associate 1, who, as described below, acted at BUNEVACZ's direction.

27.     A similar analysis can be done with some of the funds obtained from Victim 2A. On March 21, 2019, for example, Victim 2A transferred $1 million into a Wells Fargo bank account in the name "CB Holding" that held a balance of under $100 and for which BUNEVACZ's stepdaughter was the authorized signer. On March 26, $1 million was transferred from that account to a JP Morgan Chase bank account in the name "C and D Labs, LLC," for which Business Associate 1 was the authorized signer, and which held a balance of only $3 on March 25. From there, the flow of funds was similar to what I observed with respect to the investments of Victims 3, 4, and 5: an $18,000 rent payment was made to the owner of BUNEVACZ's Calabasas home from the C and D Labs account on May 2, 2019; payments on March 28 and April 25 totaling $145,000 were made to the investor in Caesar Brutus referenced in the previous paragraph; and between April 1 and May 6, ten transfers totaling $271,000 were made to a Wells Fargo Grenco Science account for which BUNEVACZ was the authorized signer. From that account, transfers totaling more than $126,000 were made to the aforementioned account at American Express, as well as credit card accounts at Discover, Citi, and Chase.

28.     Despite the fact that Business Associate 1 and BUNEVACZ's stepdaughter are authorized signers on some of the aforementioned bank accounts, the evidence in this case

---

[12] Generally, multiple cash withdrawals the same day that collectively exceed $10,000 would still trigger the filing of a currency transaction report, but it is not uncommon for individuals who structure their cash transactions to be unaware of this fact.

demonstrates that the flow of funds through these accounts was largely done at BUNEVACZ's direction and for his benefit. First, because Victims 2A, 3, 4, and 5 all dealt personally with BUNEVACZ and little, if at all, with BUNEVACZ's stepdaughter, he was responsible for investor funds being deposited into accounts for which BUNEVACZ's stepdaughter was the authorized signer. Second, as demonstrated above, BUNEVACZ was the chief beneficiary of the flow of funds, since large amounts were transferred to the Grenco Science account for which he was the authorized signer, and investor money was used to pay rent on his Calabasas home and pay off his credit card balances. Third, I have reviewed testimony BUNEVACZ's stepdaughter provided under oath during a deposition before the Securities and Exchange Commission on February 18, 2022. During the deposition, she admitted that she opened bank accounts in the name of CB Holding at her father's direction and made transfers from at least the Wells Fargo account at his direction. BUNEVACZ's stepdaughter also stated that, though she had met Business Associate 1 a few times, she had no business relationship with him, though she believed he was providing "storage" for BUNEVACZ.

29.   I interviewed Business Associate 1 in a recorded interview in the presence of his counsel on September 22, 2021.[13] Business Associate 1 stated that he had originally met BUNEVACZ in the 2009/2010 time period through Business Associate 1's business partner and that BUNEVACZ found investors and managed suppliers in China for a joint e-cigarette business venture that proved unsuccessful. Business Associate 1 eventually moved to Florida and lost touch with BUNEVACZ for a few years, though they had various business dealings again beginning in 2013. Around 2016, BUNEVACZ asked Business Associate 1 to open various businesses in the latter's name, since BUNEVACZ was unable to do so given various civil judgments that had been entered against him. This activity carried over to bank accounts for these businesses as well, which Business Associate 1 opened on BUNEVACZ's behalf. As the

---

[13] Based on law enforcement records, I understand Business Associate 1 has a 1995 conviction for bank fraud, for which he received 30 days' imprisonment, and a 2006 conviction for conspiracy to distribute a controlled substance, for which he received six months' imprisonment.

signer, Business Associate 1 was responsible for initiating wires, writing checks, and conducting cash withdrawals at BUNEVACZ's direction. Business Associate 1 stated that he rarely knew the purpose of the transactions and did not know what BUNEVACZ did with the money, but he knew that BUNEVACZ lived in a house previously associated with the Kardashians, drove fancy cars, and owned horses. BUNEVACZ had also claimed that to Business Associate 1 that he had created the G Pen, which Business Associate 1 knew to be associated with Grenco Science. Business Associate 1 had seen that money from the accounts he was operating on BUNEVACZ's behalf appeared to be going to Grenco Science, though, as discussed above, BUNEVACZ was the authorized signer on this account, and the account had no association with the Grenco Science in California that produces the G Pen.

a.      I have spoken with Special Agent Asato, who has reviewed Business Associate 1's records of personal bank account with Bank of America. These records demonstrate that Business Associate 1 received at least $224,000 in payments (mostly comprising wire transfers) from Claremont Capital Partners LLC, Blue Ox Industrial Inc., Apex Shipping LLC, CR Construction LLC, and C and D Labs.

30.      Business Associate 1 stated that he had previously learned law enforcement had obtained a search warrant for BUNEVACZ's residence (that search is described further below), and that BUNEVACZ told him investigators were looking for "money and jewelry" because of a million-dollar debt owed to a guy in Canada. "They were looking for money and jewelry because I owe this guy a million dollars in Canada" BUNEVACZ also instructed Business Associate 1 to delete all his emails and text messages. According to Business Associate 1, approximately three months prior, BUNEVACZ had told Business Associate 1 that BUNEVACZ might do a "year, year and half" of prison time but that he would "tuck away" $20 million. Business Associate 1 described BUNEVACZ as a "total crook."

31.      Special Agent Asato contacted Silver Shield Services, Inc., which was listed as the registered agent many of the Nevada corporate filings associated with Business Associate 1, according to public information on the Nevada Secretary of State website. Special Agent Asato

inquired, in particular, about BUNEVACZ, his stepdaughter, and Business Associate 1, as well as the following businesses: CB Holding Group Corpc, Brutus California Ventures Corp, Claremont Capitol Partners LLC, Blue Ox Industrial, Inc, Greenfield Organix, Inc, C and D Labs, LLC, Grenco Science, Inc, Caesar Brutus California LLC, Saveur Vape LLC, and Apex Shipping LLC. The chief financial officer responded to Special Agent Asato with a letter in which he stated, "All of our business was conducted with David [BUNEVACZ]. I think I may have spoken or answered an email to [BUNEVACZ's stepdaughter] once? I do not believe that we have ever talked to [Business Associate 1]." He also provided email communications with BUNEVACZ in which the latter directs him to create various Nevada business entities using the names of BUNEVACZ's stepdaughter and Business Associate 1 as officers.

        2.    <u>Where Did the Money Go?</u>

32.    There is a noticeable absence in the bank records of payments consistent with BUNEVACZ's claims that he would use investor funds to finance business operations for his cannabis and vape pen companies. In many instances, investor funds were funneled into an account he controlled in the name of some shell corporation, often with a name suggesting it conducted some legitimate business. In reality, these were pass-through accounts from which the funds were used overwhelmingly for one of two purposes: either financing the lavish lifestyle of BUNEVACZ and his family or making payments to earlier investors in a manner consistent with a Ponzi scheme.

33.    In reviewing expenditures from the bank accounts, Special Agent Asato was able to categorize a large percentage based on entries in the bank statements and related records. Though by no means exhaustive, the following is a summary of some of the noteworthy expenses by category (all figures approximate):

        a.    **Casinos:** $8,143,500[14]

---

[14] Special Agent Asato summarized records from the Wynn from April 2015 to February 2019. According to Special Agent Asato, while his analysis credits withdrawn funds that were redeposited, such as unused cashiers' checks, his analysis did not credit BUNEVACZ's gambling winnings, which totaled over $850,000, against his substantial losses.

      i.      I have reviewed documentation supplied by the Wynn and learned from it that BUNEVACZ lost an estimated $3,755,050 gambling at that casino between January 2018 and June 2019 alone.[15]

      b.      **Jewelers:** $920,500

      i.      The majority of these payments were made in connection with Precious Trade Jewelers, a business based in Beverly Hills. I spoke to the owner, who knew BUNEVACZ as a regular customer of both Precious Trade Jewelers and his other business, Revere Jewelers. The owner provided spreadsheets documenting some of the purchases BUNEVACZ had made over the years. These included a March 28, 2017, invoice for $14,215 for a Rolex submariner watch, which he purchased less than a week after being sentenced for unlawful sale of securities; a November 13, 2017, invoice for $209,500 for 18-carat white gold diamond earrings; a January 28, 2018, invoice for $98,000 for 6.55-carat diamond studs; a July 20, 2018, invoice for $195,000 for an 18-karat white gold diamond ring; and a June 20, 2019, invoice for $46,500 for three bracelets and two Hermès Birkin bags (one in cream and one in blue Zanzibar/green). This last purchase occurred one month after the maturity date for Victim 2B's $3.5 million investment, which BUNEVACZ failed to pay.

      c.      **Horses and Horse-Related Expenses:** $1,315,518

      i.      I spoke to the owner of Maarten Huygens Horse Sales and one of his associates, who informed me that BUNEVACZ had purchased a horse named "Vondel," a Bay Zangersheide gelding, on November 26, 2018, for $330,000. BUNEVACZ transferred the funds on November 21, 2018, from a Chase account in the name "Blue Ox Industrial Inc.," for which BUNEVACZ and Business Associate 1 were authorized signers. In reviewing bank records for the Wells Fargo CB Holding Group account, I saw Victim 2B's initial payment of $1,499,980 deposited on November 20, 2018. $1.5 million was then transferred the following

---

[15] The date range covered by the records extended through 2020, but the gambling activity summarized in the records continued through only June 2019.

day into the Blue Ox Industrial account on November 21, 2018, just in time to buy Vondel the horse.

  d.  **Aesthetica Events**: $218,700.

    i.  I interviewed the owner of Aesthetica Events, an event-planning business, on June 8, 2021. He informed me that BUNEVACZ hired his business to organize a sweet-sixteen birthday party for his daughter. The payment came from the C and D Labs account, further demonstrating BUNEVACZ's control over the accounts for which Business Associate 1 was the authorized signer.

  e.  **Rent on the Calabasas Home:** $206,340

  f.  **International Yacht Corporation:** $48,900

  g.  **Legal Services:** $791,900

  h.  **Credit Cards:** $11,471,480

    i.  Even this extraordinary figure understates the amount of credit card spending BUNEVACZ and his family did during this time period. An investigator for American Express, for example, has provided me records for BUNEVACZ and his family members. The investigator noted that several credit card accounts had to be closed with outstanding balances that totaled $224,515.07.

  34.  Even as late as 2020, BUNEVACZ and his family were the subject of a glowing profile on celebrity lifestyles during the pandemic, which describes their daily routine of waking up late, working out in the home gym, and watching a movie in the home theater.[16]

  3.  <u>The Magnitude of the Scam</u>

  35.  In reviewing the bank records, Special Agent Asato and I categorized the sources of funds as follows:

---

[16] Ricky Lo, "How Stars and Friends Abroad Are Coping with COVID-19," *The Philippine Star* (Apr. 15, 2020), *available at* philstar.com/entertainment/2020/04/15/2007275/how-stars-and-friends-abroad-are-coping-covid-19-first-series.

a.      The first category comprises those investors with whom I or another investigator have communicated, either directly, through counsel, or through a group representative, and who confirmed investing in one of BUNEVACZ's business ventures.

b.      The second category comprises investors with whom I have not personally communicated but who either (1) filed lawsuits accusing BUNEVACZ of fraud or other malfeasance or (2) were identified by individuals whom BUNEVACZ enlisted to find investors.

c.      The third category comprises sources of funds who were expressly identified by confirmed investors as fellow contributors to BUNEVACZ's businesses but for whom I have not obtained formal documentation.

d.      The fourth category comprises sources of funds that, given the amounts of the deposits and the names of the sources, appear to be investors as well.

e.      The fifth category comprises sources of funds that can be safely ruled out as investors, such as payments from casinos consistent with gambling winnings.

36.     To reach a conservative estimate of the size of BUNEVACZ's fraud scheme, I included only the first two categories in my review and, using a draft spreadsheet generated by Special Agent Asato, totaled the deposits from these investors into the bank accounts identified as controlled by BUNEVACZ. Doing so yielded a total of approximately $37,166,737 in funds raised. The bank records revealed some outgoing payments to these same investors as well.[17] For investors who have not been fully reimbursed, the outstanding principal balance is approximately $28,409,112. Thus, according to this analysis, the vast majority of investor money has not been repaid. These figures only increase if one includes categories three and four—those sources of funds that appear to be investors based either on information provided by witnesses or the nature of the deposits. Including these categories raises the total amount of investment principal to approximately $45,068,227 and an outstanding balance of approximately $35,222,932.

---

[17] In some instances, the repayments to investors were made through affiliated entities or individuals.

37.     These numbers are only estimates, since they do not account for additional investor money deposited into unidentified accounts or paid in cash, as at least one investor indicated to me was the case for his investment, nor do they account for repayments in those forms. But given the sophistication of BUNEVACZ's scheme to defraud and money laundering, the analysis above still provides a solid foundation for understanding the scope of BUNEVACZ's criminal activities. And, in my training and experience, it is often a hallmark of sophisticated investment schemes, particularly those involving repayments consistent with a Ponzi scheme, for the precise loss figure to be difficult to calculate.

### E.     Search of BUNEVACZ's Calabasas Home

38.     BUNEVACZ's extravagant expenditures using investor funds are consistent with the lifestyle I personally saw on display when executing a search warrant at BUNEVACZ's Calabasas home on April 22, 2021. Our search consisted of the main house and the two garages (one of which has been converted to a home gym) but did not include the home's guest house, which has been converted into a servants' quarters, where BUNEVACZ's live-in maid resides.

39.     During the search, investigators seized various electronic devices; five "corporate binders" for Caesarbrutus California, LLC, Holy Smokes USA, LLC, CB California, LLC, Caesarbrutus, LLC, and JB Holding Group Corp., which contained blank numbered stock certificates; and miscellaneous documents such as civil lawsuits, business receipts, and financial statements.

40.     At the search's inception and conclusion, a member of the investigative team took brief videos of the home to establish what it looked like before the search and after it concluded in lieu of taking photographs. However, photographs of the Calabasas home are publicly available on the real estate website Zillow, which, consistent with the information provided by the attorney for the former owner, lists a sale date of July 14, 2020. Attached to this affidavit as Exhibit 2 are photos from Zillow of both the exterior and interior of the house, including the front, the back yard and pool area, the dining room, living room, home theater, walk-in closet, dressing area, and courtyard. While the photographs for Zillow are staged so that personal items

are not visible, they still fairly and accurately depict the house as it appeared on April 22, 2021, including furniture and the contents of the walk-in closet, which contained dozens of pairs of shoes and various designer handbags.

### IV.  **CONCLUSION**

41.    For all the reasons described above, there is probable cause to believe that BUNEVACZ has committed wire fraud, in violation of 18 U.S.C. § 1343.

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on this 30th  day of March, 2022.

_____
UNITED STATES MAGISTRATE JUDGE
ALEXANDER F. MacKINNON

# EXHIBIT 1





Victim 3
Victim 4
Victim 5
$800,000
2 transaction [2/5/19]
$400,000
1 transaction [2/5/19]
$300,000
1 transaction [2/12/19]
Balance on 2/4/19 = $100
*Acct Signer: Bunevacz's Stepdaughter (David Bunevacz Added 9/19)
CB Holding Group Corp BoA 1506
2/6/19 - $20K
2/11/19 - $100K
2/12/19 - $30K (Chk #992)
2/15/19 - $15K
2/22/19 - $150K
Grenco Science, Inc. WF x4658
Balance on 2/5/19 = $9,157.81
*Acct Signer: David Bunevacz
2/6/19 - $5K
2/7/19 - $5K
2/8/19 - $5K
2/11/19 - $5K
2/12/19 - $20K
2/13/19 - $15,877.38
2/15/19 - $5K
2/19/19 - $10K
2/20/19 - $5K
2/22/19 - $20K
2/25/19 - $10K
AMEX CC
2/12/19 - $5K
Discover CC
2/6/19 - $100K
2/27/19 - $40K
Caesar Brutus California LLC WF x4829
Balance on 2/5/19 = $11.16
*Acct Signer: Bunevacz's Stepdaughter
2/6/19 - $1,500
3/1/19 - $18K (Chk #998)
Calabasas House Owner
2/19/19 - $10K (Chk #997)
3/15/19 - $11,639.88
Audi
2/14/19 - $20K (Chk #996)
2/22/19 - $50K
2/25/19 - $100K
Investor Repayment

Victim 2A
3/21/19 - $1M
CB Holding Group Corp WF x4539
Balance on 3/20/19 = $99.09
*Acct Signer: Bunevacz's Stepdaughter
3/26/19 – $1M
C and D Labs, LLC JPMC x9527
Balance on 3/25/19 = $3
*Acct Signer: Business Associate 1
4/1/19 - $50K
4/8/19 - $25K
4/10/19 - $21K
4/11/19 - $30K
4/18/19 - $20K
4/24/19 - $10K
4/29/19 - $20K
5/1/19 - $20K
5/3/19 - $50K
5/6/19 - $25K
Grenco Science, Inc. WF x4658
Balance on 4/1/19 = $4,806.91
*Acct Signer: David Bunevacz
5/2/19 - $18K
Calabasas House Owner
3/28/19 - $90K
4/25/19 - $55K
Investor Repayment
4/1/19 - $10K
4/2/19 - $5K
4/3/19 - $5K
4/4/19 - $5K
4/5/19 - $3K
4/8/19 - $4K
4/9/19 - $5K
4/10/19 - $5K
4/11/19 - $5K
4/11/19 - $10K
4/12/19 - $5K
4/18/19 - $10K
4/19/19 - $4K
4/22/19 - $4K
4/25/19 - $4K
4/29/19 - $2K
4/29/19 - $10K
5/1/19 - $949.59
5/3/19 - $3K
5/3/19 - $4K
5/6/19 - $5K
AMEX CC
4/4/19 - $5K
4/10/19 - $4,949
5/1/19 - $500
Citi CC
4/12/19 - $6,193.34
Chase CC
4/25/19 - $1K
Discover CC

# EXHIBIT 2



Front of House



Front of House



Rear of House



Rear of House



Kitchen



Living Room



Home Theater



Walk-In Closet



Dressing Area



Courtyard