CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JAMES S. THREATT (Bar No. 325317)
(E-Mail: Jimmy_Threatt@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
DAVID BUNEVACZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 22-CR-175-DSF |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT DAVID BUNEVACZ'S OBJECTIONS TO PSR AND SENTENCING POSITION; EXHIBITS A–D** |
| DAVID BUNEVACZ, | |
| Defendant. | Sentencing Date: November 21, 2022 |
| | Sentencing Time: 8:30 a.m. |

Defendant David Bunevacz, by and through counsel of record, Deputy Federal Public Defender James S. Threatt, hereby submits his sentencing position.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: October 31, 2022       By  */s/ James S. Threatt*
                                   JAMES S. THREATT
                                   Deputy Federal Public Defender
                                   Attorney for David Bunevacz

I. INTRODUCTION ........................................................................................... 1

II. OBJECTIONS TO THE PSR ........................................................................ 1

    A.    The PSR Incorrectly Applies a Two-Level Enhancement for
        "Substantial Financial Hardship" to Five or More Victims.................... 1

    B.    In the Alternative, the Court Should Apply a Two-Level Variance............ 3

III. FACTUAL CLARIFICATIONS TO THE PSR............................................ 4

IV. THE ADVISORY GUIDELINES RANGE .................................................. 5

V. THE APPROPRIATE SENTENCE ................................................................ 5

    A.    The Nature and Circumstances of the Offense Weigh in Favor of a
        Sentence at or Below the Low-End of the Guidelines Range.................... 6

        1.    The Dramatic Increases to Fraud Guidelines Deviated from the
            Sentencing Commission's Empirical Approach............................... 6

        2.    The Guidelines Range Would be the Same if the Loss Amount
            were Substantially Larger. ................................................................ 9

        3.    The Guidelines Range Already Reflects the Aggravating
            Factors.......................................................................................... 10

        4.    The Need for Restitution.................................................................. 10

    B.    Mr. Bunevacz Promoted Judicial Economy by Swiftly Entering a
        Guilty Plea........................................................................................... 11

    C.    Supervised Release Should Assuage Any Concerns About Recidivism...11

    D.    The History and Characteristics of Mr. Bunevacz Support a One-Level
        Downward Variance............................................................................. 12

        1.    Mr. Bunevacz is a Non-Violent Offender who has Never Been
            Incarcerated................................................................................... 12

        2.    Mr. Bunevacz has Heart Failure, Making Time in Custody More
            Punitive and Potentially Deadly. ...................................................... 12

VI. CONCLUSION ........................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Gall v. United States,*
    552 U.S. 38 (2007)...................................................................... 5

*Kimbrough v. United States,*
    552 U.S. 85 (2007)................................................................. 6, 8

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................ 6

*United States v. Ameline,*
    409 F.3d 1073 (9th Cir. 2005) (en banc) ................................... 1

*United States v. Booker,*
    543 U.S. 220 (2005)................................................................... 5

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013) ...................................................... 6

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) ................................................... 6, 8

*United States v. George,*
    949 F.3d 1181 (9th Cir. 2020) ................................................... 2

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ....................................... 6

*United States v. Lauersen,*
    362 F.3d 160 (2d Cir. 2004) ...................................................... 4

*United States v. Laurienti,*
    611 F.3d 530 (9th Cir. 2010) ................................................... 10

*United States v. Parris,*
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ................................... 4, 6

*United States v. Ruff,*
    535 F.3d 999 (9th Cir. 2008) ..................................................... 5

**Federal Statutes**

15 U.S.C. § 78j(b) ............................................................................ 1

18 U.S.C. § 1343 .............................................................................. 1

# TABLE OF AUTHORITIES

Page(s)

18 U.S.C. § 3553(a) ................................................................................... 5

*Sarbanes-Oxley Act* ............................................................................... 7, 8

U.S.S.G. § 2A1.3 ....................................................................................... 6

U.S.S.G. § 2A1.5 ....................................................................................... 6

U.S.S.G. § 2A2.1 ....................................................................................... 6

U.S.S.G. § 2A4.1 ....................................................................................... 6

U.S.S.G. § 2B1.1 ........................................................................... 2, 4, 9, 10

U.S.S.G. § 2D1.1 ....................................................................................... 6

U.S.S.G. § 2F1.1 (Nov. 2000) .................................................................... 9

U.S.S.G. § 2K2.1 ....................................................................................... 6

**Other Authorities**

Alan Ellis, John Steer & Mark Allenbaugh, *At a "Loss" for Justice:*
    *Federal Sentencing for Economic Offenses* .................................... 3

Am. Crim. L. Rev. 289, 319 (1989) ............................................................ 7

American Heart Association, Classes of Heart Failure, available at
    https://www.heart.org/en/health-topics/heart-failure/what-is-heart-
    failure/classes-of-heart-failure ...................................................... 12

David Debold & Matthew Benjamin, *Losing Ground* ............................. 7, 8

Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds*
    *After Booker* ................................................................................... 3

Medline Plus, Mitral Valve Regurgitation, available at
    https://medlineplus.gov/ency/article/000176.htm ....................... 13

Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes:*
    *Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L.
    Rev. 1611, 1648–49 (2007) ............................................................ 3

Stephen Breyer, *The Federal Sentencing Guidelines and the Key*
    *Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 23 (1988) ..... 7

## <u>TABLE OF AUTHORITIES</u>

Page(s)

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf .......................................................................... 3

# I. INTRODUCTION

David Bunevacz is before the Court for sentencing, following his guilty pleas to one count of securities fraud, in violation of 15 U.S.C. § 78j(b), and one count of wire fraud, in violation of 18 U.S.C. § 1343. Defense counsel and Mr. Bunevacz both recognize the gravity of his crimes. That is why he not only pled guilty but accepted responsibility for the full scope of his fraud as reflected by the remarkably detailed factual basis contained in the plea agreement. In recognition of the seriousness of the offenses, and the harm his conduct caused, Mr. Bunevacz acknowledges that a prison term of 87 months, or slightly more than seven years, is required—a severe sentence for a non-violent offender, particularly one who has accepted responsibility and spared the Court, the government, and the victims from enduring a trial (or even motion practice).

Mr. Bunevacz also will be required to pay $35 million in restitution. Particularly with this in mind, a sentence of 87 months—effectively a one-level downward variance—is sufficient to accomplish the goals of sentencing. Such a sentence imposes a harsh punishment on Mr. Bunevacz, while acknowledging that his conduct belongs towards the low end of the lengthy sentence recommended by the Guidelines, giving him a better opportunity to be able to repay his debt to his victims, and recognizing the mitigating circumstances, principally Mr. Bunevacz's poor health.

# II. OBJECTIONS TO THE PSR

## A. The PSR Incorrectly Applies a Two-Level Enhancement for "Substantial Financial Hardship" to Five or More Victims.[1]

The government "bears the burden of proof for any fact that the sentencing court would find necessary to determine the base offense level." *United States v. Ameline*, 409 F.3d 1073, 1085 (9th Cir. 2005) (en banc) (citations omitted). The government also bears the burden of proof when it seeks a sentence enhancement. *Id.* at 1086.

---

[1] Although Mr. Bunevacz did not agree to the sophisticated means enhancement in his plea agreement, he does not object to its application in the PSR.

1

United States Sentencing Guidelines Section 2B1.1(b)(2)(B) provides that "if the offense resulted in substantial financial hardship to five or more victims, increase by 4 levels[.]"  The Commentary provides the following factors to consider: "whether the offense resulted in the victim: (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code; (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit."  U.S.S.G. § 2B1.1 (Application Note 4(F)).

In interpreting this enhancement, the Ninth Circuit has emphasized that the analysis "focus[es] on the victims' individual circumstances."  *United States v. George*, 949 F.3d 1181, 1185 (9th Cir. 2020), *cert denied*, 141 S. Ct. 605 (2020).  In other words, "whether a loss has resulted in a substantial hardship . . . will, in most cases, be gauged relative to each victim and the same dollar harm to one victim may result in a substantial hardship while for another it may only be a minor hiccup."  *Id.* (citation omitted) (ellipsis in original).  And the use of the term "substantial" indicates that "the victim's financial hardship must be *significant*."  *Id*. (emphasis added).

The PSR identifies seven victims that, it claims, suffered "substantial financial hardship."  However, the PSR does not contain sufficient specific facts about these victims' "individual circumstances" to properly gauge whether their losses resulted in "substantial financial hardship" as that phrase is used in the context of § 2B1.1. (*See* PSR ¶¶ 32–38, 55.)  More is rightfully required to add an additional two years to Mr. Bunevacz's Guidelines range beyond the penalties already imposed for loss and number of victims.[2]

_____

[2] Moreover, according to the factual basis in the plea agreement, one victim cited in the PSR for this enhancement—G.H.—lost money only as a result of a "prior fraud scheme."  (Plea Agreement, Dkt. 32 at ¶ 15.)  Accordingly, their bankruptcy should not be considered for sentencing purposes.

**B.     In the Alternative, the Court Should Apply a Two-Level Variance.**

If the Court disagrees and is inclined to apply this two-point enhancement under a strict application of the Guidelines, then it should apply a two-level downward variance.  The additional two points for "substantial financial hardship" to five or more victims effectively double count conduct that is already separately penalized under other enhancements, specifically loss and number of victims.

This is a common thread running through the economic offense Guidelines, which have seen a proliferation of separate offense characteristics in recent years.  In fact, this particular enhancement was only added in 2015.  "In effect," then, "what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus."[3] Even the Sentencing Commission has recognized this problem of "factor creep," in which, as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness."[4]

Recognizing the Commission's inability to self-correct, many courts have departed or varied to avoid the "absurd" "piling on of points" that results when they

---

[3] Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170 (2008); *see also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648–49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation"); Alan Ellis, John Steer & Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("[T]he loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

[4] United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing*, at p. 137, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf.

3

apply the Guidelines' ever-increasing, closely-correlated enhancements.  *See, e.g.*, *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *United States v. Booker*, 543 U.S. 220 (2005)) (upholding departure to mitigate effect of "substantially overlapping enhancements" in § 2B1.1); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (characterizing § 2B1.1 as "patently absurd" due, in part, to "piling on of points") (citing *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (fraud Guidelines have "so run amok that they are patently absurd," and describing enhancement for "250 victims or more," along with others, as "represent[ing], . . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized")).

Considerations of equity counsel strongly against increasing Mr. Bunevacz's offense score by an additional two points due to substantial financial hardship when he is already being punished for the total loss involved in the scheme and for the number of victims.  These additional points penalize the same conduct and unnecessarily "pile on," particularly because Mr. Bunevacz did not target individuals who were unsophisticated, elderly, or otherwise vulnerable.  *Cf.* U.S.S.G. § 2B1.1 (Application Note 4(D) (enhancement for substantial financial hardship intended to cover similar conduct as vulnerable victim enhancement in § 3A1.1(b)(2) and therefore both cannot be applied in same case)).

### III. FACTUAL CLARIFICATIONS TO THE PSR

Paragraph 122

It is defense counsel's understanding that this residence is owned by one of Mr. Bunevacz's children and that a number of liens have been placed on the residence.

Paragraphs 123 and 124

The PSR indicates that Mr. Bunevacz "possibly co-owns a parcel of land with the Bunevacz Family Trust."  However, this residence is owned by Mr. Bunevacz's parents through the Bunevacz Family Trust and they have lived there for nearly 30 years.  Upon the passing of Mr. Bunevacz's parents, ownership of the residence will

4

1  pass to the beneficiaries.  Further defense investigation revealed that Mr. Bunevacz
2  does have a future 12.5% stake in the residence through the Bunevacz Family Trust,
3  with his sister and daughter having the other 87.5% stake.  Attached as Exhibit A are
4  documents pertaining to the Trust.

5                              **IV. THE ADVISORY GUIDELINES RANGE**

6          If offense level 33 is applied, with a three-level reduction for acceptance of
7  responsibility, Mr. Bunevacz's total offense level is 30.  Total offense level 30 and
8  Criminal History Category I result in an advisory Guidelines range of 97–121 months.

9                              **V. THE APPROPRIATE SENTENCE**

10          In determining the appropriate sentence, the Court must consider all of the
11  factors set forth at 18 U.S.C. § 3553(a).  *See United States v. Booker*, 543 U.S. 220
12  (2005).  The Court may not presume that the Guidelines range is reasonable, *Gall v.*
13  *United States*, 552 U.S. 38, 49 (2007), and "extraordinary circumstances are not
14  needed  to justify a sentence outside the guidelines range," *United States v. Ruff*, 535
15  F.3d 999, 1002 (9th Cir. 2008).  Instead, the Guidelines are only one of many factors.
16  *Gall*, 552 U.S. at 59.  The task for the Court is to impose a reasonable sentence, based
17  on the defendant and the facts of the case at hand, that is "sufficient, but not greater
18  than necessary," to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

19          Defense counsel and Mr. Bunevacz acknowledge the seriousness of his offenses
20  and the financial and emotional harm he has inflicted upon his victims.  The defense
21  will make no attempt to minimize Mr. Bunevacz's conduct or dispute that a lengthy
22  prison sentence is appropriate.  A sentence of 87 months is sufficient to accomplish the
23  goals of sentencing, particularly given the nature and circumstances of Mr. Bunevacz's
24  offense relative to violent crimes and even more egregious economic crimes for which
25  the Guidelines would prescribe similar or shorter sentences, the need to pay restitution,
26  his acceptance of responsibility, and mitigating factors, primarily that Mr. Bunevacz
27  has been diagnosed with heart failure.

28

                                          5

**A.** **The Nature and Circumstances of the Offense Weigh in Favor of a Sentence at or Below the Low-End of the Guidelines Range.**

      **1.** **The Dramatic Increases to Fraud Guidelines Deviated from the Sentencing Commission's Empirical Approach.**

A pre-acceptance offense level of 33 is comparable to, or even higher than, offense levels for people who conspire to commit murder, for major narcotics traffickers, for violent individuals who possess the most dangerous kinds of illegal weapons, and for other violent offenses. *See, e.g.*, U.S.S.G. § 2A1.5 (offense level 33 for conspiring to commit murder); U.S.S.G. § 2D1.1 (offense level 34 for distributing 149 kilograms of cocaine); U.S.S.G. § 2K2.1 (offense level 32 for possessing military-grade assault rifle with obliterated serial number and two other firearms after sustaining at least two felony convictions for crimes of violence); U.S.S.G. § 2A1.3 (offense level 29 for voluntary manslaughter); U.S.S.G. § 2A2.1 (offense level 33 for assault with intent to commit murder); U.S.S.G. § 2A4.1 (offense level 32 for kidnapping). Mr. Bunevacz's conduct was unquestionably serious, but he did not threaten or inflict physical harm on any person or otherwise endanger the community.

The degree to which the Guidelines for economic crimes have increased dramatically has been well-chronicled and criticized by scholars and courts alike.[5] As with the crack cocaine Guidelines criticized in *Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007), and the child pornography Guidelines criticized in *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010), *amended*, 616 F.3d 174 (2d Cir. 2010), the Guidelines for economic offenses tend to yield unduly severe sentences because they have been repeatedly stiffened, often in response to political pressure and in a manner inconsistent with the Sentencing Commission's institutional role.

---

[5] *See generally* Note 3, *supra*; Notes 6–12, *infra*; *United States v. Corsey*, 723 F.3d 366, 380–81 (2d Cir. 2013) (Underhill, D.J., concurring); *United States v. Adelson*, 441 F. Supp. 2d 506, 508–12 (S.D.N.Y. 2006) (Rakoff, D.J.); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y 2008); *United States v. Gupta*, 904 F. Supp. 2d 349, 351–52 (S.D.N.Y. 2012) (Rakoff, D.J.).

6

To summarize, when promulgating the first set of Guidelines, the Sentencing Commission focused almost exclusively on empirical data in the form of sentences served for each type of offense. "That is, with a few notable exceptions, the Commissioners did not attempt to determine what the penalty for any given offense *should be*; rather, they set out to reproduce the sentencing patterns in existence before the Guidelines."[6] The primary exception to this otherwise empirical approach were economic crimes, where the Commission "consciously chose to increase sentences" above pre-Guideline levels.[7] According to Justice Breyer, a member of the original Commission, it "abandon[ed] the touchstone of prior past practice" for fraud offenses.[8]

Initially, the purpose of this deviation from the usual approach was to ensure that white collar defendants served "short but certain" terms of imprisonment.[9] Over the ensuing years, however, the Commission repeatedly increased the sentences recommended for economic offenses even further without empirical justification. For example, the 1989 amendments, which added four levels for losses or gains over $20 million, were instituted in response to "recent congressional enactments" that the Commission perceived as "oblique 'signals' to the Commission to increase fraud penalties."[10] In 2001, the Commission again increased the recommended sentences, largely in an ill-guided effort to make white collar sentences comparable to sentences for defendants convicted of drug offenses.[11] The problem, of course, is that those drug

---

[6] Frank O. Bowman, III, *The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments that Followed*, 1 Ohio St. J. Crim. L. 373, 385 (2004) (emphasis in original).

[7] *Ibid.; see also* David Debold & Matthew Benjamin, *Losing Ground*, 170 Penn. L. Rev, 141, 144 (2011).

[8] Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 23 (1988).

[9] *Ibid.* at p. 20.

[10] Jeffrey S. Parker & Michael K. Block. *The Sentencing Commission. P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 319 (1989).

[11] David Debold & Matthew Benjamin, *Losing Ground*, 170 Penn. L. Rev, 141, 145 (2011).

7

Guidelines, as now widely acknowledged, themselves lacked an empirical basis and were instead dictated by mandatory minimum sentences over which the Commission had no control.[12]  And in 2003, Congress packed the Sarbanes-Oxley legislation with "hasty, cut-and-paste" directives to the Sentencing Commission, resulting in various increases to the Guidelines for economic crimes.[13]

This is exactly the kind of departure from the "Commission's exercise of its characteristic institutional role" criticized in *Kimbrough*, 552 U.S. at 89, and *Dorvee*, 616 F.3d at 188.  In sum, unlike Guidelines provisions that reflect "an empirical approach based on data about past sentencing practices," *Kimbrough*, 552 U.S. at 96, the Guidelines for economic crimes were borne of the Commission's decision to abandon its usual empirical approach, and have been steadily ratcheted ever higher in the years since, often in response to political pressure and without any regard for past sentencing practices or empirical analysis.

To be clear, Mr. Bunevacz acknowledges the seriousness of his offenses and that a substantial prison term is necessary.  But the lack of empirical basis for the Commission's dramatic revisions—particularly as to § 2B1.1's loss chart—and the significant role played by the loss amount enhancement weigh heavily in favor of a sentence at or below the low-end of the lengthy prison sentence recommended by the Guidelines.  For example, the Sentencing Guidelines from November 2000 would have prescribed a significant 17-level increase for the loss at issue here,[14] but that would still be five levels less than the current Guidelines.  *See* U.S.S.G. § 2F1.1 (Nov. 2000).  A post-acceptance offense score of 25 would yield a recommended sentence (under either version of the Guidelines) of 57 to 71 months, or approximately three to four years less

---

[12] *Ibid.*

[13] Bowman, Note 6, *supra*, at p. 406.

[14] This is true taking into account inflation and the government's higher revised loss amount of $35 million.  A total of $35 million in 2022 dollars is roughly equivalent to $60 million in 2000 dollars.

than now recommended—a difference due solely to these increases in the offense levels associated with the loss chart.

The distortion caused by the Commission's changes to § 2B1.1 is perhaps best illuminated by the fact that, as previously noted, non-violent white collar offenders now often receive longer sentences than drug kingpins and violent criminals. There is little reason to treat economic offenses nearly twice as harshly today as they were 20 years ago. Indeed, Mr. Bunevacz's requested sentence of 87 months is over one year longer than the *high-end* of the Guidelines under the loss chart that existed before the Commission's most recent revision.

### 2. The Guidelines Range Would be the Same if the Loss Amount were Substantially Larger.

As noted above, and as with virtually all economic offenses, Mr. Bunevacz's Guidelines range is driven in substantial part by loss amount. The parties agreed to a loss amount of at least $28,409,112. (Plea Agreement, Dkt. 32 at ¶ 10.) However, the structure of the loss chart contained in § 2B1.1 means that Mr. Bunevacz's recommended sentence under the Guidelines would be exactly the same if the loss amount were instead $59 million, or more than double the amount agreed to by the parties. Even taking the government's revised loss figure of approximately $35 million, the loss here is still substantially less than other fraud offenses for which the Guidelines range would be exactly the same.[15]

---

[15] Although it does not affect the Guidelines, Probation arrived at a higher loss figure of $45 million by relying on intended loss as opposed to actual loss based on the total amount solicited by Mr. Bunevacz. However, credits against loss are provided for funds returned to investors. *See* U.S.S.G. § 2B1.1 (Application Notes 3(E)(i) & 3(F)(iv)); *see also United States v. Laurienti*, 611 F.3d 530, 558 (9th Cir. 2010) (comparing case to Ponzi scheme and noting that "net loss" for each victim is proper approach to loss amount).

9

### 3. The Guidelines Range Already Reflects the Aggravating Factors.

A low-end sentence is further appropriate because the aggravating factors of this offense are already accounted for by the Guidelines. As discussed, loss amount is the primary reason for the recommended sentence. Likewise, the number of victims and sophisticated nature of the offense are accounted for under specific offense characteristics that further increase Mr. Bunevacz's range. Put differently, the aggravating factors of this offense are already captured by the Guidelines' recommended sentence and therefore do not militate against a low-end sentence.

Probation has recommended the high-end of the Guidelines range, apparently due in large part to how the fraud proceeds were spent. In a fraud of this magnitude, however, there is nothing remarkable about the proceeds being used to fund a lavish lifestyle. This characteristic thus does not weigh against a low-end sentence. Furthermore, Probation cites as an aggravating factor a prior state conviction that is part of the relevant conduct. But the Guidelines already account for that conduct by including the loss from that case in the offense level determination. More importantly, Mr. Bunevacz acknowledges the seriousness of his continuing conduct after the state conviction, which is one reason he has not requested a shorter term of imprisonment.

### 4. The Need for Restitution.

Finally, the need to compensate victims for their loss also supports a custodial sentence at the low-end of the Guidelines. Every month that Mr. Bunevacz spends in custody is a month that he will not be able to make meaningful restitution. And the older he is when released, the more difficult it will be for Mr. Bunevacz to find gainful employment—particularly after serving years in federal prison. The sooner he is allowed to resume working, the more quickly and more fully he will be able to compensate his victims. The restitution order itself is also an additional form of punishment not imposed on many defendants convicted of serious crimes.

10

1   Realistically, Mr. Bunevacz will likely have this particular form of punishment

2   hanging over his head for the rest of his life.

3       Under these circumstances, the punitive value of a sentence longer than 87

4   months is not worth the loss to the victims of an opportunity to recover restitution.

5   **B.    Mr. Bunevacz Promoted Judicial Economy by Swiftly Entering a Guilty**

6       **Plea.**

7       Mr. Bunevacz is entitled to a three-level reduction for entering a timely guilty

8   plea to Counts 1 and 2 of the Indictment.  But he did not just enter a timely plea—he

9   did so swiftly upon being charged and appointed counsel.  Mr. Bunevacz wanted to

10  take responsibility for his crimes and not waste the Court or the government's time.  He

11  did not require the government to expend time and resources preparing for trial or even

12  litigating pre-trial motions.  In fact, the plea agreement was filed on July 1, 2022—

13  within two months of arraignment, one month of appointment of counsel, and more

14  than seven months before trial.  (*Compare* Dkt. 32 *with* Dkts. 20, 24–25, 27.)

15      In short, Mr. Bunevacz immediately took responsibility for his actions and in the

16  process spared the Court, the government, and the victims the burden of litigation.

17  **C.    Supervised Release Should Assuage Any Concerns About Recidivism.**

18      It is clear from Mr. Bunevacz's past that he does not pose a danger to public

19  safety whenever he is released from custody.  To the extent the Court harbors concern

20  about future economic crimes, such concerns can be addressed by supervised release.

21  Particularly under the watchful eye of Probation and this Court, there is no reason to

22  think that Mr. Bunevacz would even be capable of committing future crimes.  This is

23  especially true in light of the publicity the current prosecution has garnered, which

24  ensures any future business partners will be well aware of his past crimes.

25

26

27

28

11

**D.    The History and Characteristics of Mr. Bunevacz Support a One-Level Downward Variance.**

     **1.    Mr. Bunevacz is a Non-Violent Offender who has Never Been Incarcerated.**

Mr. Bunevacz comes before the Court in a relatively unusual position: a non-violent offender who has not been incarcerated before but who faces a lengthy prison sentence.  Any amount of time in custody being contemplated by the Court in this case, given the Guidelines, will far surpass any punishment previously imposed on Mr. Bunevacz and will help ensure that he does not re-offend in the future.

As Mr. Bunevacz describes in his letter to the Court, he is profoundly remorseful for his crimes and the relatively brief time he has spent in custody has already been a wakeup call.  (Exhibit B.)  His pre-trial detention has also forced him to grapple with issues he has avoided for some time, namely his gambling and drug addictions.  (PSR ¶¶ 92–96, 107–115; Exhibit B.)  Although no excuse, these addictions contributed to the scope of his fraud, and Mr. Bunevacz intends to continue addressing them during and after his time in prison.  These sentiments are echoed by the letters of support submitted by Mr. Bunevacz's family.  (*See* Exhibit C.)

     **2.    Mr. Bunevacz has Heart Failure, Making Time in Custody More Punitive and Potentially Deadly.**

Mr. Bunevacz was diagnosed with heart failure in 2014.  (PSR ¶¶ 104–106.)  He has since undergone several procedures, most recently when a defibrillator was inserted in 2021 after his condition worsened as a result of contracting Covid-19.  (PSR ¶¶ 104–106.)  As reflected in the medical records attached as Exhibit D, Mr. Bunevacz is in Class III or Class VI heart failure, which are the most serious categories and include "severe limitations" and "symptoms even while at rest."[16]  Mr. Bunevacz also has

---

[16] American Heart Association, Classes of Heart Failure, available at https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure.

1  "severe" mitral regurgitation, when a valve on the left side of the heart does not close
2  properly, causing blood leakage.[17]

3        As a result, conditions of confinement are especially punitive for Mr. Bunevacz.
4  Although he has now been in the Bureau of Prisons custody since April 5, 2022, he has
5  not been permitted to see a cardiologist even once over the last seven months, despite
6  requiring regular checkups before he was arrested and despite repeated requests by
7  counsel and Mr. Bunevacz to the Bureau of Prisons for medical care due to worsening
8  symptoms.  (PSR ¶ 105.)  He is unlikely to receive adequate medical care for as long as
9  he remains in custody, which could very well lead to a severe medical episode that may
10  even be fatal.

11  **VI.CONCLUSION**

12        For the foregoing reasons, Mr. Bunevacz respectfully requests a sentence of 87
13  months' imprisonment.

14

15          Respectfully submitted,

16          CUAUHTEMOC ORTEGA
        Federal Public Defender
17

18  DATED:  October 31, 2022    By  /s/ James S. Threatt
19          JAMES S. THREATT
20          Deputy Federal Public Defender
        Attorney for David Bunevacz
21

22

23

24

25

26

27

28

---

[17] Medline Plus, Mitral Valve Regurgitation, available at
https://medlineplus.gov/ency/article/000176.htm.

13

# Exhibit A

## REVOCABLE LIVING TRUST

This Revocable Living Trust Agreement, (hereinafter "Trust"), is being made on this _04_ day of ___March___ _192_, by and between **JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ** of ___L A.___ County, State of California, herein after referred to as the Trustors and the Trustees designated below and shall be governed and administered in accordance with the following terms and provisions.

### ARTICLE I
### NAME OF TRUST

1.      **NAME OF TRUST**:  This may be referred to as **THE BUNEVACZ FAMILY REVOCABLE LIVING TRUST** and is created in accordance with the California Probate Code.

   *Purposes of Trust*. The primary purposes of this trust are:

   a.      *Care of Settlors.* To provide for our care and maintenance as long as either of us is living;

   b.      *Avoid Conservatorship.* To facilitate management of the trust property in the event of the incapacity of one or both of us;

   c.      *Transfer Property at Death.* To facilitate transfer of the trust property on our deaths; and

   d.      *Tax Planning.* To provide opportunities for reducing or postponing taxes that might be imposed as a result of our deaths.

### ARTICLE II
### IDENTIFICATION

2.      **TRUSTORS AND CHILDREN**:  The Trustors of this trust are **JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ**, Husband and Wife residing at **6625 GRANADA DRIVE, PALMDALE, CA 93551**.  As used herein, the term "Trustor(s)" shall mean all Trustor(s) of this trust, whether one or more. The Trustor(s) are married and either one or both the parents of the following child(ren):

**DESIREE JANE BUNEVACZ A/K/A DESIREE JANE GUNDERSEN**
**DAVID JOSEPH BUNEVACZ**

### ARTICLE III
### TRUSTEE APPOINTMENT

3.      **TRUSTEE APPOINTMENTS**:  The Trustor(s) hereby appoint **JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ,** the Trustor(s), as Trustees of the Trust. If either of us shall cease to act for any reason, during our joint lifetimes, the other of us shall act as sole Trustee of the trust. After the death of either of us, the survivor of us shall act as sole Trustee of the trust.

      In the event that both of us cease to act for any reason, we shall be succeeded by, and the Trustor(s) hereby appoint, **DESIREE JANE BUNEVACZ A/K/A DESIREE JANE GUNDERSEN** as Successor Trustee(s).  If neither the first or second Trustee are able to serve as Trustee for any reason, then the Trustor(s) hereby appoints **DAVID JOSEPH BUNEVACZ** as Successor Trustee(s).  If neither the first, second or third Trustee are able to serve as Trustee for any reason, then the Trustor hereby appoints **BREANNA SOFIA BUNEVACZ** as the alternate Successor Trustee(s).  The Trustee(s) shall have all the powers as provided in this agreement and the laws of the State of California.  The principal place of administration of this trust is the Trustor(s) place of residence, regardless of the residence of the

4-1

Trustee(s). In the event a vacancy in this office occurs and there is no successor Trustee, the existing Trustee, if one, and the beneficiary, or the beneficiaries, if there is no Trustee, may agree to a non-judicial change in Trustee(s) by amendment to this Trust agreement.

While co-Trustees are acting, only one signature shall be required to conduct business with respect to property and/or assets held or owned by the trust. Any third party dealing with the trust may rely upon this singular authority without any further evidence. Any trust asset may be titled to reflect this authority, including the designation "and/or".

## ARTICLE IV
## ASSETS OF TRUST

4. **ASSETS OF TRUST**: All rights, title, and interest in and to all real and personal property, tangible or intangible, listed on the attached Schedule "A," is hereby assigned, conveyed and delivered to the Trustee for inclusion in this Trust.

All property now or hereafter subject to the terms hereof shall be deemed to be our community and/or quasi-community property and the proceeds thereof shall continue to retain its character as community and/or quasi-community property during our joint lifetimes (also hereinafter called the "community estate"). It is our intention that the Trustee shall have no more extensive power over the community estate than either of us would have had under California law then in effect which govern the management of community property had this Trust Agreement not been created, and this Trust Agreement shall be interpreted to achieve this intention. This limitation shall terminate on the death of either of us.

4.1 **"FOREIGN TRUST" SAVINGS PROVISION.** It is our intent that all trusts created by this Trust Agreement qualify as "United States Persons" under § 7701(a)(30)(E) of the Code, and one or more United States Persons (as defined in § 7701(a)(30)(A) through (C) of the Code) shall always have the authority to control all substantial decisions under this Trust Agreement. Any power, fiduciary or otherwise, to the extent such power is a power to make a "substantial decision" (as defined in Treasury Regulation § 301.7701-7) which, by the terms of this Trust Agreement, would otherwise be held by a person who is not a "United States Person," shall be only exercised by the Trustee, co-Trustee or Special Trustee (as hereinafter defined) who is a United States Person. Furthermore, any person who does not reside in one of the fifty (50) states of the United States or the District of Columbia shall be deemed to not be a "United States Person" for the application of this provision.

5. **ADDITIONS TO TRUST PROPERTY**: Additional property may be conveyed to the Trust by the Trustor(s), or any other third party at any time. Trustor(s) may execute such other documents as is necessary to effectuate the assignment of property to this Trust. We, and/or any other person, may add to the principal of the trust by deed, will, or otherwise.

6. **RIGHTS TO TRUST ASSETS**: Except as specifically provided herein, the Beneficiaries of this Trust shall have no rights to any assets of the Trust.

7. **HOMESTEAD EXCEPTION**: Trustors reserve the right to use, occupy and reside upon any real property placed in this Trust as their permanent residence during their lives. Trustors shall have the right to reside in the property rent free and without charge except for the payment of the following: (1) all mortgages, costs and expenses (2) all property taxes, and (3) reasonable expenses of upkeep and maintenance. Trustors retain the legal right to use and benefit from the property in all respects. It is the intent of this provision to retain for the Trustors the requisite beneficial interest and possessor right in and to such real property needed to retain their qualification to any for any exception, such as a homestead exemption, freeze of tax rates and/or valuation granted to any individual or individuals so qualifying.

# ARTICLE V
## TRUSTEE POWERS AND OTHER PROVISIONS

8.      **POWERS**:  The Trustor(s) does hereby grant to the Trustee all powers necessary to deal with any and all property of the Trust as freely as the Trustor(s) could do individually.  The Trustee shall, at all times and in all actions, act as a fiduciary in good faith.  Trustee is hereby granted all powers contained herein and all powers conferred upon Trustee under applicable statutes and laws of the State of California, to the broadest extent possible, including, but limited to, all of the powers authorized by the California Probate Code.  All powers granted to the Trustee by this Trust Agreement are ministerial in nature and are not intended to create or alter substantial rights.  Without limiting the foregoing general statement of powers, the Trustee powers include, but shall not be limited to, the following:

Subject to the provisions and limitations set forth expressly herein, the Trustee shall have, in general, the power to do and perform any and all necessary acts and things in relation to the trust in the same manner and to the same extent as an individual might or could do with respect to his or her own property. No enumeration of specific powers made herein shall be construed as a limitation upon the foregoing general powers, nor shall any of the powers conferred herein upon the Trustee be exhausted by the use thereof, but each shall be continuing. In addition to the above, the Trustee shall have all of the powers authorized by §§ 16200, *et seq.*, of the California Probate Code (as though such powers were set forth herein) and, in addition, the Trustee is specifically authorized and empowered to exercise those powers hereinafter set forth in this Article V.

(A)     **AGREEMENTS**. To carry out the terms of any valid agreements which we, or either of us, may have entered into during our lifetimes regarding property owned by the trust.

(B)     **ASSET TITLE**. To hold securities or other property in the Trustee's name as trustee, or in "street name," or in bearer form.

(C)     **BANK ACCOUNTS**. To open and maintain bank accounts in the name of the Trustee with any bank, trust company or savings and loan association authorized and doing business in any State of the United States of America. If more than one Trustee shall be acting, the Trustees may designate one or more of them to conduct banking activities and to make deposits, withdrawals and endorsements upon giving written notice of such designation to the bank, trust company, or savings and loan association in question; and such bank, trust company or savings and loan association shall be protected in relying upon such designation.

(D)     **CLOSELY-HELD BUSINESS**.

(1)     <u>Authority to Operate</u>. The Trustee may operate "the Business" (as defined below) and retain any equity interests in the Business, even if these interests would otherwise be a speculative or inappropriate investment for a Trust. This authority shall not supersede any right otherwise granted to the Surviving Spouse under this Trust Agreement to compel that certain trust assets be made productive. The Trustee may do all things related to the operation of the Business that may be appropriate, all in a fiduciary capacity:

(a)     The Trustee may carry out the terms of any option or buy-sell agreements into which we, or either of us, may have entered.

(b)     The Trustee may sell or liquidate any of the Business interests at such price and on such terms as the Trustee may deem advisable.

(c)     The Trustee may arrange for and supervise the continued operations of the Business.

(d)     The Trustee may vote (in person or by proxy) as stockholder or otherwise and in any matter involving the Business on behalf of the Trust.

(e)     The Trustee may grant, exercise, sell or otherwise deal in any rights to subscribe to additional interests in the Business.

(f)     The Trustee may take any actions appropriate to cause the capital stock or securities in the Business to be registered for public sale under any state or Federal securities act; may enter into any underwriting agreements or other agreements necessary or advisable for this registration and sale; and may grant indemnities to underwriters and others in connection with such registration.

(g)     The Trustee may participate in any incorporation, dissolution, merger, reorganization or other change in the form of the Business and, where appropriate, deposit securities with any protective committees and participate in any voting trusts.

(h)     The Trustee may delegate to others discretionary power to take any action with respect to the management and affairs of the Business that we, or either of us, could have taken as the owner of the Business.

(i)     The Trustee may invest additional capital in, subscribe to additional stock or securities of and lend money or credit to the Business from the Trust.

(j)     The Trustee may accept as correct financial or other statements rendered by the Business as to its conditions and operations except when having actual notice to the contrary.

(2)     Liabilities. Any contractual and tort liabilities arising from the Business shall be satisfied first from its assets, and only secondarily from other assets of the Trust. The Trustee shall have no liability to anyone for any loss arising from the operations, retention or sale of the Business.

(3)     Compensation. The Trustee shall be entitled to additional reasonable compensation for the performance of services with respect to the Business, which may be paid to the Trustee from the Business, the trust assets, or both, as the Trustee may deem advisable.

(4)     Conflict of Interest Waived. The Trustee may exercise the authorities granted hereunder even if the Trustee personally shall own an interest in the Business.

(5)     "The Business" Defined. "The Business" means any interest owned by either or both of us, the Trust, or some combination of them, representing in the aggregate at least Five Percent (5%) of the total equity interests in any actively-conducted trade or business, whether incorporated or unincorporated. The term "the Business" shall also include, but not be limited to, any five percent or greater equity interests in any general and/or limited partnerships, as well as membership interests in any limited liability company formed, operated, beneficially owned by or participated in (to the extent of five percent or more) by either of us prior to our

4-4

death. The term "the Business" does not include any interests that are regularly traded on an established exchange or over-the-counter.

(E)     **CONTRACTS**. To enter into contracts which are reasonably incident to the administration of the trust.

(F)     **DEAL WITH FIDUCIARIES**. To buy from, sell to, and generally deal with the Trustee individually and as a fiduciary.

(G)     **DEPRECIATION RESERVE**. The Trustee shall not be required to establish any reserve for depreciation or to make any charge for depreciation against any portion of the income of the trust.

(H)     **DIGITAL ASSETS AND ELECTRONIC COMMUNICATIONS**. To exercise all powers over any digital device, digital asset, user account and electronically stored information, including any user account and digital asset that currently exists or may exist as technology develops, whether the same is in the name of this trust or the name of either of us (such accounts shall include, without limitation, electronic banking accounts, electronic investment accounts, debt management accounts, automatic bill payment directives, and social media accounts). Such powers include, but are not limited to, changing and circumventing the username and password to gain access to such user accounts and information; accessing any of the passwords or other electronic profile data from applicable electronic record host entities; transferring or withdrawing funds or other digital assets among or from such user accounts; opening new user accounts in the name of the trust; all as the Trustee determines is necessary or advisable. The Trustee shall have full authority to access, manage, control, delete and terminate any electronically stored information and communications of the trust or which either of us has an interest to the fullest extent allowable under the federal Electronic Communications Privacy Act of 1986, 18 U.S.C. 2510 *et seq.*, as amended from time to time, the Revised Uniform Fiduciary Access to Digital Assets Act (Part 20, Division 2 of the California Probate Code) and any other federal, state or international law; and, to take any actions which an individual owner would be authorized to take under all applicable terms of service, terms of use, licensing and other account agreements or laws. To the extent a specific reference to any federal, state, local or international law is required in order to give effect to this provision, we specifically provide that it is our intention to so reference such law, whether such law is now in existence or comes into existence or is amended after the date of this Trust Agreement.

(I)     **DIVISIONS AND DISTRIBUTIONS**. In any case in which the Trustee is required to divide any trust assets into shares for the purpose of distribution (or otherwise), such division may be in kind, including undivided interests in any real property, or partly in kind and partly in money, pro rata or non-pro rata. For such purposes, the Trustee may make such sales of trust assets as the Trustee may deem necessary on such terms and conditions as the Trustee shall deem fit, and to determine the relative value of the securities or other assets so allotted or distributed; the Trustee's determination of values and of the property for such distribution shall be conclusive. The decision of the Trustee in distributing assets in reliance on this paragraph shall be binding and shall not be subject to challenge by any beneficiary.

(J)     **INDEBTEDNESS**. With respect to any indebtedness owed to the trust, secured or unsecured:

(1)     To continue the same upon and after maturity, with or without renewal or extension, upon such terms as the Trustee deems advisable; and,

(2) To foreclose any security for such indebtedness, to purchase any property securing such indebtedness and to acquire any property by conveyance from the debtor in lieu of foreclosure.

(K) **INVEST AND REINVEST**. To invest, reinvest, change investments and keep the trust invested in any kind of property, real, personal, or mixed, including by way of illustration but not limitation, oil and gas royalties and interests; precious metals; common and preferred stocks of any corporation; bonds; notes; debentures; trust deeds; mutual funds or common trusts, including such funds administered by a Trustee; interests in Limited Liability Companies; interests in partnerships, whether limited or general and as a limited or general partner; intending hereby to authorize the Trustee to act in such manner as the Trustee shall believe to be in the best interests of the trust and the beneficiaries thereof. The Trustee is specifically vested with the power and authority to open, operate and maintain securities brokerage accounts wherein any securities may be bought and/or sold on margin, and to hypothecate, borrow upon, purchase and/or sell existing securities in such account as the Trustee shall deem appropriate or useful and, further, while we, or either of us, are acting as a Trustee, such account(s) may deal in commodities, options, futures contracts, hedges, puts, calls and/or straddles (whether or not covered by like securities held in the brokerage account). These powers shall be construed as expanding the "standards of care" rule of the California Trust Code (Division 9 of the California Probate Code beginning with § 15000) or in the Uniform Prudent Investor Act (as it may otherwise apply).

(L) **LIFE INSURANCE**. To purchase insurance on the life of any person or persons, including the lives of either of us.

(M) **LOANS**. To borrow for the trust from any person, corporation or other entity, including the Trustee, at such rates and upon such terms and conditions as the Trustee shall deem advisable, and to pledge and/or hypothecate as security any of the assets of the trust for the benefit of which such loan is made by mortgage, deed of trust or otherwise for the debts of the trust or the debts of either of us, or to guarantee the debt of either of us; to lend money upon such terms and such conditions as the Trustee deems to be in the best interests of the trust and the beneficiaries thereof, including the lending of money from one trust to any other trust created hereunder and to borrow on behalf of one trust from any other trust created hereunder, and further including the right to lend money to the probate estate (if any) of either of us, but in such event such loans shall be adequately secured and shall bear the then prevailing rate of interest for loans to such persons or entities for the purposes contemplated.

(N) **MANAGE AND CONTROL**. To manage, control, sell at public or private sale, convey, exchange, partition, divide, subdivide, improve, repair; to grant options and to sell upon deferred payments; to pledge or encumber by mortgage or deed of trust or any other form of hypothecation; to otherwise dispose of the whole or any part of the trust on such terms and for such property or cash or credit, or any combination thereof, as the Trustee may deem best; to lease for terms within or extending beyond the duration of the trust for any purposes; to create restrictions, easements, to compromise, arbitrate, or otherwise adjust claims in favor of or against the trust; to institute, compromise and defend actions and proceedings with respect to the trust; and to secure such insurance, at the expense of the trust, as the Trustee may deem advisable.

(O) **PROFESSIONAL ASSISTANCE**. To employ and compensate agents, investment managers, attorneys, accountants, and other professionals deemed by the Trustee to be

4-6

reasonably necessary for the administration of the trust, and the Trustee shall not be liable for any losses occasioned by the good faith employment of such professionals, nor shall the Trustee be liable for any losses occasioned by any actions taken by the Trustee in good faith reliance upon any advice or recommendation thereof; to pay all costs, taxes, and charges in connection with the administration of the trust; and to be reimbursed for all reasonable expenses, including attorneys' fees, incurred in the management and protection of the trust and to pay such professionals a reasonable fee without court approval thereof. Any such payment by the Trustee of such fees shall be out of principal or income, as the Trustee may elect, or partially out of each. The discretion of the Trustee to pay these expenses from income or principal, or partially from each, is subject to the Trustee's fiduciary obligation to treat income beneficiaries and remaindermen equitably.

(P)    **PURCHASE**.  To purchase property at its fair market value as determined by the Trustee from the probate estate (if any) of either of us.

(Q)    **QUALIFICATION FOR GOVERNMENT BENEFITS**. The Trustee is authorized to take any actions that the Trustee determines to be appropriate or necessary in connection with the qualification for or receipt of government benefits for either of us, including benefits (whether income, medical, disability, or otherwise) from any agency (whether state, federal, or otherwise), such as Social Security, Medi-Cal, Medicare, or state supplemental programs. In particular, we authorize and direct the Trustee, upon receiving written notice from either of us, the conservator of either of us, or the person holding a Durable Power of Attorney for either of us, to partition all of the community property of the Trust for the purpose of transmuting such community property to be the separate property of either of us. Upon such partition, if one of us is incompetent, the Trustee shall have the authority to divide our residence and our other assets between us in whatever manner is required to maximize any such government benefits or to maximize the non-incapacitated spouse's "Community Spouse Resource Allowance" ("CSRA") and/or "Minimum Monthly Maintenance Needs Allowance" ("MMMNA") as those terms are defined in the Medicare Catastrophic Coverage Act, as amended, or similar state laws or regulations. We authorize and encourage the Trustee to engage in estate planning, financial planning, Medi-Cal planning, long term care planning and/or asset preservation planning, to such extent and in such manner, as the Trustee shall deem necessary or advisable. Pursuant to this authority and notwithstanding any other provision of this Trust Agreement, the Trustee may also transfer any portion of the Trust Estate without limitation to the beneficiaries hereunder, including the Trustee if the Trustee is one such beneficiary, or to another trust established for the benefit of the beneficiaries hereunder, including the Trustee if the Trustee is one such beneficiary, in the complete discretion of the Trustee, even if doing so may be considered self-dealing. Any transfers made pursuant to this authority shall, for all purposes, be deemed to have been "in my best interest" if: (1) made in accordance with the provisions of this Paragraph; and (2) made in the context of estate planning, financial planning, Medi-Cal planning, long term care planning and/or asset preservation planning.

(R)    **RECEIVE ASSETS**. To receive, take possession of, sue for, recover and preserve the assets of the trust, both real and personal, coming to its attention or knowledge, and the rents, issues and profits arising from such assets.

(S)    **RETENTION OF TRUST PROPERTY**. To retain, without liability for loss or depreciation resulting from such retention, any assets received by the Trustee or any property that may from time to time be added to the trust or any trust created hereunder; or any property in which the funds of any trust may from time to time be invested, for such time as the Trustee shall deem best, even though such property may represent a large percentage of the total property of the trust or it would otherwise be considered a speculative or inappropriate

4-7

investment. This authority shall be construed as expanding the "standards of care" rule of the California Trust Code (Division 9 of the California Probate Code beginning with § 15000) or in the Uniform Prudent Investor Act (as it may otherwise apply); however, this authority shall not supersede any right otherwise granted to the surviving spouse under this Trust Agreement to compel that certain trust assets be made productive.

(T)     **SAFE DEPOSIT BOXES**. To hire a safe deposit box and/or space in a vault and to surrender or relinquish any such safe deposit box and/or space in a vault.

(U)     **SECURITIES**. With respect to any corporation or partnership, the stocks, bonds or interests in which may form a part of the trust estate, to act in the same manner and to exercise any and all powers which an individual could exercise as the legal owner of any such corporate stock or partnership interest, including the right to vote in person or in proxy, or to surrender, exchange or substitute stocks, bonds, or other securities as an incident to the merger, consolidation, re-capitalization or dissolution of any of such corporation, or to exercise any option or privilege which may be conferred upon the holders of such stocks, bonds, or other securities, either for the exchange or conversion of the same into other securities or for the purchase of additional securities, and to make any and all payments which may be required in connection therewith.

(V)     **SUBCHAPTER S STOCK**. Before the date on which any "S Corporation Shares" (defined below) would otherwise pass to or be treated as held by an "Ineligible Trust" (defined below), the Trustee may elect to hold these S Corporation Shares in one or more separate trusts or trust shares on the terms set forth in this Paragraph. The Trustee may elect to hold such S Corporation Shares under the section entitled "Qualified Subchapter S Trusts" or the section entitled "Electing Small Business Trusts," as the Trustee shall deem appropriate, considering the changes that such provisions would require from the terms and conditions under which such shares would otherwise be held under this Agreement.

(1)     Qualified Subchapter S Trusts.  Any S Corporation Shares held under this section shall be held on the following terms:

(a)     Each trust held under this section shall be a separate trust or substantially separate and independent share, as defined in § 1361(d)(3) of the Code, held for the benefit of one beneficiary. Any reference in this section to a beneficiary's separate trust shall refer equally to any substantially separate and independent trust share.

(b)     Until the "QSST Termination Date" (defined below), the Trustee shall annually distribute all of the trust's "Net Income" (defined below) to the sole beneficiary of each trust held under this section, together with as much of that trust's principal as is appropriate under the standard contained in the trust to which such S Corporation Shares would otherwise have been held. The Trustee shall not distribute income or principal to anyone other than the beneficiary to whom Net Income is distributable until the QSST Termination Date.

(c)     Upon the QSST Termination Date, the Trustee shall distribute the remaining trust assets to the beneficiary to whom Net Income was then distributable.

    (d)    The Trustee shall elect under § 1361(d)(2) of the Code to cause each trust held under this section to be treated as a Qualified Subchapter S Trust for Federal income tax purposes.

    (e)    The Trustee shall administer any trust under this section as a Qualified Subchapter S Trust, as defined in § 1361(d)(3) of the Code.

    (f)    The Trustee shall allocate any S Corporation Shares that will be held under this section to the one trust under this section that is not the Ineligible Trust or, if there is more than one trust under this section that is not the Ineligible Trust, between or among those separate trusts, based on each beneficiary's interest in the income of the Ineligible Trust that would otherwise have held those shares. If no beneficiary was entitled to income of such Ineligible Trust at that time, the Trustee may allocate any S Corporation Shares to the one trust under this section that is not the Ineligible Trust or, if there is more than one trust under this section that is not the Ineligible Trust, between or among those separate trusts for the beneficiaries of such Ineligible Trust, in such manner as the Trustee shall deem appropriate.

(2)    <u>Electing Small Business Trusts</u>.  Any S Corporation Shares held under this section shall be held on the following terms:

    (a)    The Trustee shall apportion to the trusts under this section a reasonable share of the unallocated expenses of all trusts under this Agreement, in a manner consistent with the applicable Code and Regulations.

    (b)    The Trustee shall make the election required by § 1361(e)(3) of the Code to qualify the trust under this section as an Electing Small Business Trust, under § 1361(e) of the Code.

    (c)    The Trustee shall administer each trust under this section as an Electing Small Business Trust, under § 1361(e) of the Code.

(3)    <u>Implementation</u>. The Trustee shall manifest the Trustee's selection of the form in which the trust shall hold any S Corporation Shares by written notice to all persons who would be eligible or entitled at the time of such writing to receive income from the Ineligible Trust that would otherwise hold such S Corporation Shares.

(4)    <u>Definitions</u>. The following definitions apply for purposes of this Paragraph:

    (a)    "Ineligible Trust" means a trust whose ownership of any S Corporation Shares would cause the termination of that corporation's election to be taxed under subchapter S of the Code.

    (b)    "Net Income" means income, as defined in § 643(b) of the Code.

    (c)    "S Corporation Shares" means shares of any stock of a corporation that then operates, or that the Trustee shall deem likely to operate in the future, under an election to have its earnings taxed directly to its stockholders under subchapter S of the Code.

(d) "QSST Termination Date" means the earlier of the date on which the beneficiary of a trust under this Paragraph dies and the date on which such trust no longer holds any S Corporation Shares.

(5) <u>Application</u>. None of the foregoing provisions of this Paragraph shall apply with respect to any S Corporation Shares that would, but for the provisions of this Paragraph, be held in any trust any portion of the disposition to which would qualify for the Federal estate and/or gift tax marital deduction.

(W) **TAX CONSEQUENCES**. To prepare and file returns and arrange for payment with respect to all local, state, federal and foreign taxes incident to this Trust Agreement; to take any action and to make any election, in the Trustee's discretion, to minimize the tax liabilities of this Trust Agreement and its beneficiaries.

(X) **GENERAL POWERS**. To do any and all other acts necessary, proper or desirable for the benefit of the trust and its beneficiaries, and to effectuate the powers conferred upon the Trustee hereunder.

## 8.1 TRUSTEE AUTHORITY.

(A) Subject to state law, a Trustee may appoint an "Attorney-in-Fact" and delegate to such agent the exercise of all or any of the powers conferred upon a Trustee and may at pleasure revoke such appointment. Any such appointment shall be made by a written, acknowledged instrument.

(B) No purchaser from or other person dealing with the Trustee shall be responsible for the application of any purchase money or thing of value paid or delivered to the Trustee, and the receipt by the Trustee shall be a full discharge; and no purchaser or other person dealing with the Trustee and no issuer, or transfer agent, or other agent of any issuer of any securities to which any dealings with the Trustee should relate, shall be under any obligation to ascertain or inquire into the power of the Trustee to purchase, sell, exchange, transfer, mortgage, pledge, lease, distribute or otherwise in any manner dispose of or deal with any security or any other property held by the Trustee or comprised in the trust.

(C) Prior to delivering the trust estate to a successor Trustee or to making any partial or complete distribution of principal hereunder (other than a distribution that is made in the exercise of the Trustee's discretion and does not terminate the trust), the Trustee may require an approval of the Trustee's accounts and a release and discharge from all beneficiaries having an interest in the distribution. If any beneficiary or beneficiaries shall refuse to provide a requested release and discharge, the Trustee may require court settlement of such accounts; all of the Trustee's fees and expenses (including attorneys' fees) attributable to court approval of such accounts shall be paid by the trust involved to the extent that the accounts are approved.

(D) The certification of a Trustee and/or Attorney-in-Fact that such Trustee and/or agent is acting according to the terms of this Trust Agreement shall fully protect all persons dealing with such Trustee and/or agent.

(E) In the event any Trustee hereunder is precluded by any other provision of this Trust Agreement or by the laws of any state from acting as a Trustee in such state, the Trustee may appoint a "Special Trustee" qualified to act and may delegate to such Special Trustee the exercise of all or any of the powers conferred upon a Trustee hereunder. A Special Trustee shall in no way be responsible for the matters not delegated to it. Any appointment

of a Special Trustee and the delegation of powers to such Special Trustee shall be made by a written, acknowledged instrument.

(F)     At any time and from time to time, a Trustee may delegate to any co-Trustee any or all of the delegating Trustee's powers and authorities conferred upon such Trustee by law or by this Trust Agreement; provided however, that a power or authority which is specifically conferred upon a Trustee (to the exclusion of any other Trustee or any other person or entity) shall not be delegated. The delegating Trustee may at pleasure revoke such delegation. Any delegation or revocation shall be made by a written, acknowledged instrument which shall be delivered to the person or entity to whom the delegation is made. So long as any such delegation is in effect, any power or authority hereby delegated may be exercised by the person or entity to whom such delegation was made, and any action may be taken by such person or entity to whom such delegation was made with the same force and effect as if the Trustee delegating such power or authority had itself joined in the exercise of such power or authority in the taking of such action.

(G)     If Co-Trustees are acting, whenever there shall be a dispute, deadlock or difference of opinion between them on a question of joint discretion, the determination of the majority shall be binding, but the dissenting Trustee or co-Trustees shall bear no liability or accountability for any act or transaction entered into as a result of the enforcement of the majority rule if such Trustee or co-Trustees shall have dissented in writing in advance of such act or transaction. If only two co-Trustees are acting, whenever there shall be a dispute, deadlock or difference of opinion between them on a question of joint discretion on which they cannot agree, such conflict shall be settled by the Trust Protector (as hereinafter designated in this Article). If no Trust Protector is then acting, such conflict shall be settled in accordance with the laws of the State of California (if no such laws then exist, in accordance with the then current rules of the American Arbitration Association) and the findings of such arbitration may be enforced by any Court having jurisdiction thereof; provided however, prior to submitting any such conflict to arbitration, the co-Trustees must first attempt to resolve the conflict through formal mediation

(H)     Notwithstanding any power of individual signature contained in this Trust Agreement or hereafter conferred on the Trustees, no one co-Trustee shall have the right, power or authority to make any unilateral decision affecting the trust, other than of a purely ministerial nature.

(I)     **RELEASE OF HEALTHCARE INFORMATION, INCLUDING HIPAA AUTHORITY**. We intend for the Trustee to be treated as we would regarding the use and disclosure of our individually identifiable health information or other medical records. This release authority applies to any information governed by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. 1320d and 45 CFR 160-164, and the California Confidentiality of Medical Information Act ("CMIA"), California Civil Code § 56. We authorize any physician, healthcare professional, dentist, health plan, hospital, clinic, laboratory, pharmacy or other covered health provider, any insurance company or medical information bureau or other health care clearinghouse that has provided treatment or services or that has paid for or is seeking payment from either of us for such services to give, disclose, and release, either orally or in writing, to the Trustee or Trustees, without restriction, all of our individually identifiable health information and medical records regarding any past, present or future medical or mental health condition.

The authority given to the Trustee shall supersede any prior agreement that we have made with either of our health care providers to restrict access to or disclosure of our individually identifiable health information. The authority given to the Trustee has no expiration date

4-11

and shall expire only in the event that either of us revokes the authority in writing and delivers such revocation to our health care providers.

(J)     **LIFE INSURANCE**. Upon the death of either of us, the Trustee shall proceed immediately to collect the net proceeds of policies, if any, on our lives which are then payable to the Trustee and shall hold such proceeds for the purposes and upon the trusts provided in this Trust Agreement. Payment to the Trustee by an insurance company of the proceeds of such policies and receipt of such proceeds by the Trustee shall be a full discharge of the liability of such insurance company with respect to such proceeds, and no insurance company need inquire into or take notice of this Trust Agreement or see to the application of such payments. The Trustee may prosecute and maintain any litigation necessary to enforce payment of such policies.

(K)     **RETIREMENT ACCOUNTS**. To the extent any trust hereunder is the beneficiary of a Retirement Account (as hereinafter defined), the Trustee shall draw the benefits from the Retirement Account in amounts sufficient to meet the minimum distribution requirements of § 401(a)(9) of the Code and the regulations thereunder (the "Required Minimum Distribution"). Notwithstanding any provision of the trust to the contrary, the Required Minimum Distribution shall be paid to or applied for the benefit of the person or persons then entitled to receive or have the benefit of the income from such trust, or if there is more than one income beneficiary, the Trustee shall make such distribution to such income beneficiaries in the proportion in which they are beneficiaries or if no proportion is designated in equal shares to such beneficiaries.

(1)     "Retirement Account" means amounts held in or payable pursuant to a plan (of whatever type) qualified under Code § 401, or an individual retirement arrangement under Code § 408, or a Roth IRA under Code § 408A, or a tax-sheltered annuity under Code § 403, or a deferred compensation plan under Code § 457 or any other benefit subject to the distribution rules of Code § 401(a)(9), or the corresponding provisions of any subsequent federal tax law. It is our intention that this trust qualify as a "conduit trust" under Code § 401(a)(9) so that the trust's beneficiaries shall be considered designated beneficiaries for purposes of the minimum distribution rules, and that distributions may therefore be taken over the trust beneficiary's life expectancy (or the life expectancy of the oldest trust beneficiary).

(2)     The Retirement Accounts shall not be subject to the claims of any creditor of either of our estates, they shall not be used for the satisfaction of any distributions to a "non-designated beneficiary" (as that term is defined in Treas. Reg. § 1.401(a)(9)-4, Q&A 1) and they shall not be applied to the payment of the debts, taxes of either of us or other claims or charges against either of our estates unless and until all other assets available for such purposes have been exhausted, and even then only to the minimum extent that would be required under applicable law in the absence of any specific provision on this subject in this Trust, and, under no circumstances, shall they be used for such purpose after September 30th of the year following the death of the owner of the Account.

(L)     **RELEASE OF POWERS**. Each Trustee shall have the power to release or to restrict the scope of any power that such Trustee may hold in connection with any trust created under this Trust Agreement, whether said power is expressly granted in this Trust Agreement or implied by law. The Trustee shall exercise this release in a written instrument specifying the powers to be released or restricted and the nature of any such restriction. Any released power shall pass to and be exercised by the other then-acting Trustees.

(M) **POWERS OF INVASION.** A discretionary power given to a Trustee of any trust created hereunder to invade or utilize the principal of such trust for "health, support, maintenance or education" (or a similar use of such terms) shall be considered to be in compliance with §§ 2041 and 2514 of the Code and any exercise of such power shall be limited by those sections. Notwithstanding § 16081(c) of the California Probate Code, any other discretionary power given to a Trustee of any trust created hereunder to invade or utilize the principal of such trust for any other purpose shall be deemed to be a broader power if a clear reading of the terms of such power would so indicate. Further, notwithstanding § 16081(c) of the California Probate Code, any discretionary power to make distributions of income or principal of any trust created hereunder which is given to a current beneficiary as sole Trustee is specifically intended to be given to such sole Trustee and the right of any other beneficiary to have another Trustee appointed for the purpose of making such discretionary distributions is hereby specifically waived.

(N) **TRUST PROTECTOR.** We, and the survivor of us, reserve the right, to appoint and remove a Trust Protector of this trust at any time or times by written notification to the then-acting Trustee. If any appointed Trust Protector is unwilling or unable to act, then such Trust Protector may appoint a successor Trust Protector by designating such successor by an instrument in writing delivered to the then-acting Trustee and to us; and may, by the same method, revoke any designation of a successor Trust Protector before it becomes effective. In addition, any successor Trust Protector so serving is authorized to designate, by an instrument in writing delivered to the then-acting Trustee, a successor Trust Protector. No beneficiary of a trust established herein and no other person whose appointment may cause such person to be treated as the owner of the trust (or any portion thereof) for federal income tax purposes (pursuant to §§ 671, *et seq.*, of the Code) may serve as Trust Protector. In exercising discretion as the Trust Protector, any Trust Protector who has or is currently providing legal services to either of us shall be allowed complete discretion to resolve all issues without regard to instructions received from us or any duties owed to us. It is our specific intent that the Trust Protector shall not be deemed to be a trustee or fiduciary with respect to any trust hereunder and shall not be liable or accountable as a trustee or fiduciary because of an act or omission of the Trust Protector when performing or failing to perform the duties of a Trust Protector under this Trust Agreement. The Trust Protector will serve without compensation but may be reimbursed for out-of-pocket expenses. Any acting Trust Protector shall have the following powers:

(1) The Trust Protector may remove any and all Trustees and may designate and appoint successor Trustees; such removal and appointment shall be by an instrument in writing, and the removal shall only be effective upon the signed acceptance of the successor Trustee agreeing to the appointment. Provided, however, that the Trust Protector may not appoint himself or herself as the Trustee. In the event that a successor Trustee is either removed or appointed pursuant to any other provision of this Article, the Trust Protector may either reinstate or remove such successor Trustee.

(2) If Co-Trustees are acting and there shall be a dispute, deadlock or difference of opinion between them on a question of joint discretion which cannot be decided by majority vote, such conflict shall be settled by the Trust Protector. The decision of the Trust Protector shall be set forth in a written instrument, delivered to the co-Trustees and shall be binding on the issue in dispute.

(3) The Trust Protector shall receive a copy of all notices, reports and/or accountings required by this Trust Agreement and/or by any applicable state law to be delivered to any trust beneficiary; further, and to the extent not prohibited by any applicable

4-13

state law, delivery to the Trust Protector shall be deemed to be the equivalent of delivery to the actual beneficiary.

    (4)    The Trustee shall consult with the Trust Protector as to the needs and requirements of the beneficiaries of the Trust, the suitability of any discretionary distribution and the fitness of any beneficiary to receive any distribution upon receipt of the recommendations of the Trust Protector, the Trustee shall have no duty to conduct an independent review of the individual beneficiary's situation and may rely on such recommendations. Notwithstanding the above:

    (a)    The Trustee shall, at all times, retain the actual power to make any discretionary distributions;

    (b)    If at any time there is no Trust Protector or if the Trust Protector fails to respond in writing in fifteen (15) days to any written request, then the Trustee may take such action as it deems to be in the best interest of the beneficiaries of the trust; and

    (c)    The Trust Protector shall not have any right or power to direct the Trustee to act in any manner inconsistent with any other duty or requirement herein set forth, or to direct the Trustee to act in any manner inconsistent with state laws concerning the fiduciary responsibilities of a Trustee.

    (5)    The Trust Protector may increase, decrease, modify or restrict the interests of any beneficiary of the trust; provided however, the Trust Protector may not grant a beneficial interest to an individual or a class of individuals unless the individual or class of individuals is specifically provided for under the Trust Agreement.

    (6)    The Trust Protector may modify or amend the Trust Agreement for any valid purpose or reason, including, without limitation, to achieve favorable tax status or to respond to changes in the Code or state law, or the rulings and regulations under the Code or state law.

**(O)**    **RELEASE OF POWERS**. Each Trustee shall have the power to release or to restrict the scope of any power that such Trustee may hold in connection with any trust created under this Trust Agreement, whether said power is expressly granted in this Trust Agreement or implied by law. The Trustee shall exercise this release in a written instrument specifying the powers to be released or restricted and the nature of any such restriction. Any released power shall pass to and be exercised by the other then-acting Trustees.

9.    **AUTHORITY TO ACT**:  The approval of any court, the Trustor(s), or any beneficiary of any Trust created by this Trust shall not be required for any dealings with the Trustee of this Trust, and any person so dealing with the Trustee of this Trust shall assume that the Trustee has the same power and authority to act as any individual does in the management of his or her own affairs.  Further, upon presentation of a copy of this page and any other page of this Trust, any person shall accept same as conclusive proof of the terms and authority granted by this Trust and shall assume that no conflicting terms or direction are contained in any of the omitted pages.

### ARTICLE VI
### TRUST ADMINISTRATION DURING LIFE OF TRUSTOR(S)

10.    **MANAGEMENT OF TRUST PROPERTY:**  All property of the Trust shall be managed by the Trustee at the direction of the Trustor(s).  The Trustee shall collect all income of the Trust and shall pay

from the income such amounts and to such persons as the Trustor(s) may from time to time direct.  In the absence of direction from the Trustor(s), the Trustee may accumulate the net income of the Trust or may disburse any portion of the net income to or for the benefit of the Trustor(s).  The Trustee is also authorized to pay from the principal of this Trust all amounts necessary for the health or maintenance of the standard of living of the Trustor(s).

During our joint lifetimes, we shall be equally entitled to the entire net income of the jointly owned property and/or the community estate (as hereinabove defined) held by the trust. At the written request of both of us, the Trustee shall pay to either spouse so much of the principal of the jointly owned property and/or the community estate held by the trust as we shall request or shall make such gratuitous transfers of the principal of the jointly owned property and/or the community estate held by the trust as we both shall direct. During our joint lifetimes, the Trustee shall also pay to each party, or shall apply for such spouse's benefit, the entire net income of such spouse's separate property (if any) held by the trust. At the written request of the spouse who contributed any separate property to the trust, the Trustee shall pay to such spouse so much of the principal of such separate property as he or she shall request. In the absence of any specific direction, the Trustee is also authorized to pay over or apply the net income and/or the principal of the trust for the support and maintenance of any person or persons who is dependent upon our financial support; further, the Trustee may also make gifts in favor of our issue, and any spouse of such issue. In this context, a gift "in favor of" a person includes but is not limited to a gift to a trust, an account under the Uniform Transfers to Minors Act of any jurisdiction, and a Tuition Savings Account or Prepaid Tuition Plan as defined under § 529 of the Code. Provided however, the aggregate amount of any gifts made in any one calendar year to any one individual shall not exceed the amount that may be made free of federal gift tax.

10.1   **INDEPENDENT ACTION OF TRUSTEE(S)**: The Trustee(s), **JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ**, may act without unanimous consent or action, and may be done independently by either Trustee, concerning the management or administration of the Trust.

11.   **INCAPACITY OF TRUSTOR(S)**:  During any period of incapacitation of the Trustor(s), as defined in this Trust Agreement, the Successor Trustee may apply or expend all or part of the income and principal of this Trust, or both, for the health and maintenance of the Trustor(s), in his or her accustomed manner of living.  Provided sufficient resources exist for the care and maintenance of the Trustor(s), during any period of incapacity of the Trustor(s), the Successor Trustee is further authorized to make distributions to or for the benefit of any issue of the Trustor(s) who has no other financial resources and who requires said distribution for their health or support.  The Successor Trustee shall consider all financial resources available to a beneficiary, including, but not limited to, the ability of said beneficiary and his or her spouse, if any, to earn a living prior to making an invasion of this Trust.  Under no circumstances may a Successor Trustee exercise this power for his or her own benefit.

As a guide to the Trustee, it is our intent that we, and the survivor of us, shall remain in our primary residence as long as it is medically reasonable and, if we should need convalescent care, that we be able to return home as soon as it is medically reasonable; the expense of home care shall be of secondary importance. This paragraph is for the guidance of the Trustee only and should not be considered by any third party as a restriction or limitation on the Trustee's powers to manage the trust in the Trustee's absolute discretion.

12.   **RESERVATION OF RIGHTS**:  Except during periods of incapacitation as defined by this Trust Agreement, upon delivery to the Trust of a written instrument, signed and acknowledged by the Trustor(s), the Trustor(s) does hereby reserve during his or her lifetime the following rights:

(A)   To revoke this Trust Agreement in its entirety and to recover any and all remaining property of the Trust after payment of all Trust administration expenses in accordance with California Code Section 15401. During our joint lifetimes, this Trust Agreement may be

revoked in whole or in part by an acknowledged instrument in writing signed by either of us which shall refer to this Trust Agreement and to this specific power and which shall be delivered to the then-acting Trustee and the other spouse. In the event of such revocation, the jointly owned property and/or the community estate (as hereinabove defined) held by the trust shall revert to both of us as if this Trust Agreement had not been created and any separate property held by the trust shall revert to the spouse who contributed such separate property and shall constitute spouse's separate property as if this Trust Agreement had not been created.

(B)     To alter or amend this instrument in any and every particular, at any time, and from time to time in accordance with the California Probate Code Section 15402. We may, at any time during our joint lifetimes, amend any of the terms of this Trust Agreement by an acknowledged instrument in writing signed by both of us which shall refer to this Trust Agreement and to this specific power and which shall be delivered to the then-acting Trustee.

(C)     To change, at any time and from time to time, the identity or number, or both, of the Trustee and/or Successor Trustee.

(D)     To withdraw from the operation of this Trust, at any time, and from time to time, any or all of the Trust property.

(E)     **REVOCATION AND AMENDMENT AFTER THE FIRST DEATH.**

   (1)     On the death of the first of us, the surviving spouse shall have the power to amend, revoke, or terminate the entire trust in whole or in part.

   (2)     Revocation and amendment shall be made in the manner as herein above provided in Paragraphs A. and B.

   (3)     After the death of the surviving spouse, the trust may not be amended or revoked.

(F)     **POWERS PERSONAL TO US**. Our powers to revoke or amend this Trust Agreement are personal to us and shall not be exercisable on our behalf by any conservator or other person, except the revocation or amendment may be authorized, after notice to the Trustee, by the Court that appointed a conservator and/or a guardian of either of us. Notwithstanding the previous sentence, in the event that either of us appoint an "Attorney-in-Fact," we reserve the right to confer upon such Attorney-in-Fact the power (1) to add property to the trust with the consent of the Trustee; (2) by written instrument delivered to the Trustee, to withdraw any property held hereunder (to the extent that we would individually have that power); and, (3) if specifically authorized in such appointment, by written instrument delivered to the Trustee, to modify or amend or revoke the trust (provided that the duties of the Trustee may not be increased or the Trustee's fees reduced without the consent of the Trustee). Any such appointment shall be made by a written, acknowledged instrument.

(G)     **TANGIBLE PERSONAL PROPERTY**. While either of us is living, we reserve the right to retain the control, use and possession of any or all of the tangible personal property included in the trust. We expressly limit the Trustee's responsibility with respect to the property so retained to the Trustee's function as the holder of legal title until we (or the survivor of us) surrender our right to the use and possession of any such property or until the death of both of us. In addition, we shall have the right, exercisable by written notice to the Trustee on terms specified by us, to direct the sale, transfer, gift or other disposition

4-16

of any such property, with or without consideration, and the Trustee shall take all actions necessary to comply with the terms of such notice. In the event we surrender any such property to the Trustee, or upon our deaths, the Trustee shall take possession, preserve and maintain such property. The Trustee shall be responsible and accountable only for that tangible personal property which is actually in the Trustee's possession or control or, if retained by us, is found by application of reasonable diligence at the death of the survivor of us or at such time that the Trustee asserts control.

(H)   **RESIDENTIAL PROPERTY**. We reserve the right to have complete and unlimited, possession, use and control of any real property which may ever constitute an asset of the trust estate and which is occupied by us for residential purposes, thereby retaining the requisite beneficial interest and possessory rights in and to such real property to comply with the "Homestead" laws of the State in which such property is located, so that such requisite beneficial interest and possessory rights constitute in all respects "equitable title to real estate". Notwithstanding anything to the contrary contained in this Trust Agreement, our interest in such real property shall be an interest in real property, and not personalty, and such real property shall be deemed to be our homestead; such use and control shall be without rent or other accountability to the Trustee. As part of such use and control, we, and not the Trustee, shall have the responsibility to manage such property, pay taxes, insurance, utilities and all other charges against the property, and may, at our option, charge such expenses to the trust, or may request reimbursement for any advances made for such purposes.

In the event any real property is encumbered or conveyed as security for repayment of a Home Equity Conversion Mortgage loan (or any form of "Reverse Mortgage" loan) to us, or the survivor of us, the Trustee shall ensure that the trust will abide by written instruments or agreements which either of us have executed in connection with any such loan; further, the Trustee will immediately notify the lender and any servicer of the loan, in writing, of any of the following events:

(1)   The death of the survivor of us;
(2)   Any change of occupancy by the survivor of us;
(3)   Any conveyance of the property; or,
(4)   Any transfer of any beneficial interest in the property.

**ARTICLE VII**
**DISTRIBUTIONS DURING LIFETIME OF TRUSTOR(S)**

13.   **GENERAL DISTRIBUTIONS**:  The following options are available to the Trustee regarding the distribution of principal or income to or for a beneficiary:

(A)   Payments may be made directly to the beneficiary as an allowance, in such amounts as the Trust may deem advisable.

(B)   Payments may be made to the Guardian of the beneficiary.

(C)   Payments may be made to a relative of the beneficiary upon agreement of such relative to expend such income or principal solely for the benefit of the beneficiary.  Said agreement may include a custodianship under the Uniform Transfers (or Gift) to Minors Act of any state.

(D)   The Trustee may expend such income or principal directly for the beneficiary.  After making a distribution as provided above, the Trustee shall have no further obligation regarding distribution.

(E)     In making distributions of income or principal, the Trustee shall be mindful of the Beneficiaries health, education, support, maintenance, comfort and general welfare needs.

14.     **RESIDENCE**:  A residence may be purchased or otherwise obtained by the Trustee for the benefit of an income beneficiary of any Trust for use by the beneficiary and his or her family.  Rent shall not be charged to said beneficiary and expenses of maintaining such residence may be borne by the Trust, the beneficiary, or partly by each, as the Trustee may deem proper.

15.     **OTHER PAYMENTS**:  At the request of any Trustor(s) in writing, the Trustee shall make lump sum or periodic payments to any third party designated by such Trustor(s).

**ARTICLE VIII**
**TRUST ADMINISTRATION AFTER TRUSTOR(S)' DEATH**

16.     **TRUSTEE**:  Upon the death of the Trustor(s), the Successor Trustee(s) shall continue to administer the assets of this Trust, as well as any other property received by this Trust from any source and shall distribute said assets as provided herein.

16.1 **NON-CITIZEN SURVIVING SPOUSE**. If the surviving spouse is not a U.S. Citizen, and acting as an initial trustee, the trustee(s) shall elect to treat the Trust as a qualified domestic Trust, and shall select the trustee(s), each of whom is a U.S. Citizen or domestic corporation, to serve with the surviving spouse, until the surviving spouse becomes a U.S. Citizen, in order to then elect, in writing, to serve as the sole trustee. The trustee(s) shall pay to the surviving spouse, or apply for the spouse's benefit, all of the income of the Decedent's Trust in monthly or other installments not less often than quarterly. In addition, the trustee(s) shall pay to the surviving spouse, or apply for the spouse's benefit, those amounts of the principal of the Decedent's Trust as, in the discretion of the trustee(s) appear necessary for the spouse's health, support and maintenance.

17.     **BENEFITS PAYABLE TO TRUST**:  Upon the death of the Trustor(s), the Surviving Trustee or if none, the Successor Trustee(s), is hereby authorized to take any and every action necessary to collect any and all benefits payable to the Trust, including but not limited to proceeds from life insurance policies, retirement plans, or IRA's.  The Trustee is further authorized to collect any and all tax refunds, health insurance proceeds, refunds under any contract, death benefits, or any other item payable to the Trustor(s)' estate.

18.     **LIABILITIES OF TRUSTOR(S)' ESTATE**:  Prior to the distribution of any assets of this Trust, the Trustee may, at his or her sole and absolute discretion, pay to the Trustor(s)' estate from the principal or income of the Trust, any, or all, of the Trustor(s)' just debts, funeral expenses, and administration expenses of the Trustor(s)' estate.  Alternatively, the Trustee may, but is not obligated to, pay such expenses directly.

19.     **TAXES**:  Upon the death of the Trustor(s), all estate and inheritance taxes that become due and payable upon all of the property comprising the Trustor(s)' gross estate, without regard to how such property passes, shall be paid by the Trustee either to the estate of the Trustor(s) or to the appropriate tax agency.  The Trustee shall have the right of contribution as provided by Section 2207 and 2207A IRC, if applicable.

20.     **ADDITIONAL DISTRIBUTIONS**:  The Trustee is hereby authorized to pay the Probate Estate of the deceased Trustor(s) as much of the income and principal of this Trust as the Trustee deems necessary for any purpose, in addition to the other distributions of this Trust.

21.   **GIFTS**:  The Successor Trustee(s) shall, upon the death of the Trustor(s), make such gifts of the tangible personal property of the Trustor(s) held or acquired by this Trust as may be directed by Paragraph 22 of this trust, the Trustor(s)' Will or any list, letter, or other writing of the Trustor(s) permitted by the Will of the Trustor(s), or as may be directed by a list, letter or other writing designated as Schedule B of this Trust, whenever made.  All costs of storing, packing, shipping, and insuring such gifts shall be paid by the Trust.

**ARTICLE IX**
**TRUSTOR(S)' DEATH**

22.   (A)   **BENEFICIARIES AND DISTRIBUTIONS**:  Upon the death of the both Trustor(s), unless otherwise specified, the following distributions shall be made from the property of this Trust after payment of the Trustor(s)' just debts, funeral expenses, expenses of any last illness, and the other distributions otherwise provided for in this Trust:

**SPECIFIC GIFTS:**

**As to all specific gifts not otherwise distribution it shall be within DESIREE JANE BUNEVACZ A/K/A DESIREE JANE GUNDERSEN's discretion to distribute.**

**The remainder of the trust estate shall be distributed to the following:**

| | |
|---|---|
| **DESIREE JANE BUNEVACZ A/K/A DESIREE JANE GUNDERSEN** | **75%** |
| **DAVID JOSEPH BUNEVACZ** | **12.5%** |
| **BREANNA SOFIA BUNEVACZ** | **12.5%** |

**Per Capita**

**CONTINGENCIES/RESTRICTIONS:**

**If DAVID JOSEPH BUNEVACZ predeceases Trustors, then this share of the estate shall be distributed to BREANNA SOFIA BUNEVACZ.**

**If BREANNA SOFIA BUNEVACZ predeceases Trustors, then this share of the estate shall be distributed equally per capita between HAYCA BUNEVACZ and JOSEPH GRANT BUNEVACZ.**

(B)   **DISTRIBUTION UPON DEATH OF FIRST TRUSTOR**:

(1)   Following the death of the first Trustor, and prior to the death of the Surviving Trustor, the Trustee shall pay to or for the benefit of the Surviving Spouse (Surviving Trustor), at the Trustee's sole and full discretion, so much of the income and principal as the Trustee deems necessary including but not limited to the health, maintenance, education, support, and happiness of the Surviving Trustor.

(C)   **DISCLAIMER TRUST**

(1)   <u>Purpose of Disclaimer Trust</u>.  In this Division, a disclaimer is a Surviving Trustor's (Settlor's) refusal to accept a transfer of property (or a particular right or interest in property) from the Deceased Trustor (Settlor).  Disclaimers are sometimes used to fine-tune an estate plan after the death of the Deceased Settlor, thereby saving substantial taxes. This is particularly true if family wealth has significantly increased or if it is determined that the Surviving Settlor has an unexpectedly short life expectancy. The provisions in this Division are intended to provide the Surviving

4-19

Settlor with increased opportunities to use disclaimers in appropriate cases.   The Settlors understand that it is important to consult a tax professional promptly after the death of the Deceased Settlor about the possible benefits of a disclaimer. The Surviving Settlor has no obligation whatever to make any disclaimers.

(2)   <u>Disclaimer of Property Passing to Surviving Settlor</u>.  The Surviving Settlor (or the personal representative of a deceased Surviving Settlor) shall have the right to disclaim any property of the Deceased Settlor distributable to the Survivor or the Survivor's Trust. In the event of such a disclaimer, the disclaimed property shall be held and administered by the trustee as a separate trust known as the Disclaimer Trust. The trustee shall pay to the Surviving Settlor all income of the Disclaimer Trust in quarter-annual or more frequent intervals, plus as much of the principal as the trustee in its discretion determines is appropriate for the Surviving Settlor's health, education, and support. In exercising its discretion, the trustee may take into account other income and resources available to the Surviving Settlor to such extent, if any, as the trustee deems appropriate.

(3)   <u>Surviving Settlor's Disclaimer of Mandatory Income Interest</u>.   If the Surviving Settlor also disclaims the right to receive mandatory income distributions from the Disclaimer Trust without disclaiming rights to principal, income shall be added to principal and the Trustee shall pay to the Surviving Settlor as much of the trust property as the trustee in its discretion determines is appropriate for the Surviving Settlor's health, education, and support. In exercising its discretion, the trustee may consider other income and resources available to the Surviving Settlor to such extent, if any, as the trustee deems appropriate.

(4)   <u>Surviving Settlor's Disclaimer of All Rights in Disclaimer Trust</u>.   If the Surviving Settlor disclaims all rights to principal and income with respect to all or a fractional share of the Disclaimer Trust, the property so disclaimed shall be distributed in the manner provided in the next paragraph, except that solely for the purpose of applying the survivorship requirements in the next paragraph, the Surviving Settlor will be deemed to have died on the date of death of the Deceased Settlor.

(D)   **DISPOSITION OF TRUST ESTATE ON DEATH OF THE SURVIVING TRUSTOR.**:  Unless otherwise specified in Paragraph 22(A), If any of the children or beneficiary of the Trustors survives the Surviving Trustor, but none of the children or beneficiary are under the age of twenty-one (21) years (or any age or restriction as designated above in paragraph 22(A)) at the time of the death of the Surviving Trustor, the Trustee shall divide the Trust property (including all income then accrued but uncollected and all income then remaining in the hands of the Trustee) into as many shares of equal market value or pursuant to the stated percentages above, as are necessary to create one share for each of the Trustor's children who survive the Surviving Trustor and one share for each of the Trustor's children who predecease the Surviving Trustor and who have left issue surviving him or her (if the plan is set up per stirpes).   The Trustee shall distribute one share outright to each of the Trustor's beneficiary or beneficiaries.  The Trustee shall distribute each share created for a deceased child or deceased beneficiary, to the then-living issue of that child or beneficiary, with those issues to take that share of the trust property as their deceased parent would have received. If all individual issue of a deceased child have reached the age of 21 years (or age as designated above)  at the death of the Surviving Trustor, the Trustee shall distribute the share created for that deceased child or beneficiary outright to those issue; if any individual issue of a deceased child has not reached the age of 21 years at the death of the Surviving Trustor, the Trustee shall continue to hold, administer, and distribute the share created for the deceased child or beneficiary in a separate trust for all then-living issue of that deceased

4-20

child or beneficiary according to the terms set forth applicable to the Sprinkling Trust for Issue.

If any children (or beneficiaries) of the Trustor surviving the Surviving Trustor are under the age of 21 years at the time of the death of the Surviving Trustor, the property shall be held, administered, and distributed by the Trustee, in trust, according to the terms set forth in this article applicable to the Sprinkling Trust.

If at any time before full distribution of the trust estate the Trustors and all the Trustor's issue are deceased, and no other disposition of the property is directed by this instrument, the remaining portion of the trust shall then be distributed to the Trustor's legal heirs according to the laws of succession of the State of California then in force.

We have intentionally, and not as a result of any mistake or inadvertence, omitted in this Trust Agreement to provide for any other children of either of us and/or the issue of such child, if any, however defined by law, presently living.

(E)   **SPRINKLING TRUST**.  Unless otherwise specified in Paragraph 22(A), Each share of portion of the Trust estate, or of the Trust property of any other Trust created by this Trust instrument, that is allocated to a Sprinkling Trust for the benefit of the beneficiaries when such beneficiary is under the age of twenty-one (21) years or any age as specified in ¶22(A), shall be held, administered, and distributed by the Trustee as a separate Trust, as follows:

Distributions to Young Persons.  If any person otherwise entitled to outright distribution of any property from any trust created by this document, is under the age of 21, or any age specified in ¶22(A), at the time the right to distribution vests, the trustee shall not make the distribution, but shall, instead, retain the property that would otherwise be distributed in a separate trust for the benefit of the underaged person ("Beneficiary"). The separate trust shall be administered as follows:

(1)   Unproductive Property.  The trustee shall hold as unproductive property any property that the trustee in its discretion determines should be preserved for distribution in kind to Beneficiary, including, in particular, tangible personal property of sentimental value. Such property shall be distributed to Beneficiary at such time as the trustee deems appropriate, but no later than the time of distribution of the remaining property.

(2)   Periodic Distributions.  The trustee shall pay to or for the benefit of Beneficiary, quarter-annually or at more or less  frequent intervals, or at intervals as specified in ¶22(A) , as much of the income and principal of the trust as the trustee in its discretion considers advisable for Beneficiary's support, health, and education, including professional education, after taking into consideration other resources of Beneficiary, the resources of the trust, and the likely future needs of Beneficiary within the trust term.

(3)   Power to Delay Distributions.  Despite the foregoing distribution provisions, the trustee may delay any distribution until a time no later than Beneficiary's death if the trustee determines that it is reasonably certain that the distributions are not in the Beneficiary's best interests because the beneficiary is incompetent, suffers from substance abuse, or because Beneficiary's financial circumstances are such that failure to delay distributions will actually reduce the trust benefits to Beneficiary.

(4)    <u>Beneficiary's Failure to Survive</u>.  If Beneficiary dies before final distribution, the trust shall terminate, and the remaining trust property shall be distributed to such persons, including Beneficiary's estate and creditors, as Beneficiary may appoint under the provisions of this trust for exercising a power of appointment. If this appointment power is not effectively exercised with respect to any trust property, that property shall be distributed to the then surviving issue of Beneficiary, per capita at each generation, and, if none, then to the then living siblings of the Beneficiary, with the then living issue of deceased siblings taking the shares of deceased siblings per capita at each generation; and, if none, then to the persons entitled to the Beneficiary's estate under the California laws of succession, or as directed in ¶22(A).

(5)    <u>Trustee</u>.  The trustee of any trust established under this paragraph shall have the power to name successors and may amend the trust to provide for administration of the trust by multiple trustees in such manner as the trustee deems appropriate. The trustee is encouraged to provide a trustee arrangement that results in more than one adult having access to the books and records of the trust during Beneficiary's minority. The provisions of this document concerning trustees shall continue to apply to this trust to the extent not inconsistent with exercises of the powers of the trustee granted in this subparagraph.

(F)    **DISTRIBUTION IF SPECIAL NEEDS TRUST REQUIRED.**  Unless otherwise specified in Paragraph 22(A)**,** In the event any beneficiary entitled to receive a distribution from the trust estate is also receiving government benefits that would impair the beneficiary's continued right to receive the government benefits, then the funds that were to be distributed to the beneficiary shall instead be held, administered, and distributed by the Trustee for the benefit, welfare, and education of the beneficiary, pursuant to the provisions set forth below.

(1)    The primary beneficiary of this trust has a disability that substantially impairs the beneficiary's ability to provide for the beneficiary's own care or custody and constitutes a substantial handicap.  The purpose of this trust is to provide financial aid that is supplemental to, rather than a replacement for, government benefits provided to the beneficiary, without disturbing government benefits that would be available to the beneficiary if the trust did not exist.   The Trustee shall hold, administer, and distribute all property allocated to the trust for the benefit of the following beneficiary during the beneficiary's lifetime, unless this trust is earlier terminated.

(2)    In accordance with the purpose of this trust and subject to the guidelines provided below, the Trustee may pay to or apply for the benefit of the beneficiary as much of the trust net income as the Trustee determines, in the Trustee's sole discretion, to be necessary or desirable to meet the beneficiary's special needs. "Special needs" are items or services that the Trustee considers necessary for the beneficiary's health, protection, and welfare and that cannot, in the Trustee's opinion, be provided by grants, services, and supplies available through any public agency, office, or department of California, any other state, or the United States. "Special needs" may include funds, items, or services that enhance the beneficiary's quality of life. Examples of funds, items, or services meeting special needs are incidental spending money, travel funds, personal items such as radios and televisions, gifts on the beneficiary's behalf to friends and relatives, a paid companion, health care services, supplies, and special equipment, training programs, and rehabilitation supplemental to those that the beneficiary is entitled to receive under a government assistance

program. The Trustee is neither obligated nor compelled to make any distribution. Any undistributed income shall be accumulated and added to principal.

(3)     The Trustee shall seek support and maintenance for the beneficiary from all available public resources, including but not limited to Social Security payments, Supplemental Security Income, Social Security Disability Insurance, Veterans Administration benefits of every kind, and any payments administered by the California Department of Health.  If the Trustee receives government assistance benefits on the beneficiary's behalf, the Trustee shall collect, expend, and account for those benefits separately from, and not commingle them with, all other assets of this trust.

(4)     The Trustee shall not use or distribute trust assets that will:

(a)     Make the beneficiary ineligible for public benefits otherwise available to the beneficiary from any public agency, office, or department of California, any other state, or the United States;

(b)     Cause the trust assets to bear all or part of any costs of treatment, equipment, or other assistance that would otherwise be paid by a government agency or benefits program; or

(c)     Pay for services, including residential care, rendered to the beneficiary by any government agency or unit.

(G)     **NO-CONTEST CLAUSE.**   Pursuant to § 21310, *et seq.*, of the California Probate Code, in the event any beneficiary under this trust shall, singly or in conjunction with any other person or persons, undertake any of the following actions then the right of that person to take any interest given him or her by this Trust Agreement shall be determined as it would have been determined had the person predeceased the survivor of us without being survived by issue:

(1)     Contests in any court the validity of this Trust Agreement and/or of the last Will of either of us;

(2)     Seeks to obtain adjudication in any proceeding in any court that this Trust Agreement, or any of its provisions, and/or that the last Will, or any provisions therein, of either of us is void, except to the extent permitted by § 21380 of the California Probate Code;

(3)     Seeks otherwise to set aside this Trust Agreement or any of its dispositive provisions;

(4)     Seeks to obtain adjudication in any proceeding in any court challenging the transfer of any property to or from this trust on the grounds that such property was not ours at the time of the transfer or at the time of our death; and/or

(5)     Files a creditor's claim against the estate of either of us or prosecutes an action against either of our estates or this trust for any claim for damages or services alleged to have been incurred during the lifetime of either of us (this subparagraph shall not apply to a creditor's claim filed by a beneficiary solely for reimbursement of administrative costs, expenses, funds advanced in the preservation of the estate of either of us or for sums advanced for the payment of the last illness and/or funeral expenses of either of us).

The Trustee is hereby authorized to defend, at the expense of the trust, any contest or other attack of any nature on this Trust Agreement or any of its provisions. A "contest" shall include any action described above in an arbitration proceeding and shall not include any action described above solely in a mediation not

preceded by a filing of a contest with a court, notwithstanding the foregoing; further, a "contest" shall not include a responsive pleading, such as an objection, response, or answer, filed by a beneficiary in defense of a characterization or transfer of property.

If California law governs the foregoing provisions of this Paragraph, then California Probate Code § 21311 shall apply and the foregoing provisions of this Paragraph may only be enforced against the following types of contests:

      (1)    a direct contest that is brought without probable cause;

      (2)    a pleading to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer; and/or,

      (3)    the filing of a creditor's claim or prosecution of an action based on it.

The terms "direct contest" and "pleading" have the same meanings as set forth in California Probate Code § 21310. All trusts created in this agreement are "protected instruments" as provided in California Probate Code § 21310(e).

    (H)    **DISTRIBUTION OF REAL PROPERTY TO CHILDREN OF TRUSTORS.**  If a real property distribution is given to a child or to children, then the transaction is to be considered exempt from property tax reassessment pursuant to Rev & T C § 63.1,  Cal Const art XIIIA, § 2(h).

23.    **DEATH OF BENEFICIARY**:  Should a named beneficiary die before a complete distribution of this Trust is made, and that Beneficiary leave no living issue, then that beneficiary's share shall go to the surviving Beneficiaries (unless otherwise directed).

**ARTICLE X**
**TRUSTEE PROVISIONS**

24.    **THIRD PARTIES**:  Any person dealing in good faith with the Trustee shall deal only with the Trustee and shall presume the Trustee has full power and authority to act on behalf of the Trust. Confirmation or approval of any beneficiary shall not be required for any transaction with the Trustee.  No Trustee of this trust shall be personally liable for contracts entered into on behalf of the trust unless the Trustee fails to reveal his or her representative capacity and identify the trust estate in the contract. Further, the Trustee shall not be personally liable for contracts or torts in connection with the administration of the trust, unless the Trustee is personally at fault.

25.    **COMPENSATION**:  Any beneficiary of this Trust serving as Trustee shall do so without compensation for his or her services, except that the Trustee shall be reimbursed for reasonable expenses incurred in the administration of the Trust. Any Trustee not a beneficiary hereunder shall be compensated at the rate customarily charged by commercial trust companies for services as a Trustee of an inter vivos trust in the State of California, unless such compensation is waived by the Trustee.

26.    **BOND AND QUALIFICATIONS**:  Bond shall not be required of the Trustee or any Successor Trustee.  The Trustee and any Successor Trustee shall not be required to qualify in any court and is hereby relieved of the requirement of filing any document and accounting in any court or for any beneficiary.

27.    **SUCCESSOR TRUSTEE(S)**:  No Successor Trustee shall be responsible for acts of any prior Trustee.  In the event a vacancy in the office of Trustee occurs and there is no Successor Trustee, the existing Trustee, if one, and the beneficiaries may agree to a non-judicial change in the Trustee by

amendment to this trust agreement.  No person shall be required to apply to any court in any jurisdiction for confirmation of said appointment.  A Successor Trustee of a trust shall succeed to all the powers, duties and discretionary authority of the original Trustee.  Any appointment of a specific bank, trust company, or corporation as Trustee is conclusively presumed to authorize the appointment or continued service of that entity's successor in interest in the event of a merger, acquisition, or reorganization, and no court proceeding is necessary to affirm the appointment or continuance of service.

28.      **REMOVAL OF SUCCESSOR TRUSTEES**:  A Successor Trustee may be removed by the last individual to serve as Trustee; however, if that person is deceased or incapacitated, the Successor Trustee may be removed by a majority vote in interest in Trust income.  Said removal must be in writing, stating the reasons for removal and indicate the Successor Trustee, which must be a corporate Trustee.

Removal of a Successor Trustee shall be permitted only for the convenient administration of the Trust and not for the purpose of influencing the exercise of the discretionary powers of a Successor Trustee as granted by this instrument.

Removal of a Successor Trustee shall be effective upon delivery of the notice of removal.  The removed Trustee shall have a reasonable period of time to transfer assets to his or her successor.  In the event the Successor Trustee believes that his or her removal is improper, he or she may, but shall not be required to, apply to a court of competent jurisdiction, at his or her expense, for a declaration of the propriety of the removal.  In that event, the removal shall be effective only upon the order of said court and after any appeal.  In the event the Successor Trustee prevails, he or she shall be entitled to reimbursement from the Trust for reasonable costs and attorney's fees associated with such action.

29.      **DELEGATION OF POWERS**:  Any management function of any Trust may be delegated by any Trustee to any Successor Trustee, even if such Successor Trustee is not then serving as Trustee.  The terms of such delegation of power shall be any conditions agreed to by the Trustees which are not detrimental to the Trust.  Provided, however, that the Trustee shall not delegate ALL of the Trustee's duties and responsibilities.

30.      **RESIGNATION OF TRUSTEE**:  Any Trustee may resign by writing filed among the trust papers effective upon the Trustees' discharge.  The resigning Trustee, or other interested party, shall provide notice to all adult income beneficiaries and other adult beneficiaries of the Trust.  The resignation shall be effective upon agreement of all parties entitled to notice, or thirty days after notice, whichever occurs first.

31:      **NONLIABILITY FOR ACTION OR INACTION BASED ON LACK OF KNOWLEDGE OF EVENTS**:  When the happening of any event, including but not limited to such events as marriage, divorce, performance of educational requirements, or death, affects the administration or distribution of the trust, a Trustee who has exercised reasonable care to ascertain the happening of the event is not liable for any action or inaction based on lack of knowledge of the event.  A corporate Trustee is not liable prior to receiving such knowledge or notice in its trust department office where the trust is being administered.

32.      **TRUSTEE AS A BENEFICIARY**:  Notwithstanding any other provision herein or of California Laws, a Trustee who is also a beneficiary of the trust may exercise powers to make:

(A)      Discretionary distributions of either principal or income to or for the benefit of the Trustee;

(B)      Discretionary allocations of receipts or expenses as between principal and income; or

(C)      Discretionary distributions of either principal or income to satisfy a legal obligation of the Trustee.

33.   **WAIVER OF ACCOUNTING**:  Except as otherwise provided herein, neither this trust, nor any Trustee, shall be required to provide an accounting to any Beneficiary or court.

## ARTICLE XI
## TRUST ADMINISTRATION

34.   **ALLOCATION TO PRINCIPAL AND INCOME**:  All expenses and all receipts of money or property paid or delivered to the Trustee may be allocated to principal or income in the sole discretion of the Trustee.  The Trustee, in a reasonable and equitable manner, shall also have the discretion to allocate, in whole or in part:

      (A)   Expenses of administration of the Trust to income or principal.

      (B)   Fees of the Trustee to income or principal.

      (C)   Any expense of Trust administration or administration of its assets which are deductible for Federal Income Tax purposes to income.

      (D)   The gains or losses from option trading, and capital gains distributions from utility shares, on mutual funds, or tax managed funds to income.

      (E)   To income or principal, distributions from qualified or non-qualified pension plans, profit sharing plans, IRA accounts or deferred compensation arrangements.

To the extent that division of any Trust is directed, the Trustee may administer any Trust physically undivided until actual division becomes necessary.  Further, the Trustee may add the assets of the Trust for any beneficiary to any other trust for such beneficiary having substantially the same provisions for the disposition of trust and principal, whether or not such trust is created by this agreement.  The Trustee may commingle the assets of several trusts for the same beneficiary, whether or not created by this agreement, and account for whole or fractional trust shares as a single estate, making the division thereof by appropriate entries in the books of the account only, and to allocate to each whole or fractional trust share its proportionate part of all receipts and expenses; provided, however, this carrying of several trusts as a single estate shall not defer the vesting of any whole or fractional share of a trust for its beneficiary at the times specified.

35.   **ALIENATION**:  Excepting the Trustor(s), no income or principal beneficiary of any Trust shall have any right or power to anticipate, pledge, assign, sell, transfer, alienate or encumber his or her interest in the Trust, in any way.  No interest in any Trust shall, in any manner, be liable for or subject to the debts, liabilities or obligations of such beneficiary or claims of any sort against such beneficiary.

36.   **TERMINATION OF TRUST**:  Should the aggregate principal of any Trust at any time be valued at Twenty Thousand Dollars ($20,000) or less, the Trustee may, in his or her sole discretion, terminate such Trust and distribute the assets of the Trust to the beneficiaries in proportion to each beneficiary's share of the Trust.

37.   **ELECTIONS**:  The Trustee and the Personal Representative of the Trustor(s)' estate will have various options in the exercise of discretionary powers, and may exercise any such discretion without incurring liability to any beneficiary, nor shall any beneficiary have the right to demand a reallocation or redistribution of Trust income or principal as a result of the proper action of the Trustee or Personal Representative, subject only to the requirement that the Trustee and the Personal Representative act in good faith and within the bounds of their fiduciary duty.  Specifically, the Trustee or Personal Representative may make certain elections for Federal Income Tax and Estate Tax purposes, which may

affect the administration of Trust income or principal, including but not limited to, in the case of a Non-Citizen spouse, making an election as a Qualified Domestic Trust pursuant to IRC 2056.

38. **BENEFICIARY DESIGNATION**: Upon written designation by the Trustor(s) of a beneficiary for a qualified plan or IRA benefits made payable to this Trust, the Trustee shall distribute the right to receive such benefits to the designated beneficiary. If no such designation of beneficiary exists, the Trustor(s) grants to the Trustee the power, on behalf of the Trustor(s), to distribute the right to receive such benefits as part of the share which is otherwise to be distributed to any beneficiary, and such person shall be Trustor(s)' designated beneficiary. It is intended that the operation of this paragraph qualify under the requirements of 401(a)(9) and 408(a)(6) IRC and it shall be interpreted in all regards in accordance with this intent.

39. **CERTIFICATE OF TRUST**: The Trustee is hereby authorized and granted all powers necessary to execute a Certificate of Trust, describing any Trust matter, including but not limited to a description of the trust terms, the administrative powers of the Trustee and the identity of any current Trustee. Any person receiving an original or photocopy of said Certificate of Trust shall be held harmless from relying on same and shall not be obligated to inquire into the terms of the Trust or maintain a copy of the Trust.

40. **REGISTRATION OF TRUST ASSETS**: Assets of the Trust during the Trustor(s)' lifetime shall be registered as follows: **JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ**, Trustee(s), or his or her successors in Trust, under **THE BUNEVACZ FAMILY REVOCABLE LIVING TRUST**, dated this _04_ day of _march_, _200_, and any amendments thereto.

41. **TAX IDENTIFICATION**: This Trust shall be identified during the Trustor(s)' lifetime by the either Trustor(s)' Social Security Number. Upon the Trustor(s)' death, the Trustee shall then apply to the IRS for a tax identification number for the Trust and any other Trust created by this Trust Agreement.

42. **SPENDTHRIFT CLAUSE**: The interest of any Beneficiary of this Trust in the income and principal shall not be subject to claims of his or her creditors, or others, or be liable to attachment, execution, or other process or law and no Beneficiary shall have the right to encumber, hypothecate, or alienate his or her interest in any of the trust in any manner except as provided herein. The interest of any beneficiary (whether entitled to current income or possessing only a future interest) in either the income or principal of the trust or any part of it shall not be alienated or in any other manner assigned or transferred by such beneficiary; and such interest shall be exempt from execution, attachment and other legal process which may be instituted by or on behalf of any creditor or assignee of such beneficiary; nor shall any part of such interest be liable for the debts or obligations (including spousal and/or child support, except as required under California law) of any such beneficiary. This paragraph is intended to impose a "Spendthrift Trust" on all interests held for any beneficiary. The rights of beneficiaries to withdraw trust property are personal and may not be exercised by a legal representative, attorney-in-fact, or others. **IT IS OUR INTENT THAT THE PRECEDING SPENDTHRIFT CLAUSE AND THE PROTECTIONS IT PROVIDES BE CONSIDERED A MATERIAL PURPOSE OF THIS TRUST AND ANY SUBSEQUENT TRUST CREATED HEREUNDER.**

43. **PERPETUITIES CLAUSE**: All Trusts created by this instrument and interest therein shall vest in their then beneficiary twenty-one years after the death of the last of the issue of the Trustor(s) who was alive when the Trustor(s) died, notwithstanding any provision of this Trust to the contrary. No provision of an instrument creating a trust, including the provisions of any further trust created, and no other disposition of property made pursuant to exercise of a power of appointment granted in or created through authority under such instrument is invalid under the rule against perpetuities, or any similar statute of common law, during the said time period.

Regardless of any other provision herein, the maximum duration for any trust created hereunder is the longest period that property may be held in trust under the applicable statutes of the state then governing

4-27

the situs of administration of the trust. If, under those rules, such maximum duration of a trust must be determined (or alternatively determined) with reference to the death of the last survivor of a group of individuals alive upon the death of the survivor of us, or at such other time that the application of such rules limiting the duration of a trust is deemed to begin, those individuals shall consist of all beneficiaries (including future and/or contingent) of this trust (as hereinafter named) alive at the death of the survivor of us. Any trust created hereunder must end immediately prior to such maximum duration and, thereupon, the Trustee shall pay over the principal, free from such trust, to the person or persons then entitled to receive the net income.

**ARTICLE XII**
**TERMS AND DEFINITIONS**

The terms below, as used throughout this Trust, shall have the following meaning:

44.    **INCAPACITATED**:  For the purposes of this Trust Agreement, if a Trustee or a beneficiary is under a legal disability, or by reason of illness, mental or physical disability is, in the written opinion of two doctors currently practicing medicine, unable to properly manage his or her affairs, he or she shall be deemed incapacitated.

45.    **REHABILITATION**:  For the purposes of this Trust Agreement, as a Trustee or a Beneficiary, shall be deemed rehabilitated when he or she is no longer under a legal disability or when, in the written opinion of two doctors currently practicing medicine, he or she is able to properly manage his or her own affairs.  Upon rehabilitation, his or her successors shall relinquish all powers and be relieved of all duties, and the rehabilitated party shall resume all duties and powers he or she had prior to incapacity.

46.    **GUARDIANSHIP**:  During any period of incapacity or incompetence, the Trustor(s) does hereby nominate as Guardian of the Trustor(s)' property the same person(s) in name and order of succession who serve as Trustee as provided herein.

47.    **SURVIVORSHIP**:  This Agreement shall be binding upon the heirs, personal representatives, successors and assigns of the parties hereto.

48.    **APPLICABLE LAW:** This Trust Agreement is intended to create a California trust and all of the terms and provisions hereof shall be interpreted according to the California Trust Code (Division 9 of the California Probate Code beginning with § 15000), except as shall be specifically modified herein. Nevertheless, the Trustee may change the situs of administration of the trust from one jurisdiction to another, thereby allowing this trust to be regulated and governed by the laws of another jurisdiction. Such action may be taken for any purpose the Trustee deems appropriate including minimization of taxes.

49.    **TRUSTEE AND TRUST**:  The term "Trustee" refers to the single, multiple and Successor Trustee, who at any time may be appointed and acting in a fiduciary capacity under the terms of this agreement. Where appropriate, the term "Trust" refers to any trust created by this agreement.

50.    **GENDER-SINGULAR AND PLURAL**:  Where appropriate, words of the masculine gender include the feminine and neuter; words of the feminine gender include the masculine and neuter; and words of the neuter gender include the masculine and feminine.  Where appropriate, words in the plural or collective sense include the singular and vice-versa.

51.    **IRC**:  The term "IRC" refers to the Internal Revenue Code and its valid regulations.

52.    **SERVE OR CONTINUE TO SERVE**: A person cannot "serve or continue to serve" in a particular capacity if they are incapacitated, deceased, have resigned, or are removed by a court of competent jurisdiction.

53.    **ISSUE**:  The term "issue," unless otherwise designated herein, shall include adopted "issue" of descendants and lineal descendants, both natural and legally adopted indefinitely.  Such terms shall specifically exclude individuals adopted out of the family of the Trustor(s) or out of the family of a descendant of the Trustor(s).  The word "living" shall include unborn persons in the period of gestation.

54.    **NOTICE**:  No person shall have notice of any event or document until receipt of written notice. Absent written notice to the contrary, all persons shall rely upon the information in their possession, no matter how old, without recertification, verification, or further inquiry.

55.    **MERGER**:  The doctrine of merger shall not apply to any interest under any Trust.

56.    **REPRESENTATION:**  In any Trust matter a beneficiary whose interest is subject to a condition (such as survivorship) shall represent the interests in the Trust of those who would take in default of said condition.  The members of a class shall represent the interest of those who may join the class in the future (e.g. living issue representing unborn issue). The legal natural guardian of a person under a legal disability shall represent the interests of the disabled person.

IN WITNESS WHEREOF, on this _04_ day of _MARCH_, _2019_, **JOSEPH A. BUNEVACZ** and **FILOMENA I. BUNEVACZ** Trustors and Trustees have signed this Instrument.

_____
**JOSEPH A. BUNEVACZ**, TRUSTOR

_____
**FILOMENA I. BUNEVACZ**, TRUSTOR

_____
**JOSEPH A. BUNEVACZ**, TRUSTEE

_____
**FILOMENA I. BUNEVACZ**, TRUSTEE

| A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT. |
| --- |

State of California
County of _Los Angeles_

On _March 4, 2019_ before me, _Angie Bobadilla_ , Notary Public, personally appeared **JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) ~~is~~/are subscribed to the within instrument and acknowledged to me that ~~he/she~~/they executed the same in ~~his/her~~/their authorized capacity(ies), and that by ~~his/her~~/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

**WITNESS my hand and official seal.**

_____
Signature of Notary Public

ANGIE BOBADILLA
Notary Public - California
Los Angeles County
Commission # 2173600
My Comm. Expires Nov 25, 2020

4-30

## THE BUNEVACZ FAMILY REVOCABLE LIVING TRUST
## ASSIGNMENT OF PERSONAL PROPERTY TO TRUSTEES

This instrument is effective _04 – March        2019_ by and between JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ (hereafter called Trustors) and JOSEPH A. BUNEVACZ and FILOMENA I. BUNEVACZ, Trustees of THE BUNEVACZ FAMILY REVOCABLE LIVING TRUST executed earlier this day (hereafter called Trustee).

The undersigned hereby declare that as Trustees of THE BUNEVACZ FAMILY REVOCABLE LIVING TRUST, that the Trustees acquire and hold in the name of THE BUNEVACZ FAMILY REVOCABLE LIVING TRUST, all items listed on the attached schedules hereto and incorporated herein as amended from time to time, including but not limited to all assets inadvertently omitted from the schedule or acquired subsequent to the execution of the trust, whether listed or hereinafter acquired, and henceforth such assets shall and will belong to said Trust and not to the Trustee individually; and the Trustors further hereby declare that, except to the extent of interest provided to the Trustors under the terms and provisions of said Trust, the Trustors have no personal interest in any of the assets, it being intended that this declaration constitutes an affirmation of trust ownership which shall be binding on the Trustors  heirs, administrators, Personal Representatives, and assigns.

Trustors assign and transfer to the Trustee all of the Trustor's right, title, and interest in and to all of the Trustor's tangible personal property, and additionally all other property listed on the attached Schedule.  The term "tangible personal property" refers, without limitation, to such items, all automobiles, club memberships, china, digital assets and/or rights (including any "social media", on-line accounts and/or email accounts), glass, clothing, jewelry, precious stones, furniture, rugs, paintings and other works of art, books, silverware, etc., and including all insurance on this tangible personal property and any proceeds of these policies.

The foregoing declaration and transfer shall apply even though "record" ownership or title, in some instances, may, presently or in the future, be registered in our respective individual name or names, in which event such record ownership shall hereafter be deemed held in trust even though such trusteeship remains undisclosed. This declaration may be terminated by us by written notice to the Trustee of the above-mentioned trust. Notwithstanding this transfer in trust, we reserve the unlimited right to the use of the aforementioned items.

TRUSTORS/TRUSTEES:

_____
JOSEPH A. BUNEVACZ

_____
FILOMENA I. BUNEVACZ

5-1

## THE BUNEVACZ FAMILY REVOCABLE LIVING TRUST

### Schedule A

This Schedule "A" should list property assets put into trust when the trust is created.  Additions to Schedule "A" are utilized for all property assets acquired after the trust is prepared.  Therefore, if you acquire a new house or different bank accounts that are property, these assets will have to be included in the trust by listing them in the Additions to Schedule "A".  Likewise, any property assets removed from the trust should be listed in the Deletions to Schedule "A".

All property now or hereafter subject to the terms hereof shall be deemed to be our community and/or quasi-community property and the proceeds thereof shall continue to retain its character as community and/or quasi-community property during our joint lifetimes (also hereinafter called the "community estate"). It is our intention that the Trustee shall have no more extensive power over the community estate than either of us would have had under California law then in effect which govern the management of community property had this Trust Agreement not been created, and this Trust Agreement shall be interpreted to achieve this intention. This limitation shall terminate on the death of either of us.

The sum of Ten Dollars ($10.00) in cash.

TOGETHER WITH:

6625 GRANADA DRIVE, PALMDALE, CA 93551

Exhibit B

Your Honor,

I would first like to address the victims of my crimes. Some of the victims were my friends in which I took advantage of and ruined their trust and loyalty. I have ruined trust that was once earned with these people and it will forever be lost. I am extremely sorry and will never forget the trail of damage I have left behind. I know that my apologies will have little to no effect to the victims and understand that the only way to even begin making amends with them (if that is even possible) is to make sure each and every one involved regains their financial loss. I know that in due time through hard work I can help compensate them for all of the harm I caused.

There is obviously no excuse for what I did.  I have learned a lot by being in prison for seven months and will continue to work on my profound flaws that allowed me to commit such terrible acts. I fully understand that I deserve a long prison sentence, which will allow me ample time to try to transform myself into a person who deserves to be a member of society again.

Along with the victims, my family has been destroyed by my lies and crimes.  They did absolutely nothing wrong. I am and will forever be sorry to them also for changing their lives for the worst.

Thank you for taking time to read this letter.


Sincerely,

David Bunevacz

Exhibit C

The Honorable Dale S. Fischer

Your Honor,

I have been married to David Joseph Bunevacz for over 22 years. We have three children two of whom he adopted, treated like his own children and one biological daughter. He is an amazing loving husband and father to my children. I believe in my heart that he gives so much love and comfort to us and the people that he loves is because he wanted to give his best as he does not know until when he will stay alive because of his heart issues. He has very serious heart issues that led his doctor insert a defibrillator

I understand that my husband is currently incarcerated, going through trial, under your custody and be soon sentenced. I know my husband is far from a perfect man and that he has done very bad and dishonest things.  What he did was painful and unacceptable to his victims.  He betrayed so many people's trust. But somehow as I speak to him and visit him for the past 7 months I have seen a lot of change already and have seen how remorseful he is for his actions and is willing to atone for the mistakes that he has done. We know that he must be punished severely, but I just pray and ask you for mercy your honor to please take consideration to spare my husband with lesser years that you think will be right for him but not really affect his heart so much, so he can live longer. My children, our family, his parents and myself we all need him in our lives.

We do not need any material things, he knew of this from the beginning he married me. He knew it was his ego and pride and his addiction to gambling that led him to do these things. The one thing good about being held under your custody is he has been forced to address the root of all the actions and wrongdoings that he had committed. I really pray that his current situation will lead him to take a step into a new beginning, a new chance to prove to himself that there is hope, there is hope for a change and bettering himself.

Sincerely,

Jessica R Bunevacz
310 █████████
█████████@yahoo.com

Honorable Dale S. Fischer
United States District Judge
350 W. 1st Street, Courtroom 7D
Los Angeles, CA 90012

Dear Judge Fischer,

My name is Breanna Bunevacz. I am 19 years old and I am the youngest daughter of David Bunevacz. My
dad and I have always been super close. We would spend time together almost everyday when I either
trained or competed for my equestrian competitions. He would wake up at 5 am just to drive and get
me coffee before my competitions. He would video every single practice and competition that I had so
we can then watch it together and laugh about my mistakes or winnings. He would always text me
before school and say, "have a great day baby" and I miss those texts more then anything right now.  He
was my best friend, my number 1 supporter, and the best dad in the whole world. All he ever cared
about was making his family happy and putting his family first.

When we heard the news about his heart, we were all torn. We didn't know the extent of it because he
didn't want us to worry but we knew that it was bad when he started to get all of these surgeries and
had to change his diet. After that, all he ever talked about was living everyday like it was your last.

I know that what my father did is wrong and that he needs to be punished, but that doesn't change how
much I love and care about him.  My dad has impacted my life in a way no one else can. No one will ever
be able to give me the amount of love he did. We all miss and love him so much. I will always look at my
dad as someone who was there for me every single day and would do anything for his family.

Sincerely,

Breanna Bunevacz

Honorable Court:

My name is Filomena I Bunevacz.  I was born, raised, and educated in the Philippines.  In 1965, I graduated in the Arellano university school of nursing. After passing the board exam, I got the degree of Registered Nurse. I worked one year in one of the hospital in Manila.  I decided to immigrate in Canada, also got accepted to work as a staff nurse in a hospital, Lennox and Addington Medical center for one year. Due to encouragement of my former classmates to join them in California I left Canada. I was accepted to work in this little hospital called El Monte Medical center.  In this place I met my hungarian husband, Joseph Bunevacz, fell in love and get married. We moved to Redondo Beach cal, bought a two bedroom house to start a family.

In the year of Dec. 20, 1968 our first american child was born, we named him David Joseph Bunevacz.  In Feb. 31 1971 our daughter, Desiree was born in Little Co. of Mary hospital, same hospital that David was born. I was employed there for two years.  Due to my hectic schedule at work, I found it difficult to give the necessary care and attention to two active children, I convinced my parents to live with us so they can help us. I relied on them completely for the care of my two children.  My son David was very energetic and playful.  My husband decided to keep them physically active by joining the sport of track and field.  My husband was an athlete also during high school and it is a tool to guide them by volunteering as a coach.  Both kids excelled very well bringing home trophy's and medals which is still on display in my house.  David's achievement in school and sports are memorable to us.  8th grade, he won the Jesse Owens track and field competition in High Jump. This is the beginning of his deep involvement in sports.  Joseph  focused on training and taking the students in different parts of the country.  My husband Joseph contributed a big portion of his time running restaurant business and coaching as a contribution to the school.  After graduating in high school, David got scholarship in UCLA.  David continued to excel in track and field bringing home more trophies medals and ribbons.  He graduated and was convinced to join the Philippines athlete representing in the Asian Games.  He met his wife who has two children, got married and became a really good father.

We have always loved our son David.  It is devastating to see what he has become.  All those years of trying to keep him in the right path of life seems useless.  As a mother it broke my heart into pieces that up to this time I could not bring myself to see him.  When he was little we held his hand to keep from falling, but now he is a grown man.  Any decision he makes will determine the path he will take.  As parents our love for him is unconditional.  David is a very good husband, father, brother, son and to many of his friend.  I know my son regrets the pain he inflected on all his victims.  We will wait for him to come home and pray he stays healthy while serving his time.

Respectfully,
Filomena I Bunevacz

Hayca Bunevacz

████████████████

Marina Del Rey, CA 90292

October 24, 2022

Honorable Dale S. Fischer
United States District Judge
350 W. 1st Street, Courtroom 7D
Los Angeles, CA 90012

Dear Honorable Dale S. Fischer:

I am writing on behalf of my father, David Bunevacz, who is currently being detained at MDC and is awaiting his sentencing. I have known my dad since I was 12 years old when my mother first introduced him. My mom was a single mother of two and he treated my brother and me as his own even before he made the decision to adopt us.

Before meeting him, I looked up to him as he was a co-host of my favorite tv shows, a sports and travel show back in the Philippines. We connected almost immediately not only because we were both athletes but also because of similar interests in sports, the love of mint chip ice cream and taste in music particularly listening to hip-hop artists like Snoop Dogg. My relationship with my dad really started when he trained me while I pursued tennis and rock climbing. We would go to the track field on the weekends and do drills and he always reminded us of how his dad used to coach him back when he was younger. He was passing on the teachings my grandpa taught him to my brother and me. In the process, he instilled hard work and perseverance. There is one moment I will never forget: it was a Sunday morning and my dad told me to run a 400m sprint, and just before the finish line, I stopped because I was exhausted and could not go on any longer. I remember how upset he got that he did not speak to me the rest of the day. Only when he explained to me why that I understood him. He said it does not matter how hard things get, just do not stop. You must reach the finish line even if meant you got to walk, but never, ever stop. Until now, I use that lesson in my life whether it be for work or my training or even in relationships. That's my dad, he taught me to never stop working until my goals are achieved.

I know my dad committed very serious crimes and did things that he shouldn't have done. He has taken responsibility for his actions and has expressed deep remorse. Knowing him, I know that he will do everything he can to try to repair the harm to his victims.  We are here for him to support him after he is released from prison.  I am a stronger person because of him and I will be by his side until the end.

I hope the court takes this letter into consideration.

Sincerely,

Hayca Bunevacz

Honorable Dale S. Fischer

United States District Judge

350 W. 1st Street, Courtroom 7D

Los Angeles, CA 90012


RE: David Bunevacz


Dear Honorable Dale S. Fischer,

My name is Kelly Parker and I currently work as a health insurance broker in California. I service clients all over California (Northern and Southern), to help assist them in determining the best benefits to offer their employees based off their location and their specific needs. I work with a wide variety of employers, ranging from 15 employees to over 1,000 employees..

You may be wondering how I know Dave. I am Dave's son's girlfriend, so I was able to get to know Dave over the past four years. In those four years, I have felt nothing less than welcome, every time I came over to their house, went to family functions, or spent time around them in general. In fact, Dave welcomed me into the family as if I was one of his own, and there is nothing more special than that. He always had a welcoming nature, and he was like that with everyone. Even if he did not know the person, he never made anyone feel like they did not belong there, and in fact, he was always inviting people to be around the family so that we can all get to know each other more.

Dave was the glue of the family, so when he was arrested, it struck the family very hard and left everyone scrambling to pick up the pieces. Admittedly, Dave did some very bad things, and he definitely made mistakes along the way.  I know that he feels a great deal of remorse over what he did and wants to try to pay the victims back.

I hope you can consider these facts when you are thinking about how to sentence Dave. We all love Dave so much and we know this situation has changed him. We have been able to talk to him during this time and he has mentioned often how sorry he is for everything.


Thank you for your time and I hope this letter has positively influenced your decision.


All the best,

Kelly Parker

# Exhibit D

## Uri M. Ben-Zur, M.D., F.A.C.C

### Interventional Cardiology / Invasive Eletrophysiology

### 18200 Ventura Blvd
### Tarzana, CA 91356

Phone (818) 986-0911 Fax (818) 986-9301

# Visit Note

**Provider: URI BENZUR, MD**
**Encounter Date: 11/16/2021**
**Patient: BUNEVACZ, DAVID   (PT00001204)**
**Sex: Male**
**DOB: Dec 20, 1968    Age: 52 Year**
**Race: Pacific Islander**
**Address: 25420 PRADO DE ORO, CALABASAS CA 913023364     Pref. Phone(H): 661-200-3616**

**Insurance:**
**Blue Sheild of California (PP)     Insurance ID: XED910619681**

**Description:** General
LL, UE venous
**Complaint/HPI:**
Mr. DAVID BUNEVACZ is an extremely pleasant 52 year old male has a relevant medical history of idiopathic dilated cardiomyopathy, severe left ventricular dysfunction with a history of congestive heart failure NYHA Class II-III, s/p dual chamber ICD implantation (10/07/21), hypertension, severe mitral regurgitation s/p mitral valve clip procedure.

The patient presents for continued cardiac care.

The patient complains of occasional bilateral leg swelling. It is mild in severity. It is noticeable at the end of the day and resolves the following morning. No associated symptoms or modifying factors noted.

On 11/15/21, patient complained of constant tingling and numbness of the right finger tips for the past 5 weeks. He states that it is worsened by raising his right arm above the level of his heart. After holding Entresto 49mg - 51mg, patient today reports 60-70% improvement in the symptoms at the right fingertips.

The patient denies chest pain, shortness of breath, palpitations, dizziness, syncope, fatigue.

The patient's blood pressure average 102/70 mmHg according to his home monitor. He does not monitor his blood sugar at home. Mr. BUNEVACZ is following an exercise program. He exercises on a Peloton bike 3-4 times per week for 45 minutes. He follows a healthy diet, 80% plant based.

Overall, Mr. BUNEVACZ states that he is stable.

**Medical History:**
**Cardiovascular:**

Idiopathic non-ischemic Cardiomyopathy.
Hyperlipidemia.
Hypertension, benign essential.
Mitral Regurgitation.
Premature Ventricular Contractions.
NST-VT.
Dual chamber ICD implantation, 10/7/21.
**SURGICAL HISTORY:**
Cardiac catheterization, non obstructive coronary arteries, no intervention 09/10/2014.
Cardiac catheterization, non obstructive coronary arteries, no intervention, 06/23/21.
Successful percutaneous mitral valve repair, with 3 MitraClip(s) deployed to the A2-P2 leaflets, with reduction of mitral regurgitation from severe to mild-to-moderate. 07/07/21.
Dual chamber ICD implantation, 10/7/21.
Left knee arthroscopy 02/2015.

Spinal fusion of L5-S1 and disc replacement between L3-L4, 06/2019.

**Current Medication:**
 **1 Potassium Cl Er 8 Meq Capsule**  PO QOD  (08/23/2021 )
 **2 Entresto 49 Mg-51 Mg Tablet 49-51**  Take 3/4 tab PO QHS, HOLD indefinitely until further reassessment of symptoms (tingling and numbness of right fingertips)  (09/20/2021 )
 **3 Lasix 20 Mg Tablet**  1 Tab PO QAM. Add 1 tab PO in the early afternoon PRN  (10/08/2021 )

**OTC:**
 **1 Magnesium 200 Mg Tablet**  1 Tab PO BID  (07/29/2021 )

**Allergy:**
**1 carvedilol,** -COREG 3.125 MG TABLET -  **Reaction:** Mild Headache, Fatigue
**2 spironolactone,** -SPIRONOLACTONE 25 MG TABLET -  **Reaction:** Mild DOSE INTOLERANCE  dizziness on 25mg PO QD
**3 ACE Inhibitors,** -LISINOPRIL 2.5 MG TABLET -  **Reaction:** Moderate Dizziness

**Social History:**
**Marital Status:** The patient is married with 3 healthy children.
**Smoking/tobacco use:**  No history of smoking.
**Alcohol:** The patient drinks alcoholic beverages. He drinks vodka socially.
**Recreational drug use:** He denies recreational drug use.
**Caffeine Intake:** He does not drink coffee, tea, soda or any other caffeinated drinks and beverages.
**Stress Level:**  High.
**Occupation:**  Self-employed.

**Family History:**
Father alive. He has hypertension and hyperlipidemia.
Mother alive. She has hypertension, diabetes mellitus, hyperlipidemia, and breast cancer.

**ROS:**
**Constitutional Symptoms:**  (-) anorexia, (-) change in appetite, (-) chills, (+) good exercise tolerance, (+) fatigue, (-) fever, (-) malaise, (-) night sweats, (-) weakness, (-) weight changes.
**Eyes:** (-) visual changes, (-) eye pain, (-) eye discharge, (-) redness, (-) itching, (-) excessive tearing, (-) double or blurred vision, (-) glaucoma, (-) cataracts.
**Head:** (-) headaches, (-) head injury or deformity, (-) visual changes, (-) eye pain, (-) double or blurred vision, (-) hearing changes, (-) tinnitus, (-) vertigo, (-) use of hearing aids, (-) frequent colds, (-) nasal allergies.
**Ears, Nose, Mouth, Throat:** (-) hearing changes, (-) tinnitus, (-) vertigo, (-) dizziness, (-) earache, (-) ear infection, (-) ear discharge, (-) use of hearing aids.
**Neck:** (-) swollen glands, (-) enlarged thyroid, (-) neck pain.
**Cardiovascular:** (-) chest pain, (-) edema, (-) high blood pressure, (-) irregular heartbeat, (-) orthopnea, (-) palpitations, (-) paroxysmal nocturnal dyspnea, (-) shortness of breath.
**Peripheral Vascular:** (-) intermittent claudication, (-) cramps, (-) varicose veins, (-) thrombophlebitis.
**Respiratory:** (-) cough, (-) hemoptysis, (-) cyanosis, (-) wheezing, (-) nocturnal choking or gasping.
**Gastrointestinal:** (-) abdominal pain, (-) heartburn, (-) constipation, (-) diarrhea, (-) nausea, (-) vomiting, (-) hematochezia, (-) melena, (-) change in bowel habits.
**Genitourinary:** (-) dysuria, (-) frequency, (-) urgency, (-) hesitancy, (-) polyuria, (-) nocturia, (-) hematuria, (-) urinary incontinence, (-) flank pain, (-) change in urinary habits.
**Musculoskeletal:** (-) muscle pain, (-) joint pain, (-) bone pain.
**Integumentary:** (-) rash, (-) lumps, (-) itching, (-) dryness, (-) acne, (-) discoloration, (-) recurrent skin infections, (-) changes in hair, nails or moles.
**Neurological:** (-) abnormal gait, (-) dizziness, (-) syncope, (+) numbness, (-) paralysis, (+) tingling, (-) tremors, (-) weakness.
**Psychiatric:** (-) anxiety, (-) depression, (-) sleep disturbance, (-) irritability, (-) mood swings, (-) suicidal thoughts or ideations.
**Endocrine:** (-) heat or cold intolerance, (-) excessive sweating, (-) excessive thirst, (-) excessive hunger, (-) excessive urination, (-) hirsutism, (-) change in ring or shoe size.
**Hematologic/Lymphatic:** (-) anemia, (-) easy bruising, (-) excessive bleeding, (-) history of blood transfusions.
**Allergic/Immunologic:** (-) difficulty breathing, (-) swelling, (-) pain, (-) rash or itch.

**Vital Signs:**
**Height:**                                 6' 3"
**BP:**                                      104/72(Left Arm)(Standing)
**Pulse:**                                   81(Left brachial)(Standing)

**Temperature:**  96.4 F
**BP:**                                      115/75(Left Arm)(Supine)
**Pulse:**                                   67(Left brachial)(Supine)
**Oxygen:**                                  96

**X-Rays & EKG:**

**ROUTINE 12 LEAD EKG WITH INTERPRETATION AND REPORT:** Date performed: Sep 20, 2021.
Indication: Shortness of breath, increased peripheral edema.
**Interpretation:**  Rate: 62 bpm; Rhythm: Normal sinus rhythm, Non-specific ST-T changes, 1st degree AV Block PR=0.22ms;
intraventricular conduction delay, atrial abnormality and QRS=0.11ms; Axis: Left axis deviation; S/P Lateral wall myocardial
infarction - age undetermined.
**Conclusion: Abnormal ECG.**

**Echocardiography:**
**2D COLOR DOPPLER ECHOCARDIOGRAPHY:** (LIMITED STUDY - 4 VIEW ECHO ONLY).
**Date:** Sep 20, 2021.

**Indication:** Evaluation of occasional shortness of breath suggestive of structural heart disease, worsening peripheral edema,
NYHA Class II-III CHF.

**Findings:**
**Left ventricle:**
-LVIDd = 7.6 cm (Men:4.2-5.9 cm/Women: 3.9-5.3cm).
-LVIDs = 6.7 cm (2.0-4.1 cm).
-IVS = 0.7 cm (0.6-1.1 cm).
-LVPWd = 0.8 cm (0.6-1.1 cm).
**Wall kinesis:** Severe left ventricular dysfunction. Inferior and lateral wall akinesis. Apical dyskinesis.
**Mitral valve:**  S/P mitral valve clips.

**Left ventricle ejection fraction:** 20-25%.

**Comments:** Severe left ventricular dysfunction. Agree with recommendation for ICD implatation for primary prevention.

**Stress Test:**
**TREADMILL STRESS TEST/W STRESS ECHOCARDIOGRAPHY**.
**Date:** Aug 29, 2021. **Indication:** Shortness of breath with moderate risk of CAD, history of cardiomyopathy, evaluate left ventricular
function, Abnormal EKG
Risk and benefits of exercise stress test including but not limited to myocardial infarction, vascular compromise and death were
explained to Mr. BUNEVACZ in detail. The patient asked appropriate questions. All questions were answered. The patient wished
to proceed and gave his informed consent.

**Protocol:** Standard Bruce protocol.

**Procedure:**
STAGE II (Min 3 to 5:50): Min: 4 . MPH: 2.5. Grade: 12%. MET: 6-7. BP: 148/80, Pulse: 112, O2 Sat: 94.
STAGE III (Min 6 to 8:50): Min: 7 . MPH: 3.4. Grade: 14%. MET 8-10. BP: 154/80, Pulse: 133, O2 Sat: 94.

**Results:**
Maximal Predicted Heart Rate: 168 bpm.
Peak heart rate achieved: 167 bpm.
Maximal heart rate achieved: 99 % of predicted heart rate.
Average O2 saturation throughout the study: 94 %.
Total Minutes: 11.
Reason for stopping: Generalized fatigue.

**Clinical response:**
Peak exercise electrocardiogram revealed occasional VPCs and occasional PAT.

**Stress echocardiography:**
Revealed an ejection fraction of 25% at rest with an adequate increase in left ventricular function in response to exercise.

**Findings:**
**Left ventricle:**
-LVIDd = 7.9 cm (Men:4.2-5.9 cm/Women: 3.9-5.3cm).
-LVIDs = 6.7 cm (2.0-4.1 cm).
-IVS = 1 cm (0.6-1.1 cm).
-LVPWd = 0.5 cm (0.6-1.1 cm).
**Wall kinesis:** Inferior and lateral wall akinesis. Severe left ventricular dysfunction pre and post EST.
**Mitral valve:**  Trace regurgitation. S/P Mitral valve clips.

**Left ventricle ejection fraction:** 25 %.

**Summary:** The patient exercised according to the BRUCE protocol for a total of 11 minutes, achieving a peak heart rate of 167
bpm, 99% of the maximum predicted heart rate. Electrocardiogram showed no significant ST-T changes. Dysrrhythmias were seen
as mentioned above.

**Symptoms at peak exercise:** The patient had no symptoms and tolerated the exercise well.
The study was abnormal.

**Conclusion:**
There is no evidence of inducible ischemia at the level of exercise achieved.
The patient had an adequate exercise capacity.

**Recommendations:**
Recommend follow exercise tolerance carefully. May need ICD for primary prevention of ventricular arrhythmias.

**Holter Monitoring:**
**Holter Monitoring 24hrs: Hookup Date: Oct 5, 2020. .**
**Indication:**  Evaluation of palpitations.
**Findings:**
Normal Sinus rhythm.
Occasional Atrial Premature Contractions.
Occasional Premature Ventricular Contractions.
1st degree AV Block PR= 0.24ms.
**Conclusions:**  Abnormal holter.

**Carotid Duplex Scan:**
**CAROTID ARTERY DUPLEX SCAN:**
**Date of Study: Jul 15, 2021.**
**Indication: Left carotid bruit, history of CHF.**

**Measurements:**
**Left:**
CCA distal peak velocity: 92 cm/sec.
CCA end diastolic velocity: 18 cm/sec.
ICA distal peak velocity: 58 cm/sec.
ICA end diastolic velocity: 28 cm/sec.
ECA distal peak velocity: 112 cm/sec.
ECA end diastolic velocity: 16 cm/sec.
Left vertebral artery showed antegrade flow.
ICA/CCA: 0.6.
**Right:**
CCA distal peak velocity: 75 cm/sec.
CCA end diastolic velocity: 15 cm/sec.
ICA distal peak velocity: 46 cm/sec.
ICA end diastolic velocity: 22 cm/sec.
ECA distal peak velocity: 64 cm/sec.
ECA end diastolic velocity: 11 cm/sec.
Right vertebral artery showed antegrade flow.
ICA/CCA: 0.6.

**Impression/Comments:**
Study within normal limits .

**Lower Extremities Doppler:**
**LOWER EXTREMITIES VENOUS DOPPLER:** Sep 27, 2021.
**Indication:** +1 Bilateral leg edema.
**Impression:** Normal venous flow with normal collapse with compression. Normal augmentation of venous flow with calf compression. No evidence of venous insufficiency with valsalva manuever or abdominal pressure. Normal lower extremities. No evidence of deep venous thrombosis or venous outflow obstruction of the lower extremities by duplex scanning.

**Renal Artery/Aorta Duplex:**
**RENAL ARTERY-AORTA DUPLEX SCAN: Jul 22, 2021.**
**Indication: Hypertension (I10).**

**Measurements:**
**Left Renal Peak Systolic Velocity:**
Proximal: 0.42 m/s [<1.0].
Mid: 0.29 m/s [<1.0].
Distal: 0.34 m/s [<1.0].
Renal/Aortic Ratio: 0.6. [<3.5].
**Right Renal Peak Systolic Velocity:**
Proximal: 0.33 m/s [<1.0].
Mid: 0.34 m/s [<1.0].

Distal: 0.61 m/s [<1.0].
Renal/Aortic Ratio: 0.9. [<3.5].

**Aorta:**
Proximal Aortic Diameter: 2.2 cm.
Mid Aortic Diameter: 1.5 cm.
Distal Aortic Diameter: 1.4 cm.
Aortic Peak Systolic Velocity: 0.70 m/s.

**Kidney:**
**Left:**
kidney length: 12.3 cm [8.5-15.0 cm].
Kidney Width: 7 cm. ( 4.5-5.0 cm].
Kidney Depth (trans): 5.1 cm. [4.5-5.0].
Cortical Thickness: 2.2 cm. [1.1 cm].
**Parenchymal Flow /Waveform:**
Upper Early Systolic Peak Present.
Mid Early Systolic Peak Present.
Lower Early Systolic Peak Present.
Resistive Index: 0.53 [<0.75] (PSV-EDV/PSV).

**Right:**
kidney length: 8.6 cm [8.5-15.0 cm].
Kidney Width: 5 cm. ( 4.5-5.0 cm].
Kidney Depth (trans): 4.8 cm. [4.5-5.0].
Cortical Thickness: 1.4 cm. [1.1 cm].
**Parenchymal Flow /Waveform:**
Upper Early Systolic Peak Present.
Mid Early Systolic Peak Present.
Lower Early Systolic Peak Present.
Resistive Index: 0.56 [<0.75]
(PSV-EDV/PSV).

**Technical impression:**
Within normal limits .

**Abdominal Aorta Duplex:**
**ABDOMINAL AORTA DUPLEX SCAN:**
**Date: Mar 4, 2013 Indication:** Indication: Atherosclerosis of the Abdominal Aorta (440.0) and cardiomyopathy.

**Aorta:**
Proximal Aortic Diameter: 1.7 cm.
Proximal Aortic Peak Systolic Velocity: 1.17 m/s.
Mid Aortic Diameter: 1.5 cm.
Mid Aortic Peak Systolic Velocity: 0.75 m/s.
Distal Aortic Diameter: 1.4 cm.
Distal Aortic Peak Systolic Velocity: 0.91 m/s.

**Technical impression:**
Within normal limits. Minimal plaque seen in abdominal aorta.

**Other :**
**Cardiac Catheterization:**
06/23/2021
ANGIOGRAPHIC FINDINGS:
1. The right coronary artery arises normally from right sinus of Valsalva. This is a major-caliber and dominant vessel. Right coronary artery is angiographically normal.
2. The left coronary artery arises normally from left sinus of Valsalva.
3. Left main is angiographically patent.
4. The LAD is a major-caliber vessel, wrapping around the apex. Except for the mild to moderate tortuosity, LAD is also angiographically normal.
5. The circumflex artery is the medium to major-caliber vessel without significant obstruction.
IMPRESSION: No angiographic evidence of obstructive coronary artery disease.
RECOMMENDATIONS: Re-evaluate options for the treatment of severe mitral regurgitation.

CARDIAC CATHETERIZATION:
09/10/14
IMPRESSION:
1. Normal coronary arteries

2. Moderate to severe mitral regurgitation
3. Moderate decrease in left ventricular function with increased cardiac size and ejection fraction estimated at 35-40%
4. Increased pulmonary capillary wedge and increased left ventricular diastolic pressure
Plan: Resume medical therapy with ACEI therapy, spironolactone and beta-blocker therapy. Referral to Dr. Laks for evaluation of mitral valve repair.

**Other:** MRI CARDIAC W/WO CONTRAST:
DATE:10/08/2020
IMPRESSION:
- Ischemic dilated cardiomyopathy with depressed LV systolic function( LVEF -29 %)
-Transmural myocardial infarction involving the mid cavity and apical portion of the anterolateral lateral left ventricular myocardium demonstrated by transmural late gadolinium enhancement.
-Moderate-severe MR ( 44% regurgitant fraction) with a posteriorly directed jet. No evidence of MVP.
-Dilated right ventricle with depressed right ventricle function. ( RVEF -28%)

SPECT
DATE: 09/15/2021
Indications: prior MI in 2019, mitral valve surgery 7/7/21; cath on 6/23/21 showed no angiographic evidence of obstructive coronary artery disease; cardiac CT on 6/8/21 showed LVEF 29% and LV EDV 282 mL; transcatheter mitral valve repair with 3 Mitraclips implanted 7/7/21; echo on 7/7/21 revealed severely dilated LV with EF of 31%.
IMPRESSION:
SPECT revealed LV EF of 35% and LV EDV of 457 mL. LV chamber shows severe enlargement. Left ventricular wall motion demonstrates severe hypokinesis in the inferior and lateral walls and moderate hypokinesis in the anterior, septal, and apical walls.

UPPER EXTREMITY VENOUS STUDY
Date: 11/16/2021
Indication: Trace bilateral upper extremity edema, S/P ICD
Impression: No evidence of DVT.

**Pacemaker/ICD/BIVD:**
QUICK CHECK. Date: 11/15/2021
Indication: History of severe cardiomyopathy, shortness of breath
Impression: Normal device function. Occasional sinus tachycardia. Normal corview.

**Diagnosis:**
| | |
|---|---|
| R60.0 | Localized edema |
| I42.9 | Cardiomyopathy, unspecified |
| I34.9 | Nonrheumatic mitral valve disorder, unspecified |
| I10 | Essential (primary) hypertension |

**Assessment:**
NYHA CLASS II-III HEART FAILURE
S/P DUAL CHAMBER ICD IMPLANTATION.
SEVERE NON-ISCHEMIC CARDIOMYOPATHY WITH SEVERELY DIMINISHED LV FUNCTION.
The patient feels well. No cardiac complaints other than numbness and tingling in the right fingertips that becomes worse when the patient raises his hand above the level of his heart which started since the ICD implantation on 10/7/21. This issue has been discussed with Dr. Ben-Zur at an in office visit on 11/15/2021. Patient states that numbness and tingling is 60-70% improved since stopping Entresto. Will continue to hold at this time. S/P successful dual chamber ICD implantation for primary prevention of ventricular tachycardia with severe cardiomyopathy, severely diminished left ventricular function and NYHA class II-III heart failure. ICD interrogation on 10/8/21 demonstrated normal device function. Cardiac catheterization performed 06/23/21 revealed no evidence of significant obstructive coronary artery disease. Cardiac MRI performed 10/08/20 revealed dilated cardiomyopathy with depressed LV systolic function, EF 29%, and transmural myocardial infarction involving the mid cavity and apical portion of the anterolateral left ventricular myocardium. EKG on 9/20/21 demonstrated Normal sinus rhythm, non-specific ST-T changes, and 1st degree AV block with a PR=0.22ms, intraventricular conduction delay and atrial abnormality. Echocardiogram on 9/20/21 (limited study) demonstrated severe left ventricular dysfunction with inferior and lateral wall akinesis, and an ejection fraction of 20-25%. Exercise stress test preformed 08/29/21 revealed low probability of obstructive coronary artery disease. Cardiac CT scan on 6/8/2021 LV EF of 29% and LV EDV of 282 mL. SPECT performed on 9/15/2021 revealed EF of 35% which is decreased from 47% on 8/6/2015. LV EDV is 457 mL. LV chamber is severely enlarged. Left ventricular wall motion demonstrates severe hypokinesis in the inferior and lateral walls and moderate hypokinesis in the anterior, septal, and apical walls. Unable to determine if mitral regurgitation is present from this type of scan. The patient has good exercise tolerance. BNP performed 09/20/21 reveals a result of 204 pg/mL. The patient has tried multiple medications in the past including beta-blockers, Spironolactone, and ACE-Inhibitors which he did not tolerate. Continue Lasix 20 mg QAM, and additional QHS prn. I advised the patient to either increase or decrease his Lasix dose prn based on his symptoms. He may take 1/2 tab or skip a dose if he is feeling fatigued and not experiencing SOB. He may take up to 60 mg if he develops SOB and/or edema. Continue Magnesium 200 mg BID, Potassium 8 mEq QOD. The patient self-discontinued Keflex after 3 days. There is no sign of infection at the surgical site. The patient was advised of the importance of cardiac risk factor modification, including optimal blood pressure, lipid profile, a healthy, plant based diet and daily aerobic exercise as tolerated. The patient was instructed to contact me or call EMS if he develops new symptoms. The office phone number and my cell number were provided.

UPPER AND LOWER EXTREMITY EDEMA
Resolved. Lower extremity venous ultrasound on 9/23/21 revealed no evidence of deep venous thrombosis or venous outflow obstruction of the lower extremities by duplex scanning. Upper extremity swelling improved after starting Lasix 20 mg bid. Patient had new complaint of b/l upper extremity paraesthesias. Decreased lasix to 20 mg qd. Venous doppler of upper extremities (axillary, brachial, subclavian) on 11/16/21 showed no evidence of DVT. The patient was advised to elevate his legs above heart level for 15-20 minutes 3-4 times per day as needed. Low salt diet advised.

HYPERTENSION.
Controlled. Mild left ventricular hypertrophy per echocardiography 9/20/21. Recommend that the patient monitor his blood pressure twice daily and provide me with the records. Target systolic blood pressure in the 110-120 mmHg range recommended. Low fat, low salt diet advised. The patient has not been following a diet plan and understands the risks.

HYPERLIPIDEMIA.
Total Cholesterol 217 mg/dL, LDL 139 mg/dL, HDL 53 mg/dL, TG 124 mg/dL per labs on 08/29/2021. Healthy diet advised.

H/O DIZZINESS.
Patient complained of dizziness (11/15/2021) that became worse upon changes in position. Patient reported worsened dizziness since the ICD was placed on 10/7/2021. Blood pressure readings within the low normal range, without orthostatic changes on physical examination. Non-obstructive disease per carotid artery Duplex scan. The patient was advised to rise slowly from a supine/seated position and remain well hydrated at all times. Safety precautions and fall prevention discussed with the patient. Discontinued Entresto and will follow closely.

H/O HEADACHE
Resolved. No red flags to suggest sub-arachnoid hemorraghic or other emergency. Advised to take Tylenol 600 mg Q6H. He is to contact me or go directly to ED if his symptom worsens or if he develops neuro/motor deficits.

H/O SEVERE MITRAL REGURGITATION S/P MITRAL VALVE CLIP.
II/VI SYSTOLIC MURMUR.
S/p successful percutaneous mitral valve repair, with 3 MitraClip(s) deployed to the A2-P2 leaflets, with reduction of mitral regurgitation from severe to mild-to-moderate with Dr. Raj Makkar on 07/07/21. Echocardiogram performed on 07/22/21 revealed mild to moderate mitral valve regurgitation. Mitra clip visualized. Will follow with serial imaging. I also recommend follow up with Dr. Makkar.

CARDIAC RISK
ASCVD: 3.7% (11/16/21)
Last PET Scan:
Last CT-A
Last LDL: 139 (8/29/21)

OTHER:
- H/O melanosis coli, severe colitis, and internal hemorrhoids per colonoscopy on 10/10/2016. His symptoms have resolved. Defer management to the patient's gastroenterologist.

The patient is to follow up with his primary care doctor for all other healthcare related issues.

**Plan:**
**Medication changes:**
Hold Entresto 49mg-51mg PO QHS indefinitely until further assessment of symptoms (numbness and tingling of right fingertips).

**Procedures ordered today:** venous doppler of upper extremities (axillary, brachial, subclavian).

**Diet:** The patient is encouraged to abstain from smoking, limit consumption of alcohol, maintain an optimal weight, engage in a regular exercise program, and follow a healthy diet with low dietary sodium.

**Exercise recommendations:** Recommend a minimum 30 minutes of exercise per day, such as walking at a brisk pace, swimming, biking, Pilates, aerobics, etc. Routine physical activity can improve overall heart health and help with weight loss. It can help with bone health to prevent risk of injury from falls, improve sleep, and lower the risk of heart disease, stroke, and high blood pressure.

**Hypertension Instructions:**
*Note that this ACC/AHA classification is based on the worst number (e.g., 168/60 mm Hg is considered Stage II even though diastolic pressure is normal).
Normal: Less than 120/80 mm Hg;
Elevated: Systolic between 120-129 *and* diastolic less than 80;
Stage I: Systolic between 130-139 *or* diastolic between 80-89; guideline-directed medical therapy should be initiated if the patient is high risk for (or has hx of) a cardiovascular event, has diabetes mellitus or chronic kidney disease.
Stage II: Systolic at least 140 *or* diastolic at least 90 mm Hg;
Hypertensive Crisis: Systolic over 180 *and/or* diastolic over 120; with patients needing prompt changes in medication if there are no other indications of signs of end-organ damage, or immediate hospitalization if there are signs of organ damage.

If the target BP is not reached within 1 month of initiating therapy, the dosage of the initial medication should be increased, or a second medication should be added.

**Internal Medicine Care:** The patient was notified that I do not practice general internal medicine. Routine examinations such as breast, prostate, and colonoscopy examinations as well as other internal medicine issues, including but not limited to, routine blood tests and routine medical examinations, shall be performed by the patient's internist.

**Follow Up:** The patient was advised to return to the office for follow up in 1 week or earlier if he has any medical problems.

**Emergency recommendations:** The patient was advised to call 911 or go to the emergency room if the patient's condition worsens or does not improve.

**Sodium consumption:** Patient educated about the effects sodium has on blood pressure and the risk of heart disease and stroke associated with excessive sodium. Provided patient with a handout providing the American Heart Association recommendations for daily sodium consumption.

Electronically signed off by BENZUR, URI, MD on 11/19/2021 at 08:51 AM.

**PROOF OF SERVICE**

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached

**OBJECTIONS TO PSR AND SENTENCING POSITION PAPER**

on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [ ] Faxing same via facsimile machine addressed as follows: |
|---|---|---|---|

[X] By e-mail as follows:

**Christopher Anderson,** USPO
22 East Temple Street
Los Angeles, CA 90012
213-894-8855
Email: Christopher_Anderson@cacp.uscourts.gov

This proof of service is executed at Los Angeles, California, on **October 31,2022**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

**Victoria Rolon**