1   E. MARTIN ESTRADA
    United States Attorney
2   SCOTT M. GARRINGER
    Assistant United States Attorney
3   Chief, Criminal Division
    ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
4   Assistant United States Attorney
    Deputy Chief, Major Frauds Section
5        1100 United States Courthouse
         312 North Spring Street
6        Los Angeles, California 90012
         Telephone: (213) 894-1259
7        Facsimile: (213) 894-0141
         E-mail:    alexander.schwab@usdoj.gov
8
    Attorneys for Plaintiff
9   UNITED STATES OF AMERICA

10                    UNITED STATES DISTRICT COURT

11                FOR THE CENTRAL DISTRICT OF CALIFORNIA

12   UNITED STATES OF AMERICA,            No. CR 22-175-DSF

13           Plaintiff,                   GOVERNMENT'S SENTENCING POSITION;
                                          DECLARATIONS; EXHIBITS
14               v.
                                          Hearing Date: November 21, 2022
15   DAVID JOSEPH BUNEVACZ,               Hearing Time: 8:30 a.m.
                                          Location:     Courtroom of the
16           Defendant.                                 Hon. Dale S. Fischer

17

18       Plaintiff United States of America, by and through its counsel

19   of record, the United States Attorney for the Central District of

20   California and Assistant United States Attorney Alexander Schwab,

21   hereby files its sentencing position.

22       This sentencing position is based upon the attached memorandum

23   of points and authorities, the attached declarations of Alexander B.

24   Schwab and Special Agent Ryan Asato, the accompanying exhibits (being

25   filed separately under seal), the Presentence Investigation Report

26   ("PSR"), the government's previously filed objections to the PSR, the

27   //

28   //

1  files and records in this case, and such further evidence and

2  argument as the Court may permit.

3   Dated: November 7, 2022          Respectfully submitted,

4                                    E. MARTIN ESTRADA
                                     United States Attorney
5
                                     SCOTT M. GARRINGER
6                                    Assistant United States Attorney
                                     Chief, Criminal Division
7

8              /s/
                                     ALEXANDER B. SCHWAB
9                                    Assistant United States Attorney

10                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1

**TABLE OF CONTENTS**

2
                                                                              **PAGE**

3   TABLE OF AUTHORITIES ...................................................ii

4   MEMORANDUM OF POINTS AND AUTHORITIES....................................1

5   I.    INTRODUCTION.....................................................1

6   II.   STATEMENT OF FACTS...............................................2

7   III.  SENTENCING GUIDELINES............................................4

8         A.   Substantial Financial Hardship to Five or More Victims....5

9   IV.   ARGUMENT.........................................................6

10        A.   While a Guideline Sentence Is Necessary To Satisfy the
               Statutory Sentencing Goals, a Low-End Sentence Is
11             Sufficient To Achieve Those Goals.........................6

12        B.   A Low-End Term of Imprisonment Is Necessary To Account
               for the Egregiousness of Defendant's Crimes and To
13             Justly Punish Him.........................................7

14        C.   The Massive Profits Defendant Reaped and His Criminal
               Behavior While on Probation Demonstrate the Need for a
15             Guideline Sentence to Afford Adequate Deterrence and
               Protect Society from Defendant...........................11
16
    V.    RESTITUTION AND VICTIMS.........................................14
17
    VI.   CONCLUSION......................................................14
18

19

20

21

22

23

24

25

26

27

28

i

**TABLE OF AUTHORITIES**

**CASES**                                                              **PAGE(S)**

United States v. George,
    949 F.3d 1181 (9th Cir. 2020) ................................. 6

United States v. Martin,
    455 F.3d 1227 (11th Cir. 2006) ............................... 12

**STATUTES**

18 U.S.C. § 3553 ....................................... 6, 10, 11

**LEGISLATIVE HISTORY**

S. Rep. No. 98-255, at 76 (1983),
reprinted in 1984 U.S.C.C.A.N. 3182............................ 12

**SENTENCING GUIDELINES**

USSG § 2B1.1 ............................................... 5

USSG § 3C1.1 ............................................... 4

USSG § 3E1.1 ............................................... 4

USSG § 5K2.0 ........................................... 7, 8, 9

**ARTICLES**

Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After
*Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005) .....................12

1        **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         For more than a decade, defendant maintained the intricate

4    illusion that he was a cannabis-industry mogul.  Exploiting his

5    victims' knowledge that decriminalization had turned cannabis into a

6    booming industry, defendant used an array of shell companies, bank

7    accounts, and forgeries to raise more than $45 million in investments

8    from victims who believed their money would be used to finance

9    successful cannabis vape pen companies.  It was a scam.

10        As he continued to gaslight his suffering victims, defendant

11   dissipated tens of millions of dollars maintaining his family's

12   quasi-celebrity lifestyle.  One victim writes how, as he and his

13   family "were struggling to figure out how we would pay for basic

14   necessities like a roof over our heads and putting food on the table"

15   as a result of defendant's crimes, he "could see on social media that

16   [defendant] was driving fancy cars, flying private planes, and

17   traveling the world with his family with not a care in the world."

18   (Exh. A, at 2).  Defendant continued to spin his lies and defraud new

19   victims even after being placed on probation for committing state

20   securities offenses.

21        For his crimes, defendant now faces sentencing for securities

22   and wire fraud.  Defendant has requested that the Court impose a

23   below-guideline sentence of 87 months' imprisonment, but, as

24   explained in further detail in this sentencing position, such a

25   sentence is insufficient to achieve the goals of sentencing.  In

26   consideration of the many both the aggravating factors in this case,

27   but also and defendant's prompt acceptance of responsibility, the

28   government requests that defendant be sentenced to the low end of his

1   guideline range as calculated by the Court, which, by the

2   government's estimate, should result in a 168-month term of

3   imprisonment, a three-year period of supervised release, restitution

4   of $35,267,851.98, and a $200 special assessment.

5   **II.   STATEMENT OF FACTS**

6       Portraying himself as someone who was "very successful in the

7   cannabis industry" and speaking "with convincing authority on the

8   changes and trends occurring around legalization" (Exh. A, at 10),

9   defendant scammed well over a hundred investors out of more than $35

10  million in a scheme that goes back to 2010.  Some of defendant's

11  victims were sophisticated investors who were snared in defendant's

12  web of convincing forgeries and false indicia of real business

13  activity.  (See, e.g., id. at 6, 8).  Others were friends and

14  acquaintances who trusted defendant implicitly and viewed his

15  conspicuous spending was proof of his business acumen.  (See, e.g.,

16  id. at 9-12).  All were taken in by defendant's lies that victims'

17  funds would be used as investments in various businesses specializing

18  in cannabis vape pen products.  (PSR ¶¶ 16-18, at 5-6).

19      To win his victims' trust, defendant maintained a complex

20  network of shell companies and bank accounts, which he controlled

21  either directly or through nominees acting at his direction.  (PSR

22  ¶¶ 22, 24 at 6, 7).  Many mimicked the names of real businesses

23  operating in the cannabis space, such as Grenco Science and

24  SaveurVape.  (Id. ¶ 23, at 6).  Using these shell companies,

25  defendant generated false invoices, purchase orders, bank statements

26  -- any document necessary to keep the scam going.  (Id. at 6-7).  One

27  investor found online information suggesting defendant had been the

28  subject of a major lawsuit; defendant placated his concerns by

1   providing him a fraudulent version of the settlement agreement in

2   that case bearing the forged signatures of G.H. and his attorney and

3   making it appear that defendant had won the lawsuit.  (PSR ¶ 21, at

4   6).  In fact, it was defendant who had agreed to pay G.H. to settle

5   the case, which arose after defendant had defrauded G.H., destroying

6   the latter's business and forcing him into bankruptcy.  (Exh. A, at

7   1-2).

8        In the midst of defendant's fraud scheme, he was charged in Los

9   Angeles Superior Court in 2012 with felony securities crimes.  (PSR

10  ¶ 75, at 15).  Nearly five years later, he was finally sentenced to

11  probation for his offenses and ordered to pay a total of $273,000 in

12  restitution to two victims.  (Id.).  Defendant was also given a

13  sentence of 360 days in jail, which was permanently stayed because

14  defendant fulfilled his restitution obligation "by securing

15  additional investments from new victims . . . . so that he would not

16  be subjected to a custodial sentence."  (Id. at 16).  During his time

17  on probation, defendant continued to defraud new investors.  He also

18  failed to abide by his probationary conditions; on May 3, 2019, for

19  example, defendant "failed to appear in court in relation to a

20  possible probation violation.  Probation was then revoked, and a

21  bench warrant was issued."  (Id. at 15).  On July 18, 2019, defendant

22  "appeared before the court and admitted to a probation violation" and

23  "[p]robation was reinstated under the same terms and conditions."

24  (Id.).  Defendant concealed his criminal prosecution and conviction

25  from investors.

26       Throughout the scheme, defendant used his victims' money to

27  finance his opulent lifestyle and that of his family.  For example,

28  defendant withdrew over $8 million at casinos, with gambling losses

of an estimated $3,755,050 at the Wynn between just January 2018 and June 2019.  (Compl. ¶ 33(a)(i), at 23-24).  He spent close to a million dollars on jewelry.  (Id. ¶ 33(b), at 24).  He used more than $1.3 million on horses and related expenses.  (Compl. ¶ 33(c), at 24).  He dropped over $200,000 on an event planner for a lavish sweet sixteen birthday party for his daughter.  (Id. ¶ 33(d), at 25).  And well over ten million dollars went to paying off various credit card bills.  (Id. ¶ 33(h), at 25).

All in all, defendant raised $45,227,266.98 from investors and caused his victims net losses of $35,267,851.98.  (Asato Decl. ¶ 13, at 5).

## III. SENTENCING GUIDELINES

The government submits that the following sentencing guidelines apply, which are consistent with the PSR's calculation except as otherwise noted in the government's previously filed objections (CR 37):

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss > $25 million | +22 | USSG § 2B1.1(b)(1)(L) |
| Substantial Financial Hardship to 5 or More Victims | +4 | USSG § 2B1.1(b)(2)(B) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(10)(C) |
| Obstruction of Justice | +2 | USSG § 3C1.1 |
| Acceptance of Responsibility | -3 | USSG § 3E1.1 |
| **TOTAL OFFENSE LEVEL:** | **34** | |

Without any departure to defendant's criminal history, his guideline range is 151 to 188 months' imprisonment.  However, if, as the government argues for in its objections to the PSR, the Court applies

1  an upward departure in defendant's criminal history to Category II,

2  the result is a guideline range of **168 to 210 months' imprisonment.**

3  **A.   Substantial Financial Hardship to Five or More Victims**

4  Defendant challenges the PSR's application of a four-level

5  adjustment to his offense level based on the offense resulting in

6  substantial financial hardship to five or more victims under USSG

7  § 2B1.1(b)(2)(B).

8  The PSR sets forth a convincing basis for applying the

9  enhancement:

10      In the present case, the government has provided
        information detailing the loss that some of the victims
11      suffered as a result of Bunevacz's actions. Specifically,
        G.H. was forced to file for bankruptcy, had no money left
12      in their savings, and lost their home; C.C. lost a majority
        of their savings and their plans of retirement were
13      deferred; I.H.[1] lost $800,000, which constituted a majority
        of their savings that they had saved over the last 10
14      years; J.H. lost $300,000 that they intended to use for
        retirement and had to change their lifestyle in hopes of
15      still being able to retire on time; A.C. lost money that
        they intended to use for retirement and is now in a
16      position where they are now planning to defer their
        retirement; and other named victims loss substantial
17      amounts of money that impacted their financial position and
        future plans.
18
   The victim impact letter of C.W. also details how his father's co-
19
   investment in defendant's scam has forced him to put off his
20
   retirement (Exh. A, at 8) -- one of the examples the Sentencing
21
   Guidelines specifically references as constituting substantial
22
   financial hardship.  USSG § 2B1.1, comment. (n.4(F)(iv)).
23
24  In any event, while the number of identified victims suffering

25  such hardship demonstrates the adjustment applies, all that is

26  necessary is a "reasonable estimate" where it is "sufficient for the

27  _____

28      [1] This appears to be a typographical error in reference to
   victim I.C.  (PSR ¶ 19, at 6).

                              5

1  government to produce evidence for enough of the [victims] to allow

2  the sentencing court reasonably to infer a pattern." United States

3  v. George, 949 F.3d 1181, 1186 (9th Cir. 2020) (internal quotation

4  marks omitted).  Given that more than a hundred victims suffered at

5  defendant's hands, see generally Exh. B, the Court has ample basis to

6  conclude, as the Probation Office did, that defendant caused

7  substantial financial hardship to at least five of his victims.

8  **IV.   ARGUMENT**

9      Defendant requests that the Court impose an 87-month sentence --

10  a substantial downward variance from 168 months, which is the low end

11  as the government calculates it.  The government continues to believe

12  that the low end of defendant's guideline range strikes the

13  appropriate balance between aggravating and mitigating factors in

14  this case.  But, as explained below in further detail, a sentence

15  below defendant's guideline range is inadequate to achieve the goals

16  of sentencing set forth in 18 U.S.C. § 3553(a).

17      **A.   While a Guideline Sentence Is Necessary To Satisfy the
           Statutory Sentencing Goals, a Low-End Sentence Is**
18           **Sufficient To Achieve Those Goals**

19      Section 3553(a) prescribes that a sentence must be "sufficient,

20  but not greater than necessary, to comply with the purposes" of

21  sentencing.  As explained above, a sentence below defendant's

22  guideline range would fail to comply with those purposes.  But given

23  the significant guideline range defendant faces, coupled with his

24  swift acceptance of responsibility, a sentence at the low end of that

25  range is appropriate.

26      Defendant was arrested on April 5, 2022, with his current

27  counsel appointed to represent him at the beginning of June.

28  Defendant entered his plea agreement on July 1.  For a case of this

1  temporal scope, complexity, and seriousness, defendant's acceptance

2  of responsibility was unusually quick, reducing the burden on the

3  Court, the government, and defendant's victims.  While the nature of

4  a defendant's acceptance of responsibility is prohibited as a basis

5  for a downward departure, USSG § 5K2.0(d)(2), it does inform where,

6  within defendant's guideline range, he should be sentenced.  That is

7  particularly the case here where even a low-end sentence involves a

8  substantial term of imprisonment.  And, as defendant correctly notes,

9  the aggravating factors of defendant's offense conduct are already

10  reflected in defendant's offense level.  (CR 38, at 10).   The Court

11  should therefore sentence defendant to the low end of his guideline

12  range.

13      In arguing for a below-guideline sentence, defendant also

14  contends that he would face the same guideline range even if the loss

15  amount in the case were substantially higher.  While the government

16  disagrees that this is a basis for a below-guideline sentence, it

17  provides yet further support for sentencing defendant at the low end

18  of his applicable range.

19      **B.    A Low-End Term of Imprisonment Is Necessary To Account for
          the Egregiousness of Defendant's Crimes and To Justly
20          Punish Him**

21      In some respects, the Sentencing Guidelines aptly quantify the

22  massive scale of the damage defendant wrought: more than $35 million

23  in losses to well over a hundred investors, with many suffering

24  serious financial hardship, like the loss of savings or delays to

25  retirement.  Yet the seriousness of defendant's offense cannot be

26  captured in mere dollars and cents.

27      Defendant, in requesting a below-guideline sentence, argues in

28  his sentencing position that the guideline range he faces resembles

7

1  one typically reserved for violent criminals.  That comparison is an

2  apt one; the wounds defendant has inflicted are every bit as real.

3  As the victim impact statements demonstrate, the sense of violation,

4  the assault on personal dignity, and the lasting trauma defendant has

5  caused are very much reminiscent of the harm typically associated

6  with violent crimes.  And, with well over a hundred victims,

7  defendant caused these harms at a scale rarely seen:

8      1.    **G.H.**   Victim G.H. describes how defendant "used his charm

9  to earn my trust and lured me into a web of lies and forged documents

10 that caused me to lose a very successful business that I had built

11 from the ground up over the course of 10 years."  (Exh. A, at 1).

12 G.H. goes on to explain how defendant's fraud "cost me my business,

13 my income, my customers, my friends, and almost, my family," and how

14 defendant's "insatiable greed" led to "foreclosure on our home,"

15 spending "our entire life savings fighting him in court," and,

16 ultimately, being "forced to file for bankruptcy.  For years

17 afterward, I struggled personally to find myself and to trust myself

18 again."  (Id. at 2).  G.H. also notes that he "got a chance to see

19 Bunevacz face-to-face a few times during our legal battle.  He had no

20 remorse for anything he caused."  (Id.).

21      2.    **G.B.**   Victim G.B. explains how defendant, in addition to

22 the direct financial losses he caused him, "totally ruined my

23 business network" and "professional credibility."  (Exh. A, at 4).

24 More importantly, he describes how defendant "dramatically ruined my

25 health, though he consciously knew I was recovering from a metastatic

26 cancer which hit me 5 years before I met him."  (Id.).  As G.B.

27 explains, defendant "told me numerous times I was a brother to him

28 and he would never forget what I was doing for him," with G.B. now

8

1  finding that he is "absolutely disgusted by [defendant] -- the worst

2  human being I've ever crossed!" (Id.).  G.B. is now facing a relapse

3  in his cancer which he worries may prove fatal.

4      3.  **S.S.**  In his letter, Victim S.S. explains how defendant's

5  "deliberate, large scale" fraud resulted in losses of $3.5 million to

6  his investment firm and another $1 million he provided personally

7  after taking out a $1 million loan based on his home's line of

8  credit.  (Exh. A, at 5).  S.S., a sophisticated investor, was taken

9  in by defendant's lies, including "purported audited financial

10  statements," "a legal opinion from their company lawyer," and

11  "purchase order details with a vape pen distributor."  (Id.).  S.S.

12  describes the "considerable stress on my marriage caused by me

13  recommending to my wife that we make this loan to David Bunevacz" and

14  the "significant reputational harm" that has limited his company's

15  ability to raise funding.  (Id. at 6-7).

16      4.  **C.W.**  Victim C.W., who invested alongside his parents and a

17  family friend, describes defendant's fraud as "highly elaborate and

18  particularly evil."  (Exh. A, at 8).  C.W. notes that defendant's

19  crime has especially harmed his father, who "came to this country

20  with $50 in his pocket," by forcing him "to push off his retirement

21  as an anesthesiologist in order to recoup the savings he lost."

22  (Id.).

23      5.  **I.C.**  Victim I.C. remarks of defendant that "[i]t still

24  shocks me whenever I recall how easily he would lie to me to convince

25  me to give him my life savings."  (Exh. A, at 9).  He notes that he

26  has "aged prematurely many years from this ordeal" and "will need to

27  work longer and harder for the rest of my life to partially repair

28  the financial ruin."  (Id.).  I.C. is "not interested in an apology"

1  because he believes defendant "is not remorseful and would continue

2  to do what he did if he was free."  (Id.).

3      6.  **W.S. & L.S.**  Victims W.S. and L.S. invested in defendant's

4  scam after meeting him through their daughters' involvement in the

5  equestrian world.  They quickly noted defendant's flashy lifestyle,

6  including "the house they rented from Kylie Jenner and [defendant's

7  wife's] 50th birthday party at Nobu.  Their ostentatious wealth -- he

8  drove a Lamborghini Urus SUV and Jessica drove a Bentley -- seemed

9  mysterious but went unquestioned."  (Exh. A, at 10).  Now that

10 defendant has revealed his true self to them, W.S. and L.S. caution

11 that he "has a deep malevolent power of persuasion that he will use

12 to try to wriggle out of any responsibility.  Once he's 'out' he will

13 return to what he knows best, stealing money from friends.  Please do

14 not fall for his manipulations."  (Exh. A, at 12).

15    To be sure, a low-end sentence in this case constitutes a

16 substantial term of imprisonment, such that a higher sentence would

17 be "greater than necessary[] to comply with the purposes" of

18 sentencing.  18 U.S.C. § 3553(a).  But neither is defendant an

19 appropriate candidate for a below-guideline sentence.  Defendant did

20 not concoct his scheme to keep a foundering business afloat or deal

21 with an unforeseen expense like a family member's medical bills.

22 Rather, he casually frittered away his victims' money propping up his

23 opulent lifestyle and that of his family, which also assisted him in

24 constructing the persona of a successful businessman whom future

25 victims could trust.  Defendant spent millions of dollars of other

26 people's money on his gambling habit, his expensive jewelry and

27 handbag purchases, and even his horses.  Even as much of the world

28 was quarantining at home amidst a global pandemic, defendant was

10

1  giving interviews describing the privileged existence he and his

2  family led with his victims' money living in their Calabasas mansion,

3  which he rented for $18,000 per month (PSR ¶ 102, at 20): "We wake up

4  late . . . . We all workout.  We are blessed to have a gym at home"

5  and "we end our day watching TV as a family, all of us will be at the

6  family room or [home] theater while eating popcorn."  (PSR ¶ 69, at

7  12-13).

8          **C.      The Massive Profits Defendant Reaped and His Criminal
                     Behavior While on Probation Demonstrate the Need for a**

9          **Guideline Sentence to Afford Adequate Deterrence and
                     Protect Society from Defendant**

10

11          The scale, length, and sophistication of defendant's scheme

12  warrant a guideline sentence to provide just punishment.  But they

13  also demonstrate the need for a sentence sufficient to protect the

14  public from defendant's further crimes and afford adequate

15  deterrence.  See 18 U.S.C. § 3553(a)(2)(B), (C).

16          As the victim impact statement of G.H. reveals, defendant has

17  been living a life of fraud for more than a decade.  His crime is no

18  aberration or series of mistakes borne of circumstances, but rather

19  an insight into his selfishness and willingness to hurt others to

20  make a buck.  The risk of recidivism is all the greater where, as

21  here, we have insight into how defendant has responded in the past

22  when made to answer for his crimes: after pleading guilty to state

23  securities offenses, defendant bamboozled the sentencing court into

24  suspending his time in jail to afford him the opportunity to make

25  restitution; defendant paid that restitution by defrauding additional

26  victims; he continued to operate his multimillion-dollar investment

27  scam while serving probation; and he even avoided punishment after

28  violating the terms of his probation.  (PSR ¶ 75, at 15-16).  Less

1  than two weeks after being sentenced in state court, defendant even

2  spent $14,215 Rolex submariner watch on March 28, 2017.  (Id.

3  ¶ 33(b), at 24).  Given this history, only a guideline sentence of

4  imprisonment will protect the public and provide the direct

5  deterrence necessary to dissuade defendant from continuing to offend.

6      More generally, defendant's scheme, which caused his victims

7  losses of more than $35 million, requires a guideline sentence to

8  deter others who might believe such a staggering sum of money would

9  be worth the chance of being caught.  Economic crimes like

10  defendant's are quintessentially deterrable so long as they are met

11  with significant term of imprisonment.  "Because economic and fraud-

12  based crimes are 'more rational, cool, and calculated than sudden

13  crimes of passion or opportunity,' these crimes are 'prime

14  candidate[s] for general deterrence.'"  United States v. Martin, 455

15  F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-

16  Collar Plea Bargaining and Sentencing After *Booker*, 47 Wm. & Mary L.

17  Rev. 721, 724 (2005)).  In fact, Congress, in drafting § 3553,

18  confirmed that this common-sense principle was one of the driving

19  forces for including deterrence among the goals of sentencing.  See

20  S. Rep. No. 98-255, at 76 (1983), reprinted in 1984 U.S.C.C.A.N.

21  3182, 3259 ("To deter others from committing the offense . . . is

22  particularly important in the area of white collar crime.").

23  Congress was, in fact, expressly concerned with the fact that

24  "[m]ajor white collar criminals often are sentenced to . . . little

25

26

27

28

12

1   or no imprisonment," which the offenders disregard as "a cost of

2   doing business."  Id.[2]

3      The sad reality is that, even with a guarantee of eventual

4   apprehension, many individuals would gladly accept the prospect of a

5   few years in prison in exchange for the life of luxury defendant and

6   his family enjoyed for the past decade.  And, of course, there is no

7   guarantee of apprehension at all, particularly in the case of complex

8   fraud schemes like this one, which involved shell companies, myriad

9   bank accounts, convincing forgeries, and the ability to plausibly

10  claim to investors that what was, in truth, a massive scam was merely

11  a business deal gone wrong.  To afford adequate deterrence, the

12  sentence in this case must account both for the profitability of

13  large-scale investment fraud schemes and the difficulty in uncovering

14  and prosecuting them.  In this case, defendant's sentencing

15  guidelines appropriately measure these interests, and a low-end

16  sentence of 168 months would take adequate consideration of the need

17  for general deterrence.

18

19

20

21  [2] Defendant argues that the Sentencing Guidelines for fraud
    offenses should be given less credence because they are not the
    product of empirical analysis of the types of sentences federal

22  judges had imposed.  This is true, but only because of Congress's
    conclusion that white-collar criminals had been systemically under-

23  sentenced vis-à-vis other offenders.  Whereas most federal fraud
    defendants received probationary sentences before the Sentencing

24  Guidelines were instituted, "the sentencing-reform movement focused
    on meting out equal sentences for equally bad crimes."  Bibas, supra,

25  at 723. Reformists specifically feared that these previously light
    sentences for fraud defendants "indulg[ed] unconscious racial and

26  class stereotypes by going easy on defendants who remind judges of
    themselves or with whom judges can identify."  Id. at 724.  Rather

27  than departing from some platonic ideal of the optimal sentence,
    Congress's directives to the Sentencing Commission to stiffen

28  penalties for white-collar crimes reflect that body's conclusion that
    fraud defendants merited tougher sentences than many had received.

**V.    RESTITUTION AND VICTIMS**

The government submits that the appropriate restitution figure in this case is **$35,267,851.98.**  Exhibit B to this sentencing position, which the government files under seal to protect the privacy interests of the victims, sets forth the individualized breakdown by victim, with the declaration of Special Agent Ryan Asato providing the basis for those calculations.

Based on information previously available to the government at the time of defendant's guilty pleas, the Probation Office calculates $35,222,932 in actual losses.  (PSR ¶ 32, at 8).  To his credit, defendant does not appear to contest this restitution figure, which provides an additional basis for sentencing him at the low end of his applicable guideline range.

Exhibit A to this sentencing position, which the government is filing separately under seal, comprises the victim impact letters it has received to date.  To the extent additional victims submit letters, the government will file those with the Court as well.  At least one victim has indicated a desire to address the Court in person at the time of sentencing.

**VI.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court reject defendant's request for a downward variance and sentence him to the low end of his guideline range (which the government currently believes to be 168 months' imprisonment), a three-year period of supervised release, restitution of $35,267,851.98, and a $200 special assessment.  Should the Court determine at sentencing that a different guideline range applies, the government will modify its recommendation accordingly.

14